**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**SCOTTY E. BOOTHE**,

        **Petitioner,**

**v.**                               **Case No.: 2:14-cv-25165**

**DAVID BALLARD, Warden,
Mount Olive Correctional Complex**

        **Respondent.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

Pending before the Court are Petitioner's *pro se* Petition for a Writ of Habeas

Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 2), Petitioner's Motion for an

Evidentiary Hearing and Appointment of Counsel, (ECF No. 15), and Respondent's

Motion for Summary Judgment, (ECF No. 10). This case is assigned to the Honorable

Thomas E. Johnston, United States District Judge, and by standing order is referred to

the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). As a

preliminary matter, the undersigned notes that the record before the Court is well-

developed and provides a sufficient basis upon which to resolve this case without need

for an evidentiary hearing. *See* Rule 8, Rules Governing Section 2254 Cases.

After thorough consideration of the record, the undersigned conclusively **FINDS**

that (1) there are no *material* factual issues in dispute and (2) Petitioner is not entitled

to the relief requested. Therefore, for the reasons that follow, the undersigned respectfully **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment; **DENY** Petitioner's Petition for a Writ of Habeas Corpus; and **DISMISS** this case from the docket of the Court. Furthermore, the undersigned **DENIES** Petitioner's Motion for an Evidentiary Hearing and Appointment of Counsel.

I.   **Relevant Facts and Procedural History**

   **A. Indictment, Trial, and Direct Appeal**

On September 9, 2008, Petitioner Scotty E. Boothe ("Petitioner") was indicted by a Fayette County, West Virginia grand jury on two counts of sexual assault in the first degree and two counts of sexual abuse in the first degree. (ECF No. 10-1 at 2-3). The indictment alleged that Petitioner committed first-degree sexual assault by penetrating the anus of the victim, D.B.,[1] with his penis (Count 1) and with the handle of a knife (Count 2). (*Id.* at 2). In addition, Petitioner was accused of sexually abusing D.B. by touching D.B.'s penis with his hand (Count 3) and by placing D.B.'s hand on Petitioner's penis (Count 4). (*Id.* at 3). The abuse was alleged to have occurred between January 2007 and September 2007, when D.B. was five years old and Petitioner was thirty-two years old. (*Id.* at 2-3; ECF No. 10-2 at 212).

Petitioner's trial began on October 20, 2009, where he was represented by Gina Tennen, an attorney from the LibertyBell Law Group based in California; and Lavoyd Morgan, an attorney licensed to practice in West Virginia. (ECF No. 10-1 at 173; ECF No. 10-2 at 2, 25). After jury selection and initial jury instructions, during which the trial judge informed the jury that he did not favor either side and stood "completely neutral, impartial[,] and indifferent" throughout the trial, the parties presented their opening

---

[1] The undersigned uses the victim's initials to protect his identity.

statements to the jury. (ECF No. 10-2 at 118-19). During the defense's opening statement, Mr. Morgan told the jury that they would hear testimony from a licensed clinical social worker who evaluated D.B. and found that he exhibited no signs of trauma. (*Id.* at 138). Mr. Morgan also apprised the jury that he would elicit testimony from a board certified forensic psychiatrist who, after examining Petitioner, opined that Petitioner did not exhibit "any characteristics of a pedophile." (*Id.* at 139). Mr. Morgan stressed that the absence of physical and psychological evidence of abuse, along with the inconsistencies in the victim's statements given to law enforcement, would prevent the State from proving each element of the charged crimes beyond a reasonable doubt. (*Id.* at 138-40).

As its first witness, the State called Robbie McGee, D.B.'s foster father. (*Id.* at 142). Mr. McGee testified that D.B. was placed in his and his wife's home in May 2008 for approximately one month. (*Id.* at 142-43). Mr. McGee recalled that sometime while D.B. was residing at the home, an incident took place where he discovered D.B. standing behind and on top of his younger brother while making a "humping motion." (*Id.* at 143-44). Mr. McGee remembered taking D.B. to D.B.'s bedroom to talk to him about the incident, where D.B. appeared scared and began rocking back and forth in the "fetal position." (*Id.* at 144). D.B. revealed to Mr. McGee that he had been "hurt" by a man at "ma-ma's house." (*Id.*) D.B. went on to state that a man "played with his weenie" and forced D.B. to "play with the man's weenie." (*Id.*) D.B. also described the man having a knife and "playing in the back of" D.B. (*Id.* at 144-45). He indicated to Mr. McGee that he tried to fight back against the man, but his efforts proved futile. (*Id.* at 145). Mr. McGee asked D.B. who "hurt" him, and D.B. responded "Scotty Boothe." (*Id.*) Mr. McGee then decided to get his wife, so that they both could talk to D.B. and ensure the

3

accuracy of their report to an "abuse hotline." (*Id.* at 145-46). Mr. McGee noticed that D.B. went from crying and upset to "kind of calmed down" after he told them about the abuse. (*Id.* at 145). At some point during D.B.'s conversation with Mr. McGee and his wife, Mr. McGee asked D.B. whether he had told his parents about the abuse, and D.B. said that he had not because "Scotty" would kill them. (*Id.* at 145-46). After talking with D.B., Mr. McGee's wife called the "abuse hotline," to relay D.B.'s report. (*Id.* at 146-47). When asked on cross-examination whether he yelled at or got upset with D.B. when he observed D.B. making the humping motion, Mr. McGee stated that he did not. (*Id.* at 150-51). Mr. McGee asserted that D.B. appeared confused as to why Mr. McGee stopped him from performing the act on his younger brother and did not know that it was wrong. (*Id.* at 152).

The State next called D.B., who was eight years old at the time of the trial. (*Id.* at 154-55). He testified that he remembered something bad happening to him at his uncle's clubhouse, which was located on the property of his grandmother, Lenora Harless. (*Id.* at 159). When asked who did something bad to him there, D.B. replied "Scotty Boothe." (*Id.*) D.B. then identified Petitioner in the courtroom. (*Id.* at 159-60). D.B. recalled sitting in a chair at Ms. Harless's house while his younger brother and Ms. Harless were asleep, and his mother was at the store. (*Id.* at 160-61). He remembered Petitioner picking him up from the chair and carrying him to the clubhouse where Petitioner "humped" him. (*Id.* at 161). When asked what "humped" meant, D.B. stated "[s]tuck it to me in my butt." (*Id.*) D.B. elaborated that he and Petitioner both had no clothes on, and Petitioner stuck his "wiener" in D.B.'s "butt." (*Id.* at 162-63). D.B. stated that it did not feel "right." (*Id.* at 163). According to D.B., Petitioner then "stuck" both the handle and "the sharp part" of a pocket knife in D.B.'s "butt hole." (*Id.* at 163-64). D.B. recounted

seeing Petitioner retrieve the pocket knife from Petitioner's pants and remembered that the knife was "real dark brown." (*Id.* at 163). In addition, D.B. asserted that Petitioner touched D.B.'s "wiener" with his hand and that D.B. touched Petitioner's "wiener" with his hand. (*Id.* at 164). D.B. remembered seeing "white stuff" on Petitioner's "wiener" after he touched Petitioner. (*Id.* at 164-65). D.B. testified that he did not want Petitioner to touch him and that he tried to get away from Petitioner during the incident. (*Id.* at 166). Eventually, Petitioner took D.B. back to Ms. Harless's house, but not before telling D.B. that he would kill D.B.'s mother and father if he told them what happened. (*Id.* at 166-67). D.B. remembered subsequently telling his foster parents about the abuse after he "humped" his brother. (*Id.* at 168). D.B. also remembered later identifying Petitioner in a photographic lineup. (*Id.* at 168-69).

On cross-examination, D.B. recalled speaking about the abuse with a number of different persons before trial. (*Id.* at 170). Ms. Tennen asked whether D.B. remembered telling a woman named Toni Householder that the knife Petitioner placed "all of the way up [his] butt" was a butcher knife, and D.B. replied that he did not. (*Id.* at 170, 172-74). D.B. also did not recall initially telling Ms. Householder that the abuse occurred in a bedroom, but did remember that he informed Ms. Householder that the abuse occurred in the attic of "Uncle Paul's clubhouse" and that Petitioner had abused him twenty times. (*Id.* at 175-77). Ms. Tennen also inquired of D.B. whether he remembered telling Ms. Householder on May 21, 2008 that the last time the abuse occurred was one week before the May 2008 interview, and D.B. stated that he did not. (*Id.* at 176). With regard to the physical description of his abuser, D.B. did not recall telling Ms. Householder that the person who abused him was an "old man." (*Id.* at 178). He did remember telling Detective Glen Chapman, an officer with the Fayette County Sheriff's Office, that during

5

the photographic line up, he was "only kind of sure" that the man who abused him looked like Petitioner since the man that abused him had a mustache. (*Id.* at 179). After defense counsel made that point, the trial court took a thirteen-minute recess. (*Id.* at 179-80). When the trial resumed and Ms. Tennen asked the court reporter to read back her last question before the recess, the trial court allowed the court reporter to do so, but stated that such a practice was not common in the local courts and added "[w]e don't have that much time here." (*Id.* at 181).

On resumption of cross-examination, D.B. admitted that he told Detective Chapman at some point that he had previously seen the person who abused him only once before and that he had seen Petitioner more than one time at Ms. Harless's home. (*Id.*) Ms. Tennen then asked D.B. about speaking with a person named "Angela," and after D.B. recalled speaking with "Angela," Ms. Tennen stated that she was referring to Angela Gwinn, "for the record."[2] (*Id.* at 182). The trial court interrupted and stated "[m]a'am, I don't know, the State doesn't object, but you're getting a lot of your own testimony in about who people are and things, so . . . . I know what you're doing, but you are, in effect, testifying. And I don't know why the State hasn't objected, but Angela is Angela." (*Id.*) After the court's interjection, D.B. testified that he remembered telling "Angela" and Detective Chapman that he was standing "straight up" when Petitioner "humped" him and that Petitioner "humped" him at the same time as sodomizing him with the knife. (*Id.* at 183). D.B. agreed with Ms. Tennen that he was able to see Petitioner place the knife "inside of [his] butt." (*Id.* at 186). D.B. also agreed with Ms. Tennen that the abuse hurt "very badly," however, he did not scream or cry and he was not "bleeding all over the place." (*Id.* at 183-84). D.B. further testified that he was cut

---

[2] Angela Gwinn was a West Virginia Child Protective Services intake worker. (ECF No. 10-5 at 213).

"inside" his "butt" from the knife, but did not have any problems walking or going to the bathroom afterward, and he never had any surgical operation performed on his "butt." (*Id.* at 184-85).

When Ms. Tennen attempted to impeach D.B. with his prior statement to Ms. Householder that the abuse occurred during the daytime, rather than at night like he told Detective Chapman on one occasion, the State objected in the middle of Ms. Tennen's question, presumably because the State believed that Ms. Tennen was reading statements from prior police reports rather than asking questions of the witness. (*Id.* at 186-87). The trial court sustained the State's objection and admonished Ms. Tennen, "that's not the proper way to do that here. . . . I have never seen anybody try to do this the way you do it, ma'am, but there is a way to do it . . . ." (*Id.* at 187-88). Ms. Tennen continued her cross-examination and was able to elicit testimony from D.B. that he told Detective Chapman that the abuse occurred downstairs in the clubhouse, and not in the attic of the clubhouse as he had told Ms. Householder. (*Id.* at 188). D.B. also remembered informing Angela McCray, a forensic interviewer, that the abuse only occurred once and that the knife used by the Petitioner was a pocket knife, but affirmed that he had told Ms. Householder that the knife was a "cutting knife." (*Id.* at 190-91; ECF No. 10-5 at 225). When Ms. Tennen again asked D.B. whether he told Ms. Householder that the knife used by Petitioner was a butcher knife, D.B. stated he did not remember. (ECF No. 10-2 at 191). In response, Ms. Tennen stated "page 20 of [Ms. Householder's] statement reads 'butcher knife,' Your Honor, for the record." (*Id.*) The trial court replied, "[t]hat amounts to you testifying, ma'am. That's not the way you impeach a witness. You don't – please don't do that anymore. . . . I know what you're doing and I'm not arguing with you . . . . Listen. This is the way we do it here, and that's

improper impeachment by you just reading an answer that's different than the one the witness may give you." (*Id.* at 191-92). The following colloquy immediately ensued:

> [Ms. Tennen]: And you [D.B.] also told Angela [McCray] that the knife was a pocket knife that was cherry wood. Do you remember that?
>
> [D.B.]: Yes, but I don't understand cherry wood.
>
> [Ms. Tennen]: So I may not refer to the record, Your Honor, his prior statement.
>
> [The Court]: That isn't record, what you have, that is a statement, ma'am.
>
> [Ms. Tennen]: May I refer to his prior statement?
>
> [The Court]: I don't know how they call it in California, but it is not record, it is a statement that —
>
> [Ms. Tennen]: May I refer to his prior statement then?
>
> [The Court]: It is a statement that he gave and you may if you do it in the proper way if you want to impeach him.

(*Id.* at 192-93). Ms. Tennen continued her cross-examination of D.B. and asked him whether he had told "Angie" that his younger brother was "half asleep" in the same room as him when Petitioner picked him up.[3] (*Id.* at 193). D.B. testified that he did remember telling her that, and he did not recall telling Angela Gwinn and Detective Chapman that his younger brother was playing and watching television when Petitioner picked him up. (*Id.*)

After eliciting testimony concerning D.B.'s younger brother's ability to witness D.B.'s interactions with his abuser before the abuse occurred, Ms. Tennen approached D.B. with a photograph of a possible alternate perpetrator of the abuse, Doug Mullins. (*Id.* at 194). When Ms. Tennen showed the photograph to D.B. and asked him if he knew

---

[3] Ms. Tennen was apparently referencing Angela McCray's interview with D.B. (ECF No. 10-5 at 233).

who it depicted, the trial court interrupted, "[f]irst of all, do you know what that is? It's a photograph." (*Id.* at 196). As Ms. Tennen began to resume questioning, the trial court again interjected, "[w]ait, I'm going to show you. . . . You ask, 'this is Defendant's Exhibit No. 1 for identification. Can you tell me what this is?' Can you [D.B.]?" (*Id.* at 196-97). After the trial court schooled Ms. Tennen in front of the jury on how to lay a foundation for the admission of evidence, D.B. confirmed that it was a photograph and testified that he was unable to identify the person in the photograph.[4] (*Id.* at 197). Ms. Tennen then returned to the subject of where the abuse occurred, and D.B. described the floor of the clubhouse's attic as both "wood" and "concrete," and the ceiling as "short." (*Id.* at 197-98).

Changing subjects, Ms. Tennen attempted to impeach D.B. with his prior statement to Ms. Householder that he had heard Petitioner tell Ms. Harless that Petitioner abused other children. (*Id.* at 198). Again, the trial court interrupted Ms. Tennen and another lengthy admonition concerning Ms. Tennen's methods of impeachment was expressed by the trial court in front of the jury.[5] (*Id.* at 199-201). Shortly thereafter, Ms. Tennen concluded her cross-examination of D.B., and the State chose not to conduct any redirect examination. (*Id.* at 202). In discussing whether D.B. was excused as a witness, and *after* Ms. Tennen had already told the court that she would like D.B. to be "[s]ubject to recall," the judge informed Ms. Tennen of the "local statewide practice" and asked whether she needed to "consult with counsel" before making a decision. (*Id.*)

---

[4] The photograph of Mr. Mullins was admitted into evidence before closing argument. (ECF No. 10-3 at 46).

[5] In all, the Supreme Court of Appeals of West Virginia counted that the trial court interrupted or commented on Ms. Tennen's cross-examination of D.B. sixty-seven times. (ECF No. 10-1 at 173).

The State's final witness was Detective Chapman. (*Id.* at 203). He testified that he was employed by the Fayette County Sheriff's Office for the previous five years and that he had attained the rank of Corporal. (*Id.* at 204). Detective Chapman stated that he had approximately 100 hours of training in investigating sexual abuse and sexual assault cases, and that he had investigated approximately sixteen sexual assault or abuse cases involving children. (*Id.* at 204-05). Detective Chapman recalled that his presence at an interview with D.B. was requested by the "Child Advocacy Center" on May 21, 2008. (*Id.* at 206). During the interview, Detective Chapman learned from D.B. that Petitioner had taken D.B. from Ms. Harless's living room to "Uncle Paul's clubhouse," where both D.B. and Petitioner removed their clothes, and Petitioner put his penis as well as a knife inside of D.B.'s rectum. (*Id.* at 206-07). D.B. also stated during the interview that Petitioner had touched D.B.'s penis in a "back and forth motion" and made D.B. perform the same act on Petitioner's penis. (*Id.* at 207). Detective Chapman recalled D.B. describing "wet stuff" coming out of Petitioner's penis. (*Id.*) Detective Chapman also testified about the photographic lineup that he presented to D.B. and recalled that D.B. identified Petitioner in response to the detective's question of who had abused him. (*Id.* at 208-09). In addition, Detective Chapman stated that he searched the clubhouse on Ms. Harless's property and did not find any physical evidence of the abuse in the clubhouse. (*Id.* at 209-10). However, Detective Chapman did not expect to find any physical evidence related to D.B.'s allegations given the lapse of time between when the alleged events occurred and when D.B. reported them in May 2008. (*Id.* at 210). With respect to how Detective Chapman arrived at his estimate of when the abuse occurred, he stated that he arrived at the range of January 2007 to September 2007 based on D.B. entering foster care in a different geographic area beginning in August 2007 and D.B.'s

description of the weather at the time of the incident. (*Id.* at 210-11).

On cross-examination, Detective Chapman conceded that he did not attempt to collect any blood or semen samples from the clubhouse, and that he did not find a knife or blood or semen stains in the three locations that he searched: the "upstairs" of Ms. Harless's home, the bedroom in Ms. Harless's home, and the attic of clubhouse. (*Id.* at 213, 223). With regard to the clubhouse's attic, Detective Chapman clarified that he was unable to stand up straight in the attic given the low height of the ceiling and that he did not climb into the attic, but rather stood at the top of the steps and looked into the attic. (*Id.* at 224). Detective Chapman further acknowledged that, other than Petitioner's photograph, the photographs used during the photographic lineup were of people that D.B. had never seen before and that he selected the photographs at random rather than researching whether any registered sex offenders lived in the area of Ms. Harless's home and including their photographs. (*Id.* at 215-16). When asked about other investigations into sexual abuse at Ms. Harless's home, Detective Chapman explained that he discovered during his investigation that D.B.'s sister, H.C.,[6] who was 12 or 13 years old by the time of trial, had informed Detective Chapman that a man named Doug Mullins had made sexual comments toward her and "pinched her butt." (*Id.* at 218-19). Detective Chapman admitted that he did not include a photograph of Mr. Mullins in the photographic lineup that he presented to D.B. (*Id.* at 220).

In addition, Detective Chapman acknowledged that he spoke with Ms. Harless during his investigation and that Ms. Harless told him that she was unaware of any opportunity that Petitioner would have had to be alone with D.B. (*Id.* at 222). Finally, Detective Chapman stated that D.B. had been examined for physical and psychological

---

[6] The undersigned uses H.C.'s initials to protect her identity.

signs of abuse. (*Id.* at 224-25). With regard to any physical abuse indicia, Detective Chapman testified that personnel at Women's and Children's Hospital in Charleston, West Virginia, had examined D.B. and found no medical evidence indicative of trauma to D.B.'s genitals or anus. (*Id.* at 225). With regard to psychological evidence of abuse, Detective Chapman testified that D.B. had been evaluated by a social worker, Saundra Culp, who concluded that D.B. did not exhibit any symptoms of trauma. (*Id.*)

On redirect examination, Detective Chapman asserted that he did not investigate any person other than Petitioner and did not include additional photographs in the lineup because D.B. was positive about the person who abused him. (*Id.* at 227). Detective Chapman added that he did not research whether any other registered sex offenders lived in the area of Ms. Harless's home for the same reason. (*Id.* at 228). Furthermore, D.B. never told Detective Chapman that Mr. Mullins was his abuser. (*Id.*) On re-cross examination, defense counsel emphasized D.B.'s statement to Detective Chapman that D.B. was "only kind of sure" that the man he identified during the photographic lineup was the man who abused him, since the man who abused him had a mustache. (*Id.* at 229). At the conclusion of Detective Chapman's testimony, the State rested.

Before the defense called its first witness, outside of the presence of the jury, the State requested that the court instruct defense counsel to inform it who the defense intended to call during its case in chief. (ECF No. 10-3 at 4). Upon receiving an updated defense witness list, the State took issue with some of the defense's planned witnesses. (*Id.* at 5-6). First, the State contested defense counsel's intention to call Ms. Culp as a witness. (*Id.* at 6). Without any argument, Mr. Morgan stated that the defense would "probably not" have Ms. Culp testify. (*Id.*) Next, the State opposed the calling of Dr.

12

Bobby Miller. (*Id.*) The State asserted that it never received an expert witness report from Dr. Miller, but the State presumed that Dr. Miller would testify that Petitioner did not fit the profile of a pedophile, which the State argued would be improper under West Virginia law as such an opinion would invade the province of the jury. (*Id.* at 7). The trial court was troubled by defense counsel's failure to provide an expert report detailing Dr. Miller's opinions and worried that the court would have to stop the trial to allow the State to review any report created by Dr. Miller. (*Id.* at 9-10). In response, Mr. Morgan stated that he was not sure whether the defense was going to call Dr. Miller. (*Id.* at 11). The trial court retorted, "I'm not sure you're going to get to [call Dr. Miller as a witness]. There you go." (*Id.*)

The defense's first witness was Nathan Glanden, a private investigator and former law enforcement officer. (*Id.* at 15-16). Mr. Glanden testified that he visited the clubhouse on Ms. Harless's property on October 19, 2009, and observed that the door leading into the clubhouse could be locked from the outside using a padlock, but not from the inside. (*Id.* at 19, 26, 29). Upon entering the clubhouse, Mr. Glanden measured the opening at the top of the ladder that led into the attic of the clubhouse, which he determined to be twenty-eight inches wide and twenty-two inches deep. (*Id.* at 21). The height of the attic's ceiling at its highest point was determined to be fifty-eight inches while the height of the sides of the attic's ceiling were thirty-three inches. (*Id.*) Mr. Glanden also testified that he had researched whether any registered sexual offenders were in close geographic proximity to Ms. Harless's home using the West Virginia State Police's database and found that there were six registered sex offenders living within a five-mile radius of the home. (*Id.* at 26-27). On cross-examination, Mr. Glanden stated that he did not take any measurements of the downstairs area of the clubhouse, but did

13

take pictures of it. (*Id.* at 29). Mr. Glanden recalled that the downstairs of the clubhouse was larger than the attic. (*Id.*)

The defense's second and final witness was Dr. Gail Swarm, a board certified doctor in family medicine who treated Petitioner for chronic low back pain caused by an injury while working in coal mines. (*Id.* at 34-37). Dr. Swarm asserted that Petitioner had back surgery, which caused him to suffer from post-laminectomy syndrome. (*Id.* at 37-38). According to Dr. Swarm, post-laminectomy syndrome occurs after back surgery due to the development of scar tissue, which can impinge on the nerves in the back and cause pain. (*Id.* at 38). As a result of Petitioner's post-laminectomy syndrome, Dr. Swarm explained that Petitioner was unable to bend, crouch, climb, or stoop down in small places. (*Id.*) Dr. Swarm opined that Petitioner's condition would have prevented him from continuing to work in the coal mines as the ceiling height in coal mines is "not very high," and that his past work as a miner would have required Petitioner to stand in a low position for a prolonged period of time, which his back injury prevented him from doing. (*Id.* at 39).

Before final jury instructions and closing arguments, defense counsel requested that the court provide the jury with an alibi instruction. (*Id.* at 51-52). Mr. Morgan stated that he had filed a notice of alibi for the time that D.B. was in foster care given that D.B. stated in a prior interview that he was abused by Petitioner in May 2008 while he was in foster care. (*Id.* at 51). The court denied the defense's request for an alibi instruction on the ground that Petitioner had failed to present any evidence supporting an alibi. (*Id.* at 51-52).

While reading the final jury instructions, the court reminded the jury that the court remained "completely neutral and impartial throughout the entire trial" and that

any statements or conduct by the court throughout the trial should not be considered by the jury as evidence indicating the court's opinion as to "the credibility of any witness, the weight of any evidence, [or] the guilt or the innocence of the defendant." (*Id.* at 63-64). The court also stressed to the jury on at least two separate occasions that the burden of proof rested on the State, and at least five separate times, the court declared that the State had to prove beyond a reasonable doubt that Petitioner was the person who committed the acts described by D.B. (*Id.* at 70-71, 73-74, 76, 78, 80-82). The parties subsequently offered closing arguments, and the jury retired to deliberate.

After deliberating for approximately eighty minutes, the jury sent a note to the court that it had a question about the evidence. (*Id.* at 115-16). The jury was brought before the court, and the foreperson asked the court whether any evidence was presented as to how often Petitioner was at Ms. Harless's home, and if so, what evidence was adduced on that issue. (*Id.* at 117). The court informed the jury that it could not answer the question and that the jury would have to rely on its recollection of the evidence presented. (*Id.*) Less than twenty minutes later, the jury found Petitioner guilty on Counts 1, 3, and 4, and not guilty on Count 2. (*Id.* at 118-20).

Petitioner's sentencing hearing took place on December 4, 2009.[7] (ECF No. 10-4 at 29). Four witnesses testified on Petitioner's behalf, including his mother, an ex-girlfriend with whom he shared a child, his pastor, and Dr. Miller. (*Id.* at 36-37, 70, 72-73, 82). Dr. Miller testified that he was board certified in general psychiatry, neuropsychiatry, and practice psychiatry, and that his practice in forensic psychiatry

---

[7] Prior to his sentencing hearing, Petitioner filed a motion for a post-verdict judgment of acquittal and a motion for a new trial. (ECF No. 10-1 at 10; ECF No. 10-4 at 3-4). Petitioner's counsel argued that no reasonable jury could have convicted Petitioner on the sole basis of D.B.'s uncorroborated and incredible testimony. (ECF No. 10-4 at 4). Additionally, Petitioner's counsel argued that the trial court erred in refusing to present an alibi instruction to the jury. (ECF No. 10-1 at 10). The court denied the motions on November 19, 2009. (ECF No. 10-1 at 12; ECF No. 10-4 at 2, 15).

occupied a majority of his professional time. (*Id.* at 37-38). As relevant to Petitioner's current claims, Dr. Miller stated that he had interviewed Petitioner twice before his testimony, once in October 2009 prior to trial and again in November 2009 prior to sentencing. (*Id.* at 41). At the interviews, Dr. Miller administered a total of thirteen tests to Petitioner, including psychiatric disorder tests, sexual deviance tests, and an IQ test. (*Id.* at 42-43). Dr. Miller provided the court with a report detailing Petitioner's test results and his opinions. (*Id.* at 41-42). He concluded based on the test results that Petitioner did not fit the profile of a sexual offender and that he was a "low risk" to commit a sexual offense. (*Id.* at 44, 46). Dr. Miller added that Petitioner did not meet the Diagnostic and Statistical Manual of Mental Disorders criteria for a pedophile and that Petitioner did not display any deviant sexual interest in, or arousal toward, children throughout testing. (*Id.* at 46, 49). With regard to the accuracy of Dr. Miller's opinions, he stated that he had administered the same battery of tests approximately 130 times over a period of five years, and that the margin of error for the process as a whole was at least five percent. (*Id.* at 45, 62). In relation to treatment for Petitioner, Dr. Miller opined that Petitioner was suitable for treatment, e.g. individual therapy, in the areas of interpersonal skills and victim empathy. (*Id.* at 47-48). Dr. Miller asserted that treatment was still effective even for those who deny "what they did," and that denial was prominent in sexual offenders. (*Id.*)

During the trial court's questioning of Dr. Miller, the court inquired if it was significant that Petitioner had told a probation officer during an interview that he had only visited Ms. Harless's home once, but informed Dr. Miller during the first interview that he had been to Ms. Harless's home a few times, and then told Dr. Miller during the second interview that he had been to Ms. Harless's home only twice. (*Id.* at 60). Dr.

Miller responded that the inconsistency in Petitioner's statements merely signaled to him that Petitioner was trying to "minimize contact with the child." (*Id.* at 60-62). The court also questioned Dr. Miller as to whether known sexual offenders had "passed" the tests administered by Dr. Miller. (*Id.* at 62). Dr. Miller answered in the affirmative and clarified that typically those sexual offenders possess anti-social personality disorders and a high level of intelligence. (*Id.*) With regard to whether Petitioner could have falsely "passed" the tests, Dr. Miller opined that Petitioner was "probably not bright enough" to deceive the tests. (*Id.* at 63). The trial court then asked Dr. Miller whether Petitioner's "history of domestic violence" with his former wife was indicative of anti-social personality disorder, and Dr. Miller responded that domestic violence can be anti-social behavior, but ultimately opined that based on psychological testing, Petitioner did not suffer from anti-social personality disorder. (*Id.* at 63-66). After hearing testimony from Petitioner's three remaining witnesses, the trial court sentenced Petitioner to a minimum of twenty-five years' imprisonment on Count 1, a minimum of five years' imprisonment on Count 3, and a minimum of five years' imprisonment on Count 4, with all sentences to run consecutively. (ECF No. 10-1 at 16, 18; ECF No. 10-4 at 98-99).

On April 22, 2010, Petitioner filed a petition for appeal with the Supreme Court of Appeals of West Virginia ("WVSCA"). (ECF No. 10-1 at 22-53, 55). In his petition, Petitioner raised six issues:

> 1. The trial court committed plain error by failing to establish and recognize D.B. as a competent witness, which denied Petitioner his constitutional right to confront witnesses;
>
> 2. The trial court committed plain error in making comments during the trial that prejudiced Petitioner's rights and "jeopardized the impartiality of the jury";

3. The trial court erred in admitting "overly suggestive pre-trial identification photos and failed to determine its [e]ffect on [D.B.'s] in-court identification [of Petitioner]";

4. The trial court erred in denying Petitioner's motion for judgment of acquittal because the evidence was insufficient to support a guilty verdict;

5. The trial court erred in denying Petitioner's request for an alibi instruction;

6. The trial court considered improper evidence during Petitioner's sentencing.

(ECF No. 10-1 at 25). The WVSCA refused the petition for appeal on October 13, 2010. (*Id.* at 55).

### B. State Habeas Proceedings

On October 11, 2011, Petitioner, through counsel, filed a petition for a writ of habeas corpus in Fayette County. (ECF No. 10-1 at 57). The petition raised nine grounds for relief:

1. Trial counsel was ineffective for the following reasons:

    a. Failing to call the following witnesses at trial:

        i. Ms. Harless;

        ii. Ms. Culp;

        iii. Dr. Miller;

        iv. Joan Phillips, M.D., who physically examined D.B. and found no medical signs of sexual trauma;

        v. Rachel Burdette, D.B.'s mother, who could testify that other men were present in Ms. Harless's home, including Mr. Mullins, and that D.B. was exposed to other potential offenders outside of the home, including the neighbor of D.B.'s father;

        vi. D.B.'s sister, H.C.;

vii. Roger Boothe, a minister, unrelated to Petitioner, who was Ms. Harless's neighbor and could have testified that he had a close relationship with D.B. and that D.B. shared information with him about what was going on in his home life. In addition, Reverend Boothe could have testified that he "tracked the license plates of individuals entering D.B.'s home."

viii. A serologist, who could have testified that DNA would be available for testing at the location where the assault occurred;

ix. An unidentified former West Virginia Department of Health and Human Resources employee, who could have testified that "interviews [with D.B] were improperly conducted and/or overly suggestive";

x. "Doctor that spoke to investigator";

b. Failing to effectively cross-examine D.B.;

c. Failing to prepare for trial;

d. Failing to investigate before trial;

2. Petitioner's conviction was obtained by a violation of his constitutional right to confront witnesses when the circuit court failed to establish that D.B. was a competent witness prior to his testimony at trial;

3. Petitioner was denied his right to a trial by an impartial jury given the trial court's derogatory comments toward defense counsel throughout the trial;

4. The evidence was insufficient to support a guilty verdict;

5. The trial court considered improper evidence at sentencing;

6. The trial court erred in refusing Petitioner's request for an alibi instruction;

7. The trial court erred in imposing consecutive sentences and the sentence was excessive;

8. The State suppressed "helpful evidence";

9. The trial court improperly and frequently made prejudicial statements toward defense counsel throughout the trial.

19

(ECF No. 10-1 at 60-71).

On February 12, 2013, an omnibus evidentiary hearing was held on Petitioner's state habeas petition. (ECF No. 10-5 at 2). Petitioner's habeas counsel, G. Todd Houck, presented six witnesses at the hearing, including Petitioner. Petitioner testified that he spoke with Mr. Morgan about representing him at trial before hiring Ms. Tennen to represent him. (*Id.* at 12). According to Petitioner, Mr. Morgan informed him that he would not represent him as the trial judge did not "care much for him," and so, Petitioner hired Ms. Tennen. (*Id.* at 11-12). However, as the trial transcript reflects, both Ms. Tennen and Mr. Morgan represented Petitioner at his trial. Petitioner testified that he paid Ms. Tennen to represent him, who in turn paid Mr. Morgan his fee. (*Id.* at 12). In relation to pre-trial investigation, Petitioner asserted that, on the day that he hired Ms. Tennen, he asked her to investigate Mr. Mullins, check for any registered sex offenders living in the area of the crimes, and have DNA testing performed at the scene of the crimes. (*Id.* at 13-15, 25). Petitioner recalled that, prior to trial, he had spoken with Ms. Tennen over the phone four times in ten-to-fifteen minute conversations, and that the first time he met Ms. Tennen was the night before trial when she presented a possible plea deal to him. (*Id.* at 16-18). Ms. Tennen and Mr. Morgan informed Petitioner that the State had offered a plea deal involving a *Kennedy* plea, whereby Petitioner would plead guilty to third-degree sexual assault with the understanding that he would be sentenced to a term of one-to-five years' imprisonment.[8] (*Id.* at 27).

---

[8] In *Kennedy v. Frazier*, the WVSCA held that "[a]n accused may voluntarily, knowingly and understandingly consent to the imposition of a prison sentence even though he is unwilling to admit participation in the crime, if he intelligently concludes that his interests require a guilty plea and the record supports the conclusion that a jury could convict him." Syllabus Pt. 1, 357 S.E.2d 43, 43 (W. Va. 1987).

Petitioner testified that he refused to accept the plea agreement because he was not guilty. (*Id.* at 33).

Mr. Houck next called Dr. Joan Phillips, a board certified pediatrician with a certification in child abuse and neglect. (*Id.* at 37-38). Dr. Phillips testified that she worked at Charleston Area Medical Center's Women and Children's Hospital and that, as part of her work there, she performed forensic medical evaluations on children who have reported allegations of abuse. (*Id.* at 39-40). Dr. Phillips asserted that she often found no physical evidence of anal rape in the children that she examined, and that only approximately five percent of children who have experienced rectal penetration exhibit physical symptoms of such abuse. (*Id.*) Dr. Phillips explained that the rectal sphincter is made to stretch, which allows it to stretch out and return to normal size. (*Id.* at 41). In addition, Dr. Phillips described the rectum as containing mucosal tissue, which heals "very quickly" and "completely." (*Id.* at 41). Dr. Phillips recalled examining D.B. on July 8, 2008, and testified that all of her findings were negative. (*Id.* at 40-41). On cross-examination, Dr. Phillips agreed that it would be "common" or "pretty common" that there would be no physical evidence of abuse nine months to one year after the abuse occurred, depending on the type of abuse. (*Id.* at 44-45).

Petitioner's next witness was Julie Heinig, Ph.D., the Assistant Laboratory Director at the DNA Diagnostic Center in Fairfield, Ohio. (*Id.* at 64-65). Dr. Heinig stated that, in preparing to testify at the hearing, she had reviewed the trial transcripts, photographs of the crime scene, transcripts of interviews with D.B., and reports from the hospital. (*Id.* at 67). In reviewing these materials, Dr. Heinig observed that no evidence was collected from any of the three locations that D.B. had described throughout his interviews, which included Ms. Harless's bedroom, the clubhouse (in

general), and the attic of the clubhouse. (*Id.* at 68). Dr. Heinig discussed the possibility that biological evidence of a sexual assault taking place could be found on items such as towels, tissues, items in the garbage, or bed sheets, and in stains on the floor, bed, or blankets. (*Id.*) Dr. Heinig asserted that when investigating allegations of sexual assault, it is helpful to perform a search of the area where the crime occurred with the aid of an ultraviolet light to detect the presence of any semen or saliva stains and Luminol testing to detect any blood stains. (*Id.* at 71). Dr. Heinig explained that she would have performed both types of tests on all three areas identified by D.B. had she been employed to investigate the case. (*Id.* at 72-73). With regard to DNA evidence, Dr. Heinig asserted that DNA can last indefinitely "if not exposed to environmental insults." (*Id.* at 73-74). She clarified that "a little bit of degradation" of DNA is expected to occur over time. (*Id.* at 74). In relation to the possible existence of DNA evidence in Petitioner's case, Dr. Heinig opined that she did not think too much time had passed for law enforcement to have attempted to collect a DNA sample from the locations described by D.B., but again, whether a sample was obtainable depended on any environmental degradation factors. (*Id.* at 75-76). On cross-examination, Dr. Heinig acknowledged that she had not visited "the crime scene." (*Id.* at 81). In addition, she conceded that she did not believe that DNA could be obtained from seminal fluid on clothing and bedding after the clothing or bedding is washed; on the other hand, Dr. Heinig testified that DNA samples had previously been obtained from blood stains on clothing after five washes. (*Id.* at 82-83). On redirect examination, Dr. Heinig opined that there was a "high probability" that a sample could have been collected for testing from the clubhouse. (*Id.* at 86-87).

Mr. Houck then called Mr. Morgan. (*Id.* at 87-88). Mr. Morgan testified that he had represented Petitioner in past proceedings, and that Petitioner, Petitioner's family, or Ms. Tennen contacted him when Petitioner was arrested in the present case. (*Id.* at 88-89). Mr. Morgan asserted that Ms. Tennen paid him a flat fee for his help with Petitioner's case. (*Id.* at 96). At some point, Mr. Morgan filed a motion with the trial court to have Ms. Tennen admitted *pro hac vice*, and he understood that his role was to assist her in understanding West Virginia court procedure and possibly examine one or two witnesses at trial. (*Id.* at 90-91). However, at trial, Mr. Morgan ended up having more responsibility than he had initially planned, which he attributed to Ms. Tennen's frustration and "inability to function under . . . West Virginia procedural rules." (*Id.* at 92). Mr. Morgan recalled that Ms. Tennen was interrupted and admonished by the trial court in front of the jury many times. (*Id.* at 93). On cross-examination, Mr. Morgan acknowledged that he alone appeared on Petitioner's behalf to argue pre-trial motions. (*Id.* at 97-100). In addition, he remembered advising Petitioner to take the plea offer, but Petitioner discarded the advice and maintained his innocence. (*Id.* at 105). Mr. Morgan also recounted that he and Ms. Tennen called fewer witnesses at trial than they had originally intended after deciding not to call certain witnesses. (*Id.* at 108). He recalled that many of the discussions concerning who would be called at trial involved Petitioner and Ms. Tennen, and that he deferred to Ms. Tennen's judgment on the issue as she was "lead counsel." (*Id.* at 108-09). Similarly, Mr. Morgan explained that he and Ms. Tennen had at least five conversations regarding trial strategy. (*Id.* at 109). On redirect examination, Mr. Morgan testified that had he been "lead counsel," he would have made different decisions than Ms. Tennen made. (*Id.* at 114).

Petitioner's next witness was D.B.'s grandmother, Ms. Harless. (*Id.* at 115-16). Ms. Harless testified that her daughter and son lived with her for a period of time encompassing January 2007 through September 2007. (*Id.* at 117). She stated that she knew Petitioner because he would visit her daughters, including D.B.'s mother, and that Petitioner had visited her home more than ten times in the past to see her daughters, both during the day and at night. (*Id.* at 118-21). Ms. Harless testified that she knew Petitioner and D.B. did not get along and recounted an incident where Petitioner pushed D.B. while both were in the kitchen of her home. (*Id.* at 123). Ms. Harless also recalled that Mr. Mullins would often visit her home and that he was a "family friend." (*Id.* at 121-22). During Ms. Harless's testimony, Mr. Houck moved for the admission of a transcript of Ms. Harless's statement to the Detective Chapman concerning D.B.'s allegations, and the trial court admitted the transcript. (*Id.* at 124-25). After Ms. Harless's testimony concluded, in lieu of calling any additional witnesses who had previously provided statements to the police, Mr. Houck moved for the admission of a number of transcribed statements, including those given by D.B.'s mother, Rachel Burdette; D.B.'s father, Ronnie Burdette; D.B.'s sister, H.C.; and D.B.[9] (*Id.* at 126-28). The court admitted the statement transcripts, but, as discussed in more detail below, it unclear from the record exactly which statement transcripts were presented to the court at that time.

---

[9] Mr. Houck moved for the admission of three transcribed statements provided by D.B. The first statement was given during an interview conducted by Ms. Householder and Detective Chapman on May 21, 2008. (ECF No. 10-5 at 192). The second statement was given during an interview conducted by Ms. Gwinn and Detective Chapman on July 11, 2008. (*Id.* at 213). The third statement was also given on July 11, 2008, and the interview was conducted by Ms. McCray and Detective Chapman. (*Id.* at 225). During each interview, D.B. identified Petitioner as the one who abused him. (ECF No. 10-5 at 199, 213-14, 228-30).

Petitioner's final witness was Roger Boothe, a minister unrelated to Petitioner, who was Ms. Harless's neighbor and lived fifty to seventy feet away from Ms. Harless's home. (*Id.* at 131-33). Reverend Boothe testified that he had a "pretty good relationship" with D.B., and that D.B. would come over and visit with him. (*Id.* at 137). Reverend Boothe also knew D.B.'s father, who told the reverend that D.B. agreed to come to the reverend if anything ever happened to him at Ms. Harless's home. (*Id.* at 138). Reverend Boothe asserted that D.B. never came to him and told him anything had happened to him. (*Id.*)

Respondent's only witness at the hearing, Vickie Hylton, was the Assistant Prosecuting Attorney who prosecuted Petitioner's case. (*Id.* at 141-42). Ms. Hylton recalled that Ms. Tennen was "lead counsel" in Petitioner's case and that she first spoke with Ms. Tennen approximately one month before trial. (*Id.* at 142). Ms. Hylton and Ms. Tennen had at least four more conversations about the case during which Ms. Tennen "tenacious[ly]" advocated on Petitioner's behalf for dismissal or an acceptable plea bargain. (*Id.* at 143-45). Ms. Hylton also remembered speaking with Mr. Morgan a number of times before trial to discuss witnesses and potential plea deals. (*Id.* at 146). In addition, Ms. Hylton stated that she had been admonished by the trial court judge during trials in the past and that Ms. Tennen was treated similarly to all other lawyers by the trial court judge. (*Id.* at 47-48). With regard to Ms. Tennen's presentation at trial, Ms. Hylton disagreed with Mr. Houck's assessment that it was "poor." (*Id.* at 55).

After the evidentiary hearing, Ms. Culp's deposition was taken for submission to the state habeas court. Ms. Culp testified that she possessed a bachelor's degree and master's degree in social work, and that she was a certified trauma specialist. (*Id.* at 151). She recalled that she became involved in the case when Fayette County

Department of Health and Human Resources asked her to interview D.B. to determine whether D.B. was "traumatized by an alleged abuse situation." (*Id.* at 150). Ms. Culp met with D.B. and his mother on July 29, 2008. (*Id.* at 152). She noted that while D.B. told her the story of the abuse, he did not cling to his mother, he did not have any difficulty reciting the events, and he did not display any fear. (*Id.* at 153). Ms. Burdette reported that D.B. had not exhibited fear of being around strangers or anyone in particular and that D.B.'s sleeping and eating habits were normal or fine. (*Id.*) Ms. Burdette informed Ms. Culp that D.B.'s behavior only changed near the time that D.B. was placed in foster care, but when D.B. returned to her from foster care, his behavior had gotten better. (*Id.* at 154). Based on her interactions with D.B. and Ms. Burdette, Ms. Culp concluded that there was no evidence of traumatization, such as bed wetting, change in eating habits, apprehension of strangers, or sleeplessness. (*Id.*) Ms. Culp clarified that in using the word traumatization, she meant some form of posttraumatic stress syndrome. (*Id.* at 155). She opined that D.B. did not suffer from posttraumatic stress syndrome and that if D.B.'s allegations were true, then he would have shown signs of traumatization. (*Id.* at 155, 163). Ms. Culp further opined that "[i]f [a] child [is] traumatized, there's always something that raises a red flag." (*Id.* at 158). In D.B.'s case, Ms. Culp found that there were no "red flags" suggesting sexual abuse or assault. (*Id.*) On cross-examination, Ms. Culp stated that all individuals who have experienced sexual abuse will not exhibit some type of trauma; rather, displaying indicia of trauma depended on "how [the abuse] was done" and for what length of time. (*Id.* at 161). When asked to elaborate on that statement, Ms. Culp opined that a sexual assault or sexual abuse victim would not exhibit signs of trauma "[o]nly if [the abuse] was done in a nonthreatening way in the beginning, because [the victim has] to be trained." (*Id.* at 162). Ms. Culp was asked

again if it was possible for a sexual assault or abuse victim to not exhibit signs of trauma, and she responded, "[y]es, it is possible. But that's like a half answer." (*Id.*)

On June 19, 2013, the circuit court entered an order denying the petition for a writ of habeas corpus. (ECF No. 10-1 at 81). As relevant here, the circuit court concluded that Petitioner's counsel was not ineffective in failing to call Ms. Harless as a witness at trial because her testimony would not have been persuasive as to whether D.B. was abused given that the exact date of the crimes was unknown. (*Id.* at 99). Similarly, the circuit court determined that counsel was not ineffective in refraining from calling Dr. Miller at trial as evidence of Petitioner's "tendencies" would not have been compelling evidence on the issue of whether Petitioner abused D.B. (*Id.*) Furthermore, the circuit court found that Dr. Miller's testimony would have implied that D.B.'s testimony was incredible, which would have been improper and inadmissible under West Virginia law. (*Id.* at 100-01). In relation to Dr. Phillips, the circuit court concluded that trial counsel was not ineffective in failing to call her as a witness since Dr. Phillips "actually revealed that [Petitioner] could have committed" the crimes given that "physical evidence of sexual assault in the anal region of a human was generally detectable in only five percent of cases." (*Id.* at 101-02). With regard to defense counsel's decision not to call Ms. Burdette, the circuit court noted that Petitioner's habeas counsel failed to elicit testimony from Ms. Burdette at the omnibus evidentiary hearing and that Ms. Burdette's statement to the police was not "offered for admission into evidence." (*Id.* at 102). Therefore, the circuit court denied relief on the claim. (*Id.*) Turning to defense counsel's failure to have H.C. testify at trial, the circuit court determined that counsel was not ineffective as H.C.'s testimony concerning Mr. Mullins's actions was of minimal relevance to whether Petitioner abused D.B. (*Id.*) In relation to Petitioner's claim

regarding the testimony of a serologist, the circuit court found that trial counsel was not ineffective for failing to call a serologist at trial as Dr. Heinig confirmed that "environmental insults" could have degraded any biological evidence left at the crime scene. (*Id.* at 103). Furthermore, the circuit court pointed out that Dr. Heinig did not visit the crime scene to attempt to collect samples for DNA testing and that Petitioner failed to present any DNA evidence at the evidentiary hearing. (*Id.*) In addition, the circuit court recognized that Petitioner raised ineffective assistance of counsel claims related to the testimony of Ms. Culp and Reverend Boothe, but did not specifically address the claims as it did with the other witnesses who Petitioner claimed should have been called at trial. (*Id.* at 85, 91-92). Rather, after setting forth specific reasons as to why counsel was not ineffective for failure to call Ms. Harless, Dr. Miller, Dr. Phillips, H.C., Ms. Burdette, and a serologist, the circuit court declared that "[t]he decisions to call or not various witnesses amount to strategic trial decisions, and do not rise to the level of ineffective assistance of counsel." (*Id.* at 104). Consequently, the circuit court concluded that all of the ineffective assistance of counsel claims related to calling certain witnesses at trial were without merit. (*Id.*) The circuit court also denied Petitioner's claims related to the trial court's failure to provide an alibi instruction and the trial court's treatment of defense counsel throughout the trial. (*Id.* at 115, 120).

On July 15, 2013, Petitioner, represented by Mr. Houck, appealed the circuit court's denial of his petition to the WVSCA. (*Id.* at 125). In his notice of appeal, Petitioner raised six issues:

1. Petitioner was denied effective assistance of counsel;

2. Petitioner's constitutional right to confront his accuser was violated;

3. Petitioner's constitutional right to an impartial jury and judge was violated;

4. Petitioner's constitutional right to present alibi evidence and have an alibi instruction read to the jury was violated;

5. Petitioner's sentence was excessive;

6. The State failed to properly provide Petitioner with any and all exculpatory evidence.

(*Id.* at 132-33). In his subsequent brief to the WVSCA, Petitioner, again through Mr. Houck, raised only three issues: (1) Petitioner was denied his constitutional right to effective assistance of counsel; (2) the trial court's multiple interruptions and comments during defense counsel's cross-examination of D.B. violated Petitioner's constitutional rights to confront witnesses and to an impartial jury; and (3) Petitioner's constitutional right to assert an alibi defense was violated by the trial court. (*Id.* at 140-41). In the fact section of his appellate brief, Petitioner summarized certain testimony adduced at the sentencing hearing, omnibus evidentiary hearing, or thereafter, including testimony provided by Dr. Phillips, Dr. Miller, Dr. Heinig, Ms. Harless, and Ms. Culp. (*Id.* at 155-57). In his argument section, Petitioner insisted that he was denied his constitutional right to effective assistance of counsel when defense counsel failed to call Ms. Culp, Dr. Phillips, and Dr. Miller to testify at trial. (*Id.* at 163). Furthermore, Petitioner generally argued that defense counsel "fail[ed] to present to the jury all of the exculpatory evidence available to refute the uncorroborated testimony of D.B." (*Id.*)

On June 19, 2014, the WVSCA issued a memorandum decision affirming the circuit court's denial of Petitioner's state habeas petition. (*Id.* at 172); *Boothe v. Ballard*, No. 13-0740, 2014 WL 2782127, at *1 (W.Va. June 19, 2014). In relation to Petitioner's ineffective assistance of counsel claim, the WVSCA asserted:

As for Ms. Tennen's strategic decision not to call various defense witnesses at trial, the circuit court found that this decision did not change the outcome of petitioner's trial for the following reasons. First, Dr. Phillips's testimony may have harmed petitioner given that she testified at petitioner's omnibus hearing that the vast majority of children who are rectally penetrated do not manifest physical trauma. Second, with regard to Ms. Heinig, the circuit court noted that she never visited the crime scene in this case, nor did she perform any tests showing that DNA was present there or, if present, was still capable of testing. Third, in regard to Social Worker Culp, the circuit court found that the absence of her testimony at trial did not likely change the outcome given that, during her deposition, she testified that not all sexually abused children exhibit signs of trauma. Finally, regarding petitioner's claim that Ms. Tennen's failed to timely notify the State about the forensic psychologist's report (which claimed that petitioner did not fit the profile of a pedophile), the circuit court found that the report would not have been admissible because evidence regarding "tendencies" was not compelling evidence that petitioner did not assault D.B.

. . . .

The record on appeal in this case shows that both Ms. Tennen and Mr. Morgan made strategic decisions on petitioner's behalf that were assistive of his interests. Those decisions included not calling the three witnesses of whom petitioner complains. Given that petitioner failed to prove that Ms. Tennen's acts were outside the broad range of competent assistance or that any errors she may have made affected the outcome of his trial, and given that he does not argue that Mr. Morgan's significant work on his case was ineffective, we find that the circuit court did not err in denying petitioner's claim that he received ineffective assistance of counsel.[10]

(ECF No. 10-1 at 176-77); *Boothe*, 2014 WL 2782127, at *5.

With regard to Petitioner's claim that he was denied his right to an impartial jury and to confront witnesses by virtue of the trial court's conduct, the WVSCA recognized that the trial court possessed discretion to limit the cross-examination of witnesses and held:

The record on appeal in this case shows that the trial judge properly rebuked both sides when it believed they were stepping outside the

---

[10] The undersigned notes that the WVSCA's assertion related to the circuit court's reason for denying Petitioner's ineffective assistance of counsel claim related to Ms. Culp is not supported by the circuit court's June 19, 2013 order denying habeas relief. The circuit court's habeas order made no mention of any purported testimony by Ms. Culp that not all abused children demonstrate signs of trauma.

boundaries of the law. However, the circuit judge also specifically instructed the jury that he was absolutely impartial and nothing he did or said should be taken as partiality. Further, the trial judge did not prevent defense counsel from asking any questions on cross-examination, it merely asked that Ms. Tennen comply with the laws of this State and not unnecessarily tarry when cross-examining a young child. Importantly, the record also shows that the trial court interrupted the prosecutor and placed the same requirements on her as it did on Ms. Tennen. Further, the fact that the jury acquitted petitioner of one count of sexual assault indicates that the trial court's comments did not adversely affect the jury or prejudice it against Ms. Tennen or petitioner. Based on this record, we cannot say that the circuit court erred in finding that the trial court did not violate petitioner's constitutional rights to an impartial jury or to confront witnesses against him.

(ECF No. 10-1 at 177); *Boothe*, 2014 WL 2782127, at *6.

Finally, on the subject of Petitioner's alibi claim, the WVSCA pointed out that Petitioner filed a notice of alibi for a particular week in May of 2008 while he was indicted for acts occurring between January 2007 and September 2007. (ECF No. 10-1 at 178); *Boothe*, 2014 WL 2782127, at *6. The WVSCA added that Petitioner had failed to present any evidence of alibi at trial. (ECF No. 10-1 at 178); *Boothe*, 2014 WL 2782127, at *6. Accordingly, the WVSCA concluded that the trial court did not err in denying Petitioner's request for an alibi instruction. (ECF No. 10-1 at 178); *Boothe*, 2014 WL 2782127, at *6.

### C. Federal Habeas Petition

On August 28, 2014, Petitioner filed his § 2254 petition seeking a writ of habeas corpus. (ECF No. 2). On September 23, 2014, the undersigned ordered Respondent to answer the petition. (ECF No. 7). On December 5, 2014, Respondent filed an answer, (ECF No. 8), and a motion for summary judgment, (ECF No. 10).[11] In his answer, Respondent asserted that the petition was timely and that the state court remedies for

---

[11] Respondent also filed a motion to file exhibits under seal, (ECF No. 9), which the undersigned granted, (ECF No. 12).

the claims raised in the petition have been properly exhausted. (ECF No. 8 at 2). On February 6, 2015, Petitioner filed a brief in opposition to Respondent's motion for summary judgment, (ECF No. 14), and a motion for appointment of counsel and an evidentiary hearing. (ECF No. 15). On February 9, 2015, Respondent filed a memorandum opposing Petitioner's motion for appointment of counsel and an evidentiary hearing. (ECF No. 17). Notwithstanding Petitioner's motion for appointment of counsel and an evidentiary hearing, the undersigned finds that the issues have been fully briefed and are ready for resolution.

II.   **Petitioner's Claims**

Petitioner asserts the following grounds in support of his § 2254 habeas petition:

1. Petitioner was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when trial counsel failed to call Ms. Culp as a witness at trial. (ECF No. 2 at 7).

2. Trial counsel were ineffective when they failed to call Dr. Miller as a witness at trial. (*Id.* at 10).

3. Trial counsel were ineffective when they failed to call Dr. Phillips as a witness at trial. (*Id.* at 13).

4. Trial counsel were ineffective when they failed to call Dr. Heinig as a witness at trial. (*Id.* at 15).

5. Trial counsel were ineffective when they failed to call Ms. Harless as a witness at trial. (*Id.* at 18).

6. Trial counsel were ineffective when they failed to call H.C. as a witness at trial. (*Id.* at 20).

7. Trial counsel were ineffective when they failed to call Reverend Boothe as a witness at trial. (*Id.* at 22).

8. Trial counsel were ineffective when they failed to call Ms. Burdette as a witness at trial. (*Id.* at 24).

9. Petitioner was denied due process of law under the Fourteenth Amendment to the United States Constitution when the trial judge repeatedly interrupted trial counsel. (*Id.* at 25).

10. Petitioner was denied due process of law under the Fourteenth Amendment to the United States Constitution when the trial judge refused to allow Petitioner to assert an alibi defense. (*Id.* at 29).

## III.   <u>Standard of Review</u>

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in state custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a § 2254 petition, the district court applies the standard set forth in § 2254(d), which provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

> (1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d) (1) and (2). Moreover, the factual determinations made by the state court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e) (1). Thus, when reviewing a petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v. Branker,* 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and independent meanings. *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams,* 529 U.S. at 405) (internal quotations omitted). A habeas writ may be granted under the "unreasonable application" clause if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular case." *Id.* at 300-01 (internal marks omitted).

Accordingly, the AEDPA limits the habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be

unreasonable." *Williams*, 529 U.S. at 365.

Here, Respondent has moved for summary judgment. (ECF No. 10). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller &, Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). On the other hand, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party as it

must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50). With these standards in mind, the undersigned considers each ground raised by Petitioner.

## IV.   <u>Discussion</u>

### A. Petitioner's Motion for Appointment of Counsel and an Evidentiary Hearing

### *1. Evidentiary Hearing*

As mentioned above, Petitioner has requested that he be appointed counsel and that an evidentiary hearing be held on his § 2254 petition. (ECF No. 15). In support of his request for appointment of counsel, Petitioner asserts that he is indigent and not "versed in the law." (*Id.* at 4). He insists that he will be at a disadvantage proceeding *pro se* given the experience of Respondent's counsel and that appointment of counsel is in the interests of justice. (*Id.*) On the subject of an evidentiary hearing, Petitioner argues that a hearing should be held on his petition because "the state courts' determinations of key facts Petitioner relies on in his [petition] were either ignored by the state courts, clearly erroneous, or the procedures employed to reach such determinations were

incomplete and/or not full and fair." (*Id.* at 3). Additionally, Petitioner maintains that, even if the hearing held by the state circuit court was full and fair, the hearing did not result in factual findings that resolve all of the issues currently raised by Petitioner. (ECF No. 14 at 29). In support of his request for an evidentiary hearing, Petitioner relies on two pre-AEDPA cases: *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). (ECF No. 15 at 2-3).

In response, Respondent asserts that Petitioner is not entitled to an evidentiary hearing in this Court because he received a full and fair hearing on his claims in state circuit court. (ECF No. 17 at 1). Relatedly, Respondent argues that Petitioner cannot meet the standard for an evidentiary hearing contained in § 2254(e)(2). (ECF No. 17 at 2). Furthermore, Respondent maintains that Petitioner has failed to specifically identify what purpose, if any, conducting an evidentiary hearing in this Court would serve. (*Id.*)

The Supreme Court has recognized that the decision to grant an evidentiary hearing on a § 2254 petition is within the discretion of the district court, so long as the petitioner is not barred from obtaining an evidentiary hearing pursuant to § 2254(e)(2). *Schriro v. Landrigan*, 550 U.S. 465, 468, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). With respect to conducting evidentiary hearings in § 2254 cases, subsection (e)(2) states:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A) the claim relies on--
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously

discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). "Diligence for purposes of the opening clause [of § 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court . . . ." *Id.* at 435. "If the petitioner was diligent in pursuing the claim in state court, he cannot have 'failed to develop' the claim, and § 2254(e)(2) does not bar an evidentiary hearing." *Wolfe v. Johnson*, 565 F.3d 140, 167 (4th Cir. 2009) (quoting *Williams*, 529 U.S. at 430). The Fourth Circuit has held that, where § 2254(e)(2) "does not proscribe an evidentiary hearing . . . a § 2254 petitioner 'who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if he satisfies one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, [372 U.S. at 313].'"[12] *Wolfe*, 565 F.3d at 168-69 (quoting *Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir.2006)).

---

[12] The Supreme Court held in *Townsend* that a federal court must grant an evidentiary hearing to a habeas petitioner if: "(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." 372 U.S. at 313.

However, "'[a]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.'" *Flippo v. McBride*, No. 5:05-cv-00765, 2009 WL 1543915, at *7 (S.D.W.Va. May 29, 2009) (quoting *Schriro*, 550 U.S. at 474). Furthermore, the Fourth Circuit has recognized that in § 2254 cases, "'federal evidentiary hearings ought to be the exception, not the rule.'" *Winston v. Kelly*, 592 F.3d 535, 552 (4th Cir. 2010) (quoting *Pike v. Guarino*, 492 F.3d 61, 70 (1st Cir.2007)).

Petitioner's request for an evidentiary hearing must be denied for a number of reasons. First, Petitioner has entirely neglected to inform the Court what factual issues related to his petition require further development in this Court. Having reviewed Petitioner's petition and his supplemental briefing, Petitioner's claims wholly rely on facts already developed in state court that Petitioner appears not to dispute, save for the facts underlying his ineffective assistance of counsel claim related to Rachel Burdette. (ECF No. 14 at 20-21). With regard to that claim, the state circuit court found that Petitioner had failed to present any evidence as to what the substance of Ms. Burdette's testimony would have been at trial, and consequently, the court denied the claim on the merits. (ECF No. 10-1 at 102). While Petitioner correctly points out that his counsel moved for the admission of and purportedly submitted a copy of Ms. Burdette's statement to the police at the state habeas evidentiary hearing, (ECF No. 10-5 at 128), apparently his counsel omitted the transcript of Ms. Burdette's statement when providing the other statement transcripts that he simultaneously moved to admit and submitted to the court. Even faced with the circuit court's opinion stating that it had not received the transcript of Ms. Burdette's statement, Petitioner's habeas counsel declined to supplement the record and request reconsideration of the circuit court's habeas decision. Moreover, Petitioner's habeas counsel declined to pursue the claim on appeal

to the WVSCA. Given counsel's failure to develop the factual basis for the claim in state habeas proceedings when provided with the opportunity to do so, the stringent requirements for granting an evidentiary hearing under § 2254(e)(2) likely apply to Petitioner's claim concerning Ms. Burdette's potential testimony.

Second, Petitioner likewise fails to demonstrate that the absence of a fully developed factual record in the state court proceedings was the result of something other than his or his counsel's lack of diligence. *Cf. Williams*, 529 U.S. at 432. Accordingly, § 2254(e)(2) would apply to Petitioner's request for an evidentiary hearing, and he would be unable to meet the exacting standard for an evidentiary hearing under that provision because the factual predicates that he relies on in his petition could have been previously discovered through the exercise of due diligence *and* the facts underlying Petitioner's claim are insufficient to establish by clear and convincing evidence that "no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

Third, a court need not conduct an evidentiary hearing if the facts to be developed by the Petitioner at the hearing would not entitle him to relief. *See Schriro*, 550 U.S. at 474. As explicated below, even accepting all of Petitioner's factual allegations as true, the undersigned finds that he is not entitled to relief on his petition.

Finally, it is worth noting that, other than Petitioner's exceedingly general assertion that the state court's determinations of "key facts" were clearly erroneous, (ECF No. 15 at 3), all of his claims center on whether the state court's decision was contrary to, or an unreasonable application of, clearly established federal law pursuant to § 2254(d)(1). When analyzing a state court's rejection of a state prisoner's claim under § 2254(d)(1), a federal habeas court is "limited to the record that was before the state

court that adjudicated the claim on the merits." *Cullen v. Pinholster*, ____ U.S. ____, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011). Here, the WVSCA adjudicated on the merits all of the claims presented to it, and some of those claims are also raised in Petitioner's § 2254 petition. *Cf. Winston*, 592 F.3d at 557 (holding state court did not adjudicate claim on merits where petitioner's request for evidentiary hearing was denied by state court, state court "passed on the opportunity to adjudicate [his] claim on a complete record," and "the state court adjudicated a claim that was materially incomplete."). Accordingly, *Pinholster* prevents the Court from considering any additional evidence that might be developed at an evidentiary hearing on a number of Petitioner's claims.[13]

### 2. *Appointment of Counsel*

In regard to Petitioner's request for appointment of counsel, the law is well-settled that a habeas petitioner has no constitutional right to counsel. *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1990). The Criminal Justice Act, 18 U.S.C. § 3006A, authorizes the United States District Court to appoint counsel to represent financially eligible individuals in actions brought pursuant to § 2254, "whenever the United States magistrate judge or the court determines that the interests of justice so require." 18 U.S.C. § 3006A(a)(2)(B). An analogous standard is set forth in 28 U.S.C. § 1915(e)(1), which governs the appointment of counsel for indigent litigants in civil actions. In both circumstances, the matter is left to the sound discretion of the court. As a general rule, habeas petitioners and indigent civil litigants are only provided counsel in "exceptional circumstances." *See, e.g., Rice v. Riley,* No. 4:13–3049–TMC, 2014 WL 5524461, at *1 (D.S.C. Oct. 31, 2014). When determining whether to appoint

---

[13] Among those grounds are Petitioner's claims that trial counsel was ineffective in failing to call Dr. Phillips, Dr. Heinig, Ms. Culp, and Dr. Miller at trial; that the trial court violated his right to an impartial jury and to confront witnesses; and that the trial court infringed upon his right to present an alibi defense.

counsel, the court should consider several factors, including (1) the type and complexity of the case; (2) the ability of the petitioner to adequately investigate and present his claim; (3) the likelihood of success on the merits of the application; and (4) the apparent need for an evidentiary hearing in order to resolve the case. *See, e.g., Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), *abrogated on other grounds by Mallard v. United States Dist. Court*, 490 U.S. 296, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989); *Hoggard v. Purkett,* 29 F.3d 469, 471 (8th Cir. 1994). According to the Eighth Circuit Court of Appeals:

> The interests of justice require the court to appoint counsel when the district court conducts an evidentiary hearing on the petition. The appointment of counsel is discretionary when no evidentiary hearing is necessary. In exercising its discretion, the district court should consider the legal complexity of the case, the factual complexity of the case, and the petitioner's ability to investigate and present his claims, along with any other relevant factors. Where the issues involved can be properly resolved on the basis of the state court record, a district court does not abuse its discretion in denying a request for court-appointed counsel.

*Hoggard,* 29 F.3d at 471.

In this case, Petitioner has previously filed a direct appeal, a state habeas petition, and an appeal of the state habeas court's decision. Accordingly, the issues raised by Petitioner have been well-briefed in the past and are adequately presented by the record before this Court. Moreover, as discussed above, the grounds asserted by Petitioner do not merit an evidentiary hearing, and as explained below, Petitioner has no likelihood of success on the merits. Accordingly, because Petitioner fails to demonstrate exceptional circumstances that justify the appointment of counsel, his motion must be denied.

For the aforementioned reasons, the undersigned **DENIES** Petitioner's Motion for an Evidentiary Hearing and Appointment of Counsel, (ECF No. 15).

## B. Exhaustion and Procedural Default

Turning to the substantive claims raised the petition, the undersigned notes that Respondent asserted in his answer that Petitioner has *properly* exhausted his state court remedies for the claims raised in his § 2254 petition.[14] (ECF No. 8 at 2). While Petitioner only appealed five of the ten claims in his § 2254 petition to the WVSCA, Respondent has ***not*** argued that these claims are only *technically* exhausted, and thus subject to the procedural default doctrine. Nonetheless, because the applicability of the procedural default doctrine is readily apparent in this case, the undersigned, *sua sponte*, will address this issue. *See Roach v. Angelone*, 176 F.3d 210, 215 n.3 (4th Cir. 1999) (recognizing that court has discretion to address petitioner's procedural default *sua sponte*); *Harper v. Ballard*, No. 3:13-23467, 2014 WL 4470536, at *2 (S.D.W.Va. Sept. 10, 2014) (same); *see also Hill v. Braxton*, 277 F.3d 701, 705 (4th Cir. 2002) (stating that federal habeas court has power to raise affirmative defenses *sua sponte*).

As a prerequisite to filing a § 2254 proceeding, a habeas petitioner must exhaust his state remedies. 28 U.S.C. § 2254(b)(1)(A). Exhaustion of state remedies requires the petitioner to fairly present the federal constitutional issues to the state courts and allow them "one full opportunity" to resolve the issues. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Given that the purpose of exhaustion is to ensure that the state has "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights," *Picard*, 404 U.S. at 275 (internal quotations omitted), fair presentation demands that the state courts be fully informed of "'both the operative

---

[14] The Supreme Court has recognized that its opinions "certainly suggest that the procedural-bar issue should ordinarily be considered first." *Lambrix v. Singletary*, 520 U.S. 518, 524, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997).

facts and the controlling legal principles.'" *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000) (quoting *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997)). While it is unnecessary to cite "book and verse on the federal constitution," *Picard*, 404 U.S. at 278, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (internal citations omitted). Instead, the petitioner must present the "substance of a federal habeas corpus claim" to the state courts. *Picard*, 404 U.S. at 278.

In West Virginia, exhaustion is accomplished in one of three ways: by (1) presenting the federal constitutional issues directly to the WVSCA through an appeal of the conviction or sentence; (2) filing a petition for a writ of habeas corpus under the WVSCA's original jurisdiction and receiving a dismissal with prejudice;[15] or (3) filing a petition for a writ of habeas corpus in the appropriate circuit court followed by an appeal of the judgment to the WVSCA, if the result is adverse. *Moore v. Kirby*, 879 F. Supp. 592, 593 (S.D.W.Va. 1995); *Bayerle v. Godwin*, 825 F. Supp. 113, 114-15 (N.D.W.Va. 1993); *McDaniel v. Holland*, 631 F. Supp. 1544, 1545-46 (S.D.W.Va. 1986); *see also Gardner v. Plumley*, No. 2:12-cv-03386, 2013 WL 5999041, at *5 (S.D.W.Va. Nov. 12, 2013). In general, the district court may not review a federal habeas petition unless there has been "total exhaustion" of the presented issues. *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Thus, when a petitioner has failed to exhaust his state court remedies, a federal habeas petition should be dismissed. *See*

---

[15] However, an original jurisdiction petition that is denied without any indication that the denial was with prejudice, following a determination on the merits, does not exhaust the prisoner's state court remedies. *See Meadows v. Legursky*, 904 F.2d 903, 908-09 (4th Cir. 1990), *abrogated on other grounds by Trest v. Cain*, 522 U.S. 87, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997).

*Preiser v. Rodriguez*, 411 U.S. 475, 477, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). In the event that a federal habeas petitioner presents a "mixed petition" consisting of both exhausted and unexhausted claims, the district court may (1) dismiss the petition in its entirety; (2) order a stay and abeyance while the petitioner exhausts his claims in state court;[16] or (3) allow the petitioner to remove the unexhausted claims and proceed with the exhausted claims. *Rhines v. Weber*, 544 U.S. 269, 277-78, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). The court may also deny the unexhausted claims on the merits "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state." 28 U.S.C. § 2254(b)(2); *see also White v. Keller*, No. 1:10-CV-841, 2013 WL 791008, at *5 (M.D.N.C. Mar. 4, 2013).

Petitioner failed to raise four of his ineffective assistance of counsel claims before the WVSCA. Specifically, Petitioner never presented to the WVSCA his claims that counsel was ineffective for failing to call Ms. Harless, H.C., Reverend Boothe, and Ms. Burdette at trial. Accordingly, the WVSCA never addressed those claims.[17]

The exhaustion barrier may only be removed when "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B). These statutory exceptions apply "only if there is no opportunity to obtain redress in state

---

[16] Stay and abeyance is only appropriate in limited circumstances in which the district court determines that "the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Rhines v. Weber*, 544 U.S. 269, 277-78, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005); *Wright v. Keller*, No. 3:11-cv-341-RJC, 2011 WL 5827236, at *2 (W.D.N.C. Nov. 18, 2011) (declining to order stay and abeyance); *Abido v. Ballard*, No. 2:08-cv-00341, 2009 WL 772918, at *2 n.2 (S.D.W.Va. Mar. 18, 2009) (same); *Wilson v. Humphrey*, No. 5:05-cv-00795, 2006 WL 643154, at *3 (S.D.W.Va. Mar. 10, 2006) (same).

[17] While Petitioner did not present his ineffective assistance of counsel claim related to Dr. Heinig in the argument section of his state habeas appeal brief, the WVSCA addressed the claim, and therefore, the undersigned will consider the claim to be properly exhausted.

court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief." *Duckworth v. Serrano*, 454 U.S. 1, 3, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981). Where a state court would refuse to hear a claim as a result of a petitioner's failure to observe a state procedural rule, the claim is considered to be exhausted because there is "an absence of available State corrective process." *See, e.g., Rose v. Lee*, No. 7:07-cv-00003, 2007 WL 2050823, at *3 (W.D.Va. July 12, 2007) (citing *Teague v. Lane*, 489 U.S. 288, 298, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)); *see also Coleman v. Thompson*, 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."); *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006) ("State remedies are exhausted when the petitioner does not have the 'right under the law of the State to raise, by any available procedure, the question presented.'") (quoting 28 U.S.C. § 2254(c)); *Villot v. Varner*, 373 F.3d 327, 337 (3d Cir. 2004) ("[W]hen the state refuses to consider the merits of the prisoner's claims because the petitioner has failed to comply with the state's procedural requirements, his claim is nonetheless technically exhausted because 'there is an absence of available State corrective process'") (quoting 28 U.S.C. § 2254(b)(1)(B)(i)). However, even though such claims are technically exhausted, the procedural default doctrine applies to those claims in any subsequent federal habeas proceeding. *See Clagett v. Angelone*, 209 F.3d 370, 378 (4th Cir. 2000) ("If claims were not exhausted in state court but would now be procedurally barred if brought in state court, then federal courts can treat the claims as if they were procedurally defaulted in the state courts."). The procedural default doctrine prevents a court from hearing a claim that has been, or would be, disposed of on "adequate and independent state-law grounds, unless

46

the petitioner can show cause and prejudice for, or a fundamental miscarriage of justice resulting from, failure to comply with the applicable rule." *See Bostick v. Stevenson*, 589 F.3d 160, 164 (4th Cir. 2009). "A rule is adequate if it is regularly or consistently applied by the state court . . . and is independent if it does not depend on a federal constitutional ruling." *Hedrick v. True*, 443 F.3d 342, 359 (4th Cir. 2006) (internal citations and markings omitted) (ellipsis in original).

With regard to the ineffective assistance of counsel claims that Petitioner failed to raise on appeal to the WVSCA, West Virginia Code § 53-4A-1(c) creates a rebuttable presumption that a state habeas petitioner knowingly and intelligently waives any claim that could have been presented during a state habeas proceeding but that was not presented at that time. Chief Judge Chambers recently recognized that West Virginia Code § 53-4A-1(c) is "an adequate and independent state ground," for procedural default purposes. *Green v. Ballard*, No. 3:02-1348, 2015 WL 1612198, at *5 (S.D.W.Va. Apr. 10, 2015). In this case, Petitioner presented all of the ineffective assistance of counsel claims raised in his § 2254 petition to the state circuit court, but failed to appeal all of those claims to the WVSCA. Thus, the presumption that he knowingly and intelligently waived the claims that he did not raise on appeal applies.[18] Consequently, the claims that Petitioner failed to raise are procedurally defaulted, unless Petitioner can establish "cause and prejudice for, or a fundamental miscarriage of justice resulting from, failure to comply with the applicable rule." *See Bostick*, 589 F.3d at 164.

---

[18] The undersigned is mindful that "[i]f any reasonable possibility exists that the state court may apply an exception to its procedural default rule, the federal court should not apply a state procedural bar to find that exhaustion is futile." *Meadows v. Legursky*, 904 F.2d 903, 909 (4th Cir. 1990), *abrogated on other grounds by Trest v. Cain*, 522 U.S. 87, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997). However, given the fact that Petitioner's state habeas counsel chose not to raise additional ineffective assistance of counsel claims on appeal to the WVSCA that he raised in the state circuit court, it seems very unlikely that the WVSCA would permit Petitioner to now raise those claims that his counsel declined to raise during his state habeas appeal proceeding.

Considering Respondent's concession that all of Petitioner's grounds for habeas relief have been properly exhausted, it is not surprising that Petitioner makes no argument that one or the other exception to the procedural default doctrine applies to his claims. Nevertheless, the record does not clearly establish that Petitioner meets either exception to the procedural default doctrine. The Fourth Circuit has explained that "[a] procedural default is excusable under the cause and prejudice standard when the petitioner demonstrates (1) that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule, and (2) that errors at his trial . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Wolfe*, 565 F.3d at 158 n.27 (internal markings and citations omitted) (ellipsis and emphasis in original). While Petitioner argues *once* in his brief that his state habeas counsel was ineffective (in relation to his claim regarding Ms. Culp's testimony), "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause." *Maples v. Thomas*, ____ U.S. ____, 132 S.Ct. 912, 922, 181 L.Ed.2d 807 (2012) (markings omitted). In certain limited situations, state habeas counsel's ineffectiveness may excuse a procedural default and permit a court to reach the merits of an ineffective assistance of *trial* counsel claim. *Trevino v. Thaler*, ____ U.S. ____, 133 S.Ct. 1911, 1918, 185 L.Ed.2d 1044 (2013) (citing *Martinez v. Ryan*, ____ U.S. ____, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012)). However, that exception (the *Martinez* exception) "does not 'concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings.'" *Cole v. Lester*, No. 3:12-cv-00704, 2015 WL 163541, at *11 (M.D. Tenn. Jan. 13, 2015) (quoting *Martinez*, 132 S.Ct. at 1320). Accordingly, even if Petitioner were to argue that his habeas counsel was ineffective in failing to appeal to the WVSCA all of the ineffective

assistance of counsel claims raised in the state circuit court habeas proceeding, that allegation would not establish cause under the *Martinez* exception. Furthermore, Petitioner is hard-pressed to show prejudice inasmuch as the claims that state habeas counsel refrained from appealing lacked merit. For the same reason, Petitioner has not demonstrated that failure to consider the claims will result in a fundamental miscarriage of justice.[19] Accordingly, the undersigned **FINDS** that claims 5, 6, 7, and 8 of Petitioner's § 2254 are procedurally defaulted. Notwithstanding, the undersigned will address the merits of the procedurally defaulted claims and, as an alternate finding, suggest that the District Court deny them on the merits. *See Flippo v. McBride*, 393 F. App'x 93, 97 (4th Cir. 2010) ("Although courts may reach the merits of a habeas petition to deny it, 28 U.S.C. § 2254(b)(2), they cannot issue the writ for unexhausted or procedurally defaulted claims."); *Eaton v. Angelone*, 139 F.3d 990, 994 n.1 (4th Cir. 1998) ("Because we agree with the district court's denial of [petitioner's] ineffectiveness claims on the merits, we need not resolve the thorny issue of procedural default.").

### C. Ineffective Assistance of Counsel

In his first eight assignments of error, Petitioner alleges that his trial counsel was ineffective for failing to call certain witnesses at trial. (ECF No. 2 at 7-25). Each one of the witnesses is addressed individually below. Preliminarily, the undersigned will discuss the standard governing ineffective assistance of counsel claims under the AEDPA.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington*,

---

[19] Of course, because this is a PF&R and not a final decision on the merits of the petition, Petitioner is free to argue to the District Court that his procedural default should be excused. *See Harper v. Ballard*, No. 3:13-23467, 2014 WL 4470536, at *2 (S.D.W.Va. Sept. 10, 2014).

466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate . . . defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995).

In a § 2254 proceeding, the standard of review differs somewhat from the standard used in the direct review of a *Strickland*-based challenge. *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem review is doubly so." *Id.* at 788 (internal citations and quotations omitted). "'Surmounting *Strickland's* high bar is never an easy task[;]' . . . Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more

difficult." *Id.* (quoting *Padilla v. Kentucky,* 559 U.S. 356, 371, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010)). The question, then, is not "whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 788. With this standard in mind, the undersigned turns to Petitioner's specific claims of ineffective assistance of counsel.

### 1. Saundra Culp

In his first assignment of error, Petitioner argues that his trial counsel was ineffective for failing to call Ms. Culp as a witness at trial. (ECF No. 2 at 7-8). Petitioner asserts that Ms. Culp would have testified that she observed no evidence that D.B. had been traumatized and that D.B. displayed no "red flags" of being sexually abused or assaulted. (ECF No. 14 at 8). In addition, Petitioner insists that Ms. Culp would have testified that a child who experiences sexual abuse or assault will exhibit signs of trauma unless the abuse was performed in a "nonthreatening manner." (*Id.*) According to Petitioner, Ms. Culp's testimony would have been critical as the only evidence offered against him at trial was D.B.'s "inherently incredible testimony." (*Id.* at 9-10). The WVSCA rejected Petitioner's ineffective assistance of counsel claims on the basis that "Ms. Tennen and Mr. Morgan made strategic decisions on [P]etitioner's behalf that were assistive of his interests." (ECF No. 10-1 at 176). Furthermore, the WVSCA noted that Petitioner failed to prove that any errors made by defense counsel affected the outcome of his trial. (*Id.* at 176-77).

The undersigned cannot conclude that the WVSCA's decision on this claim is contrary to, or an unreasonable application of, clearly established federal law. At the outset, it is worth mentioning that Mr. Morgan testified at the state habeas evidentiary hearing that he and Ms. Tennen called fewer witnesses at trial than they had originally

intended after deciding not to call certain witnesses, and that defense counsel and Petitioner had many of the discussions concerning who would be called at trial. With regard to Ms. Culp, Petitioner's claim fails for two reasons. First, the State presented no expert testimony as to any trauma experienced by D.B. evidencing sexual abuse; in fact, Detective Chapman conceded on cross-examination that he was aware of Ms. Culp's finding that D.B. did not exhibit any symptoms of trauma. (ECF No. 10-2 at 225). As such, defense counsel was on equal footing with the State when it came to the presentation of evidence concerning psychological trauma. At a sexual abuse trial, where the State fails to present any expert testimony on the victim's display of signs or symptoms of sexual abuse, and defense counsel chooses to refrain from introducing expert testimony, defense counsel's decision may certainly be a rational one given the potential for concessions that an expert witness might make in this area. *See Jackson v. Conway*, 763 F.3d 115 (2d Cir. 2014) (holding trial counsel not ineffective where defense counsel and prosecutor would be "on the same footing at trial" and defense counsel could have made strategic decision not to call medical expert for fear of concessions that may be made on cross-examination of expert); *Green*, 2015 WL 1612198, at *3 ("Because there was no specific expert testimony in favor of the prosecution that a second expert could rebut, trial counsel was reasonable in choosing not to call an expert.").[20]

In this case, while some of Ms. Culp's testimony would have benefitted Petitioner, it should be noted that she acknowledged at her deposition that she had not reviewed all of the evidence in the case before forming her opinions. (ECF No. 10-5 at 160). Moreover, Ms. Culp would have been yet another witness to reiterate that D.B. had

---

[20] This is not to say that defense counsel is *never* ineffective in failing to call an expert witness where the State does not produce expert testimony.

alleged he was sexually abused by Petitioner. In addition, although Ms. Culp testified that D.B. exhibited no signs of trauma, she did not comment on certain facts contained in her reports related to her interviews with D.B. and his mother, including the act that D.B. performed on his younger brother and Ms. Burdette's statements to Ms. Culp that D.B. acted disobedient and used inappropriate language before being placed in foster care. (ECF No. 10-5 at 176-78). Furthermore, in a March 2009 report, Ms. Culp ultimately ended up recommending counseling for D.B. "regarding the entire case," which might be at odds with her conclusion that D.B. was not traumatized. (*Id.* at 178). Additionally, while Ms. Culp's testimony might be read to imply that a child victim of sexual abuse will *always* exhibit signs of traumatization unless the abuse was performed in a "nonthreatening way," it is unclear what, if any, scientific literature would support such an opinion, and it is incredibly difficult to believe that the State would have been unable to find a qualified and credible expert witness to rebut such testimony. Accordingly, defense counsel could have made a strategic decision not to call Ms. Culp after Detective Chapman testified as to Ms. Culp's ultimate finding given the potentially damaging statements that Ms. Culp might make and the potential rebuttal testimony that Ms. Culp's testimony would invite.

Second, Petitioner cannot demonstrate that he was prejudiced by defense counsel's decision to refrain from calling Ms. Culp as a witness at trial. Defense counsel was able to elicit Ms. Culp's ultimate conclusion through the testimony of Detective Chapman without any further examination by the State on the issue or the introduction of any damaging rebuttal testimony. *Cf., e.g.*, *Huffington v. Nuth*, 140 F.3d 572, 581 (4th Cir. 1998) (recognizing petitioner could not meet ineffective assistance of counsel standard where testimony of witness that was not called would have been cumulative).

Moreover, defense counsel highlighted Ms. Culp's finding during closing argument. (ECF No. 10-3 at 97). Consequently, the jury was well aware that there was no evidence that D.B. exhibited symptoms of psychological trauma, and the jury still convicted Petitioner. For the aforementioned reasons, the WVSCA's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law.

### 2. Dr. Bobby Miller

In his second ground for relief, Petitioner asserts that trial counsel was ineffective in failing to call Dr. Miller at trial. (ECF No. 2 at 10-11). Petitioner states that Dr. Miller would have testified that Petitioner did not have a "DSM-IV sexual disorder such as pedophilia" and that he was not sexually aroused by children.[21] (ECF No. 14 at 10). Petitioner insists that it would have been permissible under West Virginia law for Dr. Miller to testify that it would be unlikely for Petitioner to have committed the sexual abuse alleged by D.B. (*Id.* at 11). As with the previous claim, the WVSCA rejected Petitioner's claim on the merits, concluding that defense counsel made a strategic decision to abstain from calling Dr. Miller and that Petitioner failed to demonstrate prejudice. (ECF No. 10-1 at 176-77).

To begin, the admissibility of Dr. Miller's opinions under West Virginia law is unclear. Dr. Miller essentially would have testified that Petitioner did not fit the profile of a pedophile, if such a thing exists, and that Petitioner did not possess the indicators one would expect of a person who committed the abuse that D.B. alleged. The state circuit court found that the evidence would have been irrelevant to the ultimate issue of Petitioner's guilty and also barred by West Virginia precedent. (ECF No. 10-1 at 99-101).

---

[21] Petitioner refers to the Diagnostic Statistical Manual of Mental Disorders, Am. Psych. Assoc., 32 (4th ed. 2002) ("DSM–IV").

For the proposition that Dr. Miller's testimony would have been inadmissible, the state circuit court cited *State v. Martin*, 687 S.E.2d 360 (W. Va. 2009). (ECF No. 10-1 at 100). In that case, the WVSCA held that "regarding the admissibility of psychological testimony in cases involving incidents of child sexual abuse, . . . 'an expert may not give an opinion as to whether he personally believes the child, nor an opinion as to whether the sexual assault was committed by the defendant, as these would improperly and prejudicially invade the province of the jury.'" *Martin*, 687 S.E.2d at 365 (quoting *State v. Edward Charles L.*, 398 S.E.2d 123, 126 (W. Va. 1990)). Based on this precedent, the state circuit court found that Dr. Miller's testimony would clearly imply that D.B.'s testimony was not credible. (ECF No. 10-1 at 101).

In response, Petitioner cites *State v. Beck*, 286 S.E.2d 234, 241 (W. Va. 1981), for the proposition that West Virginia law permits expert testimony from a psychologist that it would be "unlikely" for a defendant to have committed a specific sexual offense. (ECF No. 14 at 11). In *Beck*, the issue was only raised in *dicta*, and *Beck* is far from an endorsement for the consistent admission of psychological profile testimony. The WVSCA noted in *Beck* that psychological profile testimony in sexual abuse cases comes with its "perils," and while the court cited a Supreme Court of Alaska case favorable to Petitioner's argument, the WVSCA did not ultimately conclude that such opinion testimony should be *per se* admissible. *Beck*, 286 S.E.2d at 245 n.8 (citing *Freeman v. State*, 486 P.2d 967, 972 n.8 (Alaska 1971)). Indeed, a number of state courts have parted ways on the issue. *See, e.g.*, *Commonwealth v. Trowbridge*, 636 N.E.2d 291, 295-96 (Mass. App. Ct. 1994) (collecting cases holding that sexual abuser profile evidence is inadmissible).

Other federal courts that have discussed this issue have noted that a majority of state courts "reject as irrelevant and scientifically unreliable proffered expert testimony that a criminal defendant is unlikely to have engaged in sexual misconduct because he or she does not exhibit certain indicators that the expert determined are associated either with pedophilia or sexual abuse." *Buley v. Woods*, No. 08-cv-13688, 2014 WL 4314849, at *9 (E.D. Mich. Sept. 2, 2014) (citing *Bowen v. Haney*, 622 F. Supp. 2d 516, 541-45 (W.D.Ky. 2008)); *Buley*, 622 F. Supp.2d at 544 ("[T]he exclusion of pedophile profile testimony is by far and away the majority view among all the state courts."); *see also Williamson v. Parker*, No. CIV-13-899-D, 2015 WL 1061131, at *16 (W.D. Okla. Mar. 10, 2015) (rejecting petitioner's claim that his trial was fundamentally unfair where state court excluded pedophile propensity evidence because it invaded province of jury); *Williams v. Schriro*, No. CV 06-3058-PHX-PGR, 2009 WL 42265, at *10 (D. Ariz. Jan. 7, 2009) ("As the trial court correctly noted, [psychologist's] testimony that [p]etitioner was not a 'true pedophile' would not assist the jury in determining whether Petitioner had committed sexual crimes against the victims, particularly given [psychologist's] testimony that seven out of ten adults who molest children are not 'true pedophiles.'").[22] Without clear direction from the WVSCA that the type of testimony Dr. Miller would have provided is *per se* admissible, and in light of the fact that the circuit court found that the testimony would have been inadmissible because it either invaded the province

---

[22] As the District Court for the Eastern District of Michigan pointed out, some courts have found that the underlying testing used to support such opinion testimony, such as the Abel Assessment used by Dr. Miller, is utterly unreliable. For example, in *United States v. White Horse*, 177 F. Supp. 2d 973, 974-76 (D.S.D. 2001), the court excluded testimony by an expert who conducted a "psychosexual examination" of the defendant, who was charged with sexually abusing his son. The expert would have testified that the defendant did not have a sexual interest in "underage boys." *Id.* at 974. However, the court noted that the expert relied on the Abel Assessment in reaching his conclusion, and that Part I of the Abel Assessment was unreliable, in part, because "almost one quarter of admitted pedophiles were inaccurately classified as non-pedophiles" by the test. *Id.* at 975; *compare United States v. Birdsbill*, 243 F. Supp. 2d 1128, 1136 (D. Mont. 2003) (holding Abel Assessment results unreliable), *with United States v. Robinson*, 94 F. Supp. 2d 751, 752-54 (W.D. La. 2000) (admitting Abel Assessment results).

of the jury or was irrelevant, the undersigned cannot conclude that defense counsel acted unreasonably in failing to call Dr. Miller at trial. *See Moore v. Hardee*, 723 F.3d 488, 497 (4th Cir. 2013) ("We decline to hold that by failing to call a witness whose testimony the state trial court had full discretion to exclude, . . . counsel rendered constitutionally deficient performance. . . . '[S]tate courts . . . have wide latitude' to determine when an expert is necessary.") (quoting *Richter*, 562 U.S. at 106).

Furthermore, Petitioner cannot demonstrate that he was prejudiced by counsel's decision to forgo calling Dr. Miller at trial. The State did not call, and likely would not have been permitted to call, any witness to testify on the subject of whether Petitioner possessed the indicators of pedophilia. Accordingly, defense counsel was not required to rebut such testimony, and reasonably could have feared the possibility of concessions that Dr. Miller might have made or potential rebuttal testimony by a State's witness on the subject. Certain facts that would have been elicited from Dr. Miller would not have been favorable to Petitioner. For example, Dr. Miller testified at the sentencing hearing that his method of testing produced a margin of error of at least five percent and that it was possible for a sexual offender to "pass" the battery of tests that Petitioner was administered. (ECF No. 10-4 at 62). Additionally, Dr. Miller stated that, on an "actuarial test," Petitioner was eleven percent likely to "commit an offense" in the next ten years. (*Id.* at 46). While this is a low percentage, anything above zero or a single-digit percentage may not have reflected particularly positively on Petitioner's character. Similarly, on the Abel Test, assuming the results were admissible, the jury would have heard that there was a twenty-six percent chance that Petitioner "sexually offended a boy outside of the family." (ECF No. 10-5 at 183). On the same test, Petitioner scored an eighty percent "Desirability Score," meaning that he wanted to be "seen in a good light."

(*Id.*) Moreover, Dr. Miller opined that Petitioner was suitable for treatment, e.g. individual therapy, and that he lacked victim empathy, which was not helpful to Petitioner's case. (ECF No. 10-4 at 47-48). Dr. Miller did confirm that Petitioner denied abusing D.B.; however, Dr. Miller also testified that denial was prominent in sexual offenders. (*Id.*) The jury also would have heard testimony from Dr. Miller that Petitioner admitted to being around Ms. Harless's home a few times, although Petitioner denied ever being alone with D.B. (*Id.* at 60; ECF No. 10-5 at 180). Notwithstanding Dr. Miller's ultimate conclusion, the above testimony may have damaged Petitioner's case as much as, if not more than, helped it.

In sum, defense counsel could have reasonably concluded, in light of the State's limited presentation of evidence, that Dr. Miller's testimony was an unnecessary gamble at trial. Moreover, the circuit court in its state habeas order found that Dr. Miller's testimony would have been inadmissible under West Virginia law, and Petitioner has failed to cite any convincing authority to the contrary. As the Fourth Circuit has recognized, defense counsel does not render ineffective assistance by "failing to call a witness whose testimony the state trial court had full discretion to exclude." *Hardee*, 723 F.3d at 497. For these reasons, the WVSCA's denial of Petitioner's claim is not contrary to, or an unreasonable application of, clearly established federal law.

### 3. Dr. Joan Phillips

Next, Petitioner contends that his trial counsel was ineffective when they failed to call Dr. Phillips at trial. (ECF No. 2 at 13). Petitioner asserts that Dr. Phillips would have testified that she examined D.B. for any physical signs of the alleged abuse and found none. (ECF No. 14 at 13). According to Petitioner, it would be "inconceivable" that D.B. would not have any sign of injury if his allegations were true. (*Id.*) In Petitioner's lay

opinion, if D.B. was abused in the way that he claimed, there would be, at the "very least," evidence of "fissures that occurred during the healing process." (*Id.*) The WVSCA denied Petitioner's claim for the same reason mentioned in the two preceding sections; specifically, the WVSCA determined that defense counsel made a strategic decision to refrain from calling Dr. Phillips and that Petitioner had failed to demonstrate any prejudice resulting from that decision. (ECF No. 10-1 at 176-77).

At trial, defense counsel was able to elicit from Detective Chapman on cross-examination that D.B. had been examined by a medical professional and that the medical professional did not find any evidence of trauma to D.B.'s genitalia or anus. (ECF No. 10-2 at 225). On redirect examination, the State did not attempt to rehabilitate Detective Chapman on this point, nor did the State call any medical expert witness at trial regarding the physical symptoms of sexual abuse and assault. During closing argument, defense counsel emphasized Detective Chapman's testimony as to the lack of medical evidence of abuse. (ECF No. 10-3 at 97). At the state habeas evidentiary hearing, Dr. Phillips testified that she often found no physical evidence of anal rape in the children that she examined, and that only approximately five percent of children who have experienced rectal penetration exhibit physical signs of such abuse. (ECF No. 10-5 at 39-40). In addition, Dr. Phillips stated that she examined D.B. in July 2008 and that all of her findings were negative, but that it would be "common" or "pretty common" that there would be no physical evidence of abuse nine months to one year after the abuse occurred, depending on the type of abuse. (*Id.* at 41-42, 44-45).

In *Green*, the Petitioner made a similar claim that counsel was ineffective in failing to call a medical expert in a sexual abuse trial. 2015 WL 1612198, at *3. Recognizing that the prosecution's expert witness provided "equivocal opinions" at trial

and that the prosecution's expert was unable "to conclude, based on the medical evidence, whether [the victims] had been sexually abused," this Court found that trial counsel was reasonable in deciding not to call a medical expert at trial. *Id.* Here, defense counsel was able to extract testimony from Detective Chapman that the medical examination findings for D.B. were negative *without* having the witness add the caveat that a lack of medical findings is the norm in this area, as Dr. Phillips undoubtedly would have done on cross-examination. Because defense counsel was able to make their medical evidence point through Detective Chapman, defense counsel acted reasonably in deciding not to call Dr. Phillips, who also certainly would have confirmed that most children who have been sexually abused do not exhibit signs of the abuse. Moreover, to the extent that Petitioner insists that Dr. Phillips's testimony was important to highlight any mismatch between D.B.'s allegations with relation to the abuse with the knife and the medical evidence, Petitioner was ultimately acquitted of the sexual assault charge concerning the knife. Finally, Petitioner cannot demonstrate any prejudice from his counsel's decision not to call Dr. Phillips at trial. The testimony from Dr. Phillips that would have been favorable to Petitioner was obtained through Detective Chapman, and the jury still convicted Petitioner on three of the four charged counts despite the absence of medical findings supporting the allegations of abuse. *Cf. Nuth*, 140 F.3d at 581 (holding no prejudice where testimony would have been cumulative). For these reasons, the WVSCA's denial of Petitioner's claim is not contrary to, or an unreasonable application of, clearly established federal law.

### 4. Dr. Julie Heinig

In his fourth ground for relief, Petitioner argues that trial counsel was ineffective when they failed to call Dr. Heinig at trial. (ECF No. 2 at 15). As there is no evidence that

Dr. Heinig was known to defense counsel at the time of trial, the undersigned interprets Petitioner's claim to mean that defense counsel should have generally called a serologist at trial, and recognizes that Petitioner cites Dr. Heinig's testimony at the state habeas evidentiary hearing as illustrative of the testimony that could have been obtained from a serologist at trial. Petitioner asserts that a serologist would have testified that DNA evidence could have been collected from the "crime scene" even though a number of months had passed between when the crimes occurred and when D.B. reported the crimes. (*Id.*) Moreover, Petitioner contends that a serologist would have testified that Detective Chapman should have performed a visual check for physical evidence as well as examined the scene using a ultraviolet light or Luminol testing. (*Id.* at 16). While Petitioner did not specifically raise this argument in his brief to the WVSCA, the WVSCA apparently addressed the claim and denied it on the merits, concluding that defense counsel made a strategic decision not to call a serologist at trial and that Petitioner had failed to demonstrate prejudice. (ECF No. 10-1 at 176-77).

At trial, Detective Chapman testified that he was trained in crime scene investigation, including the identification and collection of blood samples and semen samples. (ECF No. 10-2 at 213). Detective Chapman conceded that he did not attempt to collect any blood or semen samples from the clubhouse, and that he did not find a knife or blood or semen stains in the three locations that he searched: the "upstairs" of Ms. Harless's home, the bedroom in Ms. Harless's home, and the attic of the clubhouse. (*Id.* at 213, 223). With regard to the clubhouse's attic, Detective Chapman acknowledged that he did not climb into the attic, but rather stood at the top of the steps and looked into the attic during his search. (*Id.* at 224). However, Detective Chapman opined that he did not expect to find any "physical evidence" due to the passage of time between

when he believed the crimes occurred and when D.B. reported the crimes. (*Id.* at 209-10).

At the state habeas evidentiary hearing, Dr. Heinig asserted that when investigating allegations of sexual assault, it is helpful to perform a search of the area where the crime occurred with the aid of an ultraviolet light to detect the presence of any semen or saliva stains and Luminol testing to detect any blood stains. (ECF No. 10-5 at 71). Dr. Heinig explained that she would have performed both types of tests on all three areas identified by D.B. had she been employed to investigate the case. (*Id.*at 72-73). With regard to DNA evidence, Dr. Heinig asserted that DNA can last indefinitely "if not exposed to environmental insults," but clarified that "a little bit of degradation" of DNA is expected to occur over time. (*Id.* at 73-74). In relation to the possible existence of DNA evidence in Petitioner's case, Dr. Heinig opined that she did not think too much time had passed for law enforcement to have attempted to collect a DNA sample from the locations described by D.B., but whether a sample was obtainable depended on any environmental degradation factors. (*Id.* at 75-76). Petitioner's habeas counsel did not introduce any DNA test results at the evidentiary hearing.

Petitioner's claim fails as he cannot demonstrate prejudice. Because defense counsel was able to obtain concessions from Detective Chapman that there was no physical evidence linking Petitioner to the crime scene and that Detective Chapman did not attempt to collect blood or semen samples from the clubhouse, Dr. Heinig's testimony would have been somewhat cumulative. Moreover, Dr. Heinig's opinion that DNA evidence might have been obtainable when Detective Chapman searched the clubhouse is of little help to Petitioner *without knowing what the results of those tests would have been*. At the state evidentiary hearing, Petitioner failed to produce any

evidence on this point. Mere speculation that the test results might have been favorable to Petitioner is insufficient to establish prejudice. *See Anderson v. Sec'y, Dep't of Corr.*, No. 8:09-cv-2083-T-17EAJ, 2010 WL 4259448, at *8 (M.D. Fla. Oct. 25, 2010) ("In envisioning exonerating DNA test results, [petitioner] merely engages in speculation, which is insufficient to demonstrate actual prejudice."); *Sierra v. Schriro*, No. CV 06-350-PHX-ROS, 2008 WL 2065949, at *11 (D. Ariz. May 13, 2008) ("[P]rejudice based on speculation, is insufficient to establish an ineffective assistance of counsel claim under *Strickland*."). Ultimately, the jury was made aware of the absence of physical evidence against Petitioner and that Detective Chapman did not attempt to collect any blood or semen samples at the crime scene; they still found him guilty. In view of the speculative nature of Petitioner's argument, the WVSCA's denial of Petitioner's claim is not contrary to, or an unreasonable application of, clearly established federal law.

### 5. Lenora Harless

In his fifth ground for relief, Petitioner claims that trial counsel was ineffective when they failed to elicit testimony from Ms. Harless at trial. (ECF No. 2 at 18). Petitioner argues that Ms. Harless would have testified at trial that he lacked the opportunity to sexually abuse and assault D.B. (ECF No. 14 at 16). In addition, Petitioner contends that Ms. Harless would have testified that she suspected a neighbor of D.B.'s father had committed the crimes. (ECF No. 2 at 18). Finally, Petitioner asserts that the jury would have heard from Ms. Harless that Petitioner was only at her house "a few times" dating back to November 2007, which predates the time that the crimes occurred. (*Id.*) The WVSCA did not address this claim because Petitioner's counsel declined to raise the claim on appeal after the circuit court denied it. For the reasons in the Exhaustion and Procedural Default section above, the claim is procedurally

defaulted. Nonetheless, the undersigned addresses the merits of the claim *de novo*.[23]

In a May 2008 statement given to Detective Chapman, Ms. Harless stated that she had known Petitioner for "a few years" and that Petitioner began visiting her home approximately six months before the interview (approximately November 2007). (ECF No. 10-5 at 169-70). Ms. Harless stated that she did not know of any time when Petitioner and D.B. were alone together at her home, and that she did not recall Petitioner or D.B. spending time in the clubhouse. (*Id.* at 170-71). In addition, Ms. Harless informed Detective Chapman that Petitioner was "rough" with D.B. and that, on one occasion, she thought Petitioner pushed D.B. (*Id.* at 172-73). Ms. Harless also asserted that D.B. never complained to her about Petitioner. (*Id.* at 173). At trial, Detective Chapman testified that he had spoken with Ms. Harless during his investigation and that Ms. Harless had told him that she was unaware of any opportunity that Petitioner would have had to be alone with D.B. (ECF No. 10-2 at 222).

At the state habeas evidentiary hearing, Ms. Harless testified that her daughter and son lived with her for a period of time encompassing January 2007 through September 2007. (ECF No. 10-5 at 117). She stated that she knew Petitioner because he would visit her daughters, including D.B.'s mother, and that Petitioner had visited her home more than ten times in the past to see her daughters, both during the day and at night. (*Id.* at 118-21). Ms. Harless testified that she knew Petitioner and D.B. did not get along and recounted an incident where Petitioner pushed D.B. while both were in the kitchen of her home. (*Id.* at 123).

---

[23] The undersigned assumes, without deciding, that *de novo* review is appropriate when reaching the merits of a procedurally defaulted claim to deny it. *See Grobman v. Cash*, No. C 10-03785, 2011 WL 5599783, at *4 (N.D. Cal. Nov. 17, 2011) ("If a federal court chooses to analyze the merits of a federal claim that a state court denied on grounds of procedural default, it must apply a de novo standard of review rather than the deferential standard of § 2254(d).").

Petitioner's claim fails on the merits because he cannot meet either prong of *Strickland*. In his brief, Petitioner highlights Ms. Harless's statement that she did not know of any time when Petitioner and D.B. were alone together at her home. (ECF No. 14 at 16). Yet, this statement was introduced at trial through Detective Chapman. Moreover, D.B. testified that the abuse occurred while Ms. Harless was in bed asleep, and his mother was at the store. (ECF No. 10-2 at 160-61). Accordingly, Ms. Harless's statement that she was unaware of any time that Petitioner and D.B. were alone together is consistent with D.B.'s description of when the abuse occurred. With regard to Ms. Harless's statement to Detective Chapman that Petitioner only began visiting her home approximately six months before May 2008, her assertion was merely an estimate, and she remembered at the state habeas evidentiary hearing that Petitioner would visit her daughter at her home during the period when her daughter lived with her, which encompassed January 2007 through September 2007. In addition, there is no evidence in the record to support that Ms. Harless suspected that a neighbor of D.B.'s father had abused D.B. Given the lack of helpful testimony that defense counsel could have elicited from Ms. Harless at trial, and the potential that Ms. Harless would have testified that Petitioner visited her home at least ten times and that Petitioner and D.B. did not get along, Petitioner's counsel could have strategically decided that Ms. Harless's testimony, on balance, would not be beneficial to Petitioner's case.

Furthermore, Petitioner cannot demonstrate that there is a reasonable probability that, had Ms. Harless testified, the result of his trial would have been different. Indeed, the jury would have heard testimony from Ms. Harless that was unfavorable to Petitioner without much, if any, beneficial testimony in return. In addition, the jury heard from Detective Chapman the statement that Petitioner

primarily relies on in making this claim, and since D.B. alleged that Petitioner abused him while Ms. Harless was asleep, Ms. Harless's statement as to opportunity is largely inconsequential. Because Petitioner has failed to demonstrate that his counsel's representation fell below an objective standard of reasonableness or that any prejudice resulted from his counsel's decision to refrain from calling Ms. Harless at trial, his claim is unconvincing.

### 6. H.C.

Next, Petitioner asserts that trial counsel was ineffective when they failed to call H.C. to testify at trial. (ECF No. 2 at 20). Petitioner insists that H.C. would have testified that Mr. Mullins made inappropriate sexual advances toward her. (*Id.*) He maintains that Mr. Mullins is a "known sexual offender" who had access to D.B and that H.C.'s testimony would have pointed to Mr. Mullins as an alternate suspect. (ECF No. 14 at 18). Petitioner did not appeal this issue to the WVSCA, and for the reasons state above, the claim is procedurally defaulted. Nevertheless, the undersigned addresses the merits of the claim.

In June 2008, then nine-year-old H.C., provided a statement to Detective Chapman wherein she asserted that Mr. Mullins had pinched her "butt" on one occasion and made "some comments" to her. (ECF No. 10-5 at 188-89). At trial, Detective Chapman testified that he recalled interviewing H.C. and that H.C. had reported to him that Mr. Mullins had pinched her "butt" and made comments of a sexual nature to her while the two were at Ms. Harless's home. (ECF No. 10-2 at 218-19). Despite this information, Detective Chapman stated that he did not include a photograph of Mr. Mullins in the photographic lineup that he presented to D.B. because D.B. consistently identified Petitioner as his abuser. (*Id.* at 220, 227).

Again, Petitioner cannot establish either requirement of *Strickland*. Since defense counsel was able to elicit all of the beneficial facts from H.C.'s statement during Detective Chapman's testimony, defense counsel could have reasonably decided that calling H.C. as a witness would be cumulative and needlessly introduce the prospect of H.C. stating something detrimental to Petitioner's case. For the same reason, Petitioner cannot demonstrate any prejudice resulting from counsel's decision to decline calling H.C. at trial. *Cf. Nuth*, 140 F.3d at 581. The jury was informed that, according to H.C., Mr. Mullins pinched her "butt" and made sexual comments toward her. The jury was also aware that Mr. Mullins had performed these alleged acts at Ms. Harless's home. Still, the jury convicted Petitioner. Because Petitioner has not shown that his counsel's representation fell below an objective standard of reasonableness or that any prejudice resulted from his counsel's decision to refrain from calling H.C. at trial, his claim must fail.

### 7. Reverend Roger Boothe

In his seventh ground for relief, Petitioner asserts that trial counsel was ineffective when they failed to call Reverend Boothe to testify at trial. (ECF No. 2 at 22). Petitioner claims that Reverend Boothe would have testified that he was Ms. Harless's neighbor; that D.B. confided in him, particularly when it came to his home life; and that he tracked the license plates of persons visiting Ms. Harless's home at the request of D.B.'s father. (*Id.*) Petitioner argues that Reverend Boothe's testimony would have impeached D.B.'s credibility because D.B. never informed Reverend Boothe that he was abused, despite the "good relationship" shared by Reverend Boothe and D.B. (ECF No. 14 at 19). Petitioner did not appeal this issue to the WVSCA, and for the reasons state

above, the claim is procedurally defaulted. Notwithstanding, the undersigned addresses the merits of the claim.

Reverend Boothe testified at the state habeas evidentiary hearing that he was Ms. Harless's neighbor. (ECF No. 10-5 at 131). He further testified that he had a "pretty good relationship" with D.B., and that D.B. would come over and visit with him. (*Id.* at 137). Reverend Boothe also knew D.B.'s father, who told the Reverend that D.B. agreed to come to the Reverend if anything ever happened to him at Ms. Harless's home. (*Id.* at 138). In addition, Reverend Boothe stated that D.B. never informed him that anything was wrong. (*Id.*)

Petitioner's claim with regard to Reverend Boothe is unconvincing largely because Reverend Boothe's testimony is generally irrelevant as to whether Petitioner committed the acts alleged by D.B. Reverend Boothe did not testify that he was present or constantly monitored the events taking place on Ms. Harless's property. Furthermore, contrary to Petitioner's assertion, there is nothing in the record to suggest that Reverend Boothe agreed to track the license plates of persons visiting Ms. Harless's home. Even if Reverend Boothe had testified to that fact, it is unclear how that evidence would have been useful to the jury. Reverend Boothe did *not* testify that Petitioner was never at Ms. Harless's home. In fact, D.B. and Detective Chapman both testified that Petitioner had been to Ms. Harless's home, and Petitioner does not assert that he never visited Ms. Harless's home. In addition, Petitioner's argument that D.B. would have informed Reverend Boothe if he had been abused is *entirely* speculative. In fact, Reverend Boothe's testimony that D.B. never reported the abuse to him may have been viewed by the jury as consistent with D.B.'s testimony that he was afraid to report the abuse after being threatened by Petitioner. Moreover, there is no evidence in the record

that D.B. ever discussed issues of a personal nature with Reverend Boothe before the abuse occurred. Because Reverend Boothe's testimony at trial would have been predominantly, if not wholly, irrelevant and speculative, Petitioner has not demonstrated that his counsel's representation fell below an objective standard of reasonableness or that any prejudice resulted from his counsel's decision to refrain from calling Reverend Boothe at trial, his claim is unconvincing.[24]

### 8. Rachel Burdette

In his final claim of ineffective assistance of counsel, Petitioner contends that trial counsel erred in failing to call Ms. Burdette to testify at trial. (ECF No. 2 at 24). Petitioner asserts that Ms. Burdette would have testified that other men were present in Ms. Harless's home, including Mr. Mullins, and that the neighbor of D.B.'s father, who Petitioner believes is a potential suspect, had access to D.B. (*Id.* at 24; ECF No. 14 at 20-21). In denying this claim, the state circuit court found that Petitioner had not submitted any evidence as to what Ms. Burdette's testimony would have been at trial. As explained above, at the state habeas evidentiary hearing, Petitioner's counsel moved for the admission of and purportedly submitted a copy of the statement Ms. Burdette made to the police. (ECF No. 10-5 at 128). Seemingly, however, Petitioner's habeas counsel mistakenly omitted the transcript of Ms. Burdette's statement when providing the other statements that he simultaneously moved into evidence and submitted to the court. After receiving the circuit court's order denying habeas relief, which indicated that Ms. Burdette's statement was not in evidence, Petitioner's habeas counsel never supplemented the record and declined to pursue the claim on appeal to the WVSCA.

---

[24] Respondent also points out that, to the extent that defense counsel might have questioned Reverend Boothe at trial as to his opinion on D.B.'s credibility, as Petitioner's habeas counsel did at the state evidentiary hearing, any such testimony would have been improper and inadmissible under West Virginia law. (ECF No. 11 at 19).

Nevertheless, the undersigned will assume that the factual allegations made by Petitioner are true and review the claim on the merits.

Petitioner's argument is unavailing for a number of reasons. First, Petitioner's reliance on Ms. Burdette's statement that other men visited her mother's home is not particularly helpful considering that D.B. consistently identified Petitioner as the person who abused him. (ECF No. 10-5 at 199, 213-14, 228-30). Second, Ms. Burdette's testimony in relation to Mr. Mullins would have been cumulative given Detective Chapman's testimony that Mr. Mullins had visited Ms. Harless's home and allegedly acted inappropriately toward H.C. Third, defense counsel could have understandably been reluctant to call the victim's mother at trial as she almost certainly did not view Petitioner in a favorable light after her son accused Petitioner of committing heinous acts against him. *Cf. Green*, 2015 WL 1612198, at *30 (finding defense counsel not ineffective in failing to call victims' mother at trial where victims' mother was petitioner's ex-wife and she was not inclined to help petitioner) (citing *Boyle v. McKune*, 544 F.3d 1132, 1138 (10th Cir.2008) ("[T]he speculative witness is often a two-edged sword.")). Lastly, D.B.'s mother would have been yet another witness to describe D.B.'s allegations of abuse to the jury. In light of D.B.'s persistent identification of Petitioner as the man who abused him and Ms. Burdette's relationship to D.B., even accepting as true Petitioner's factual allegations, the undersigned cannot conclude that defense counsel's representation fell below an objective standard of reasonableness or that any prejudice resulted from counsel's decision not to call Ms. Burdette as a witness at trial.

### 9. Ineffective Assistance of Counsel Conclusion

The Fourth Circuit recently reminded district courts that a state court decision on the merits of an ineffective assistance of counsel claim should be "given the benefit of

the doubt," and that the standard for overcoming AEDPA deference requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Jones v. Clarke*, ____ F.3d ____, 2015 WL 1812952, at *2, *4 (4th Cir. Apr. 22, 2015) (quoting *Cullen*, 131 S.Ct. at 1398, and *Richter*, 562 U.S. at 103) (markings omitted). Petitioner has not met that burden here. Accordingly, having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has failed to establish that the state court's denial of claims 1, 2, 3, and 4 contained in his § 2254 petition was an unreasonable application of, or contrary to, clearly established federal law. Additionally, the undersigned **PROPOSES** that the District Court **FIND** that, to the extent claims 5, 6, 7, and 8 of Petitioner's § 2254 are *not* procedurally defaulted, those claims are also without merit. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on grounds one through eight of Petitioner's § 2254 petition.

### D. The Trial Court's Interruptions of Defense Counsel and Comments During Trial

In his ninth ground for relief, Petitioner insists that the trial court violated his right to due process under the Fourteenth Amendment when the court repeatedly interrupted defense counsel during trial. (ECF No. 2 at 25). Petitioner argues that the trial court's interruptions were particularly harmful because most of them came during the cross-examination of D.B. (*Id.* at 27). Petitioner asserts that the trial court's comments denied him his constitutional right to an impartial jury as the jury could not have viewed the evidence "neutrally" after hearing the trial court's comments;

particularly, when some of the jurors had personal relationships with the trial judge. (*Id.*; ECF No. 14 at 22). In addition, Petitioner maintains that the trial court's interruptions during the cross-examination of D.B. denied him this right to confront witnesses against him. (ECF No. 2 at 28; ECF No. 14 at 22). Respondent counters this argument by contending that Petitioner's citations to the record to support his claim are taken out of context and that the trial court interrupted and corrected the Prosecutor as well. (ECF No. 11 at 20-22). Moreover, Respondent points out that the trial court instructed the jury that they were to "infer the [c]ourt's impartiality throughout the proceeding." (*Id.* at 22).

As mentioned above, the WVSCA denied Petitioner's claim on the merits. With regard to Petitioner's impartial jury argument, the WVSCA concluded that Petitioner was not entitled to relief because the trial court "properly rebuked both sides" and the trial court "specifically instructed the jury that he was absolutely impartial and nothing he did or said should be taken as partiality." (ECF No. 10-1 at 177). In relation to Petitioner's Confrontation Clause claim, the WVSCA held that the trial court "did not prevent defense counsel from asking any questions on cross-examination, it merely asked that Ms. Tennen comply with the laws of this State and not unnecessarily tarry when cross-examining a young child." (*Id.*)

Beginning with Petitioner's jury impartiality claim, "[t]he Sixth and Fourteenth Amendments to the United States Constitution 'guarantee[ ] to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.'" *Hurst v. Joyner*, 757 F.3d 389, 394 (4th Cir. 2014) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). The Fourth Circuit has recognized that due process "has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment

requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002) (quoting *Morgan v. Illinois*, 504 U.S. 719, 727, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)).

Due process also secures a criminal defendant's right to an impartial trial judge. *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (citing *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)); *Montgomery v. Uchtman*, 426 F.3d 905, 910 (7th Cir. 2005) (citing same); *Layer v. Lyles*, 598 F. Supp. 95, 98 (D. Md. 1984). "The general presumption is that judges are honest and impartial." *Montgomery*, 426 F.3d at 910. In assessing judicial impartially, the Fourth Circuit has accepted that a judge is not merely a spectator at trial; rather, a judge must ensure that the presentations of counsel are not confusing to the jury and that trials do not become "protracted and costly affairs," even if that means that the trial judge must interrupt counsel. *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006); *see also United States v. Ecklin*, 528 F. App'x 357, 362 (4th Cir. 2013). "'A judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration' . . . do not establish bias or partiality." *United States v. Castner*, 50 F.3d 1267, 1274 (4th Cir. 1995) (quoting *Liteky v. United States*, 510 U.S. 540, 556, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). In addition, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge . . . they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible" *Liteky*, 510 U.S. at 555.[25] A trial judge's participation during trial,

---

[25] While *Liteky* concerned the federal recusal statute, federal courts have looked to it for guidance in resolving habeas claims of judicial bias. *See, e.g.*, *Willis v. Lafler*, No. 05-74885, 2007 WL 3121542, at *22 (E.D. Mich. Oct. 24, 2007).

however, should "never reach the point at which it appears clear to the jury that the court believes the accused is guilty." *Ecklin*, 528 F. App'x at 362 (citations and markings omitted); *see also United States v. Bencivengo*, 749 F.3d 205, 216 (3d Cir. 2014). Ultimately, "[t]o prevail on a claim of judicial misconduct, [Petitioner] must show that the state trial judge's conduct was so fundamentally unfair as to deprive [him] of [his] constitutional right to due process," and this task is an onerous one. *Paccione v. New York*, 353 F. Supp. 2d 358, 368 (E.D.N.Y. 2005).

While Petitioner raises his due process claim under the guise of an impartial jury argument, his position is better understood as a judicial bias claim. Essentially, Petitioner argues that the trial court's bias against defense counsel in front of the jury deprived the jury of an opportunity to impartially consider the evidence and stripped him of his right to a fair trial. Having reviewed the trial transcripts and summarized some of the more concerning interruptions by the trial court above, the undersigned agrees with Petitioner that the trial court disproportionately interrupted defense counsel throughout the trial when compared with the number of interruptions suffered by the State.[26] The undersigned also agrees with Petitioner that the trial court, at times, displayed excessive impatience with defense counsel, and that the trial court felt compelled on a number of occasions to implicitly remind Ms. Tennen, in front of the jury, that she was not from West Virginia. (ECF No. 10-2 at 5, 192, 202). Nonetheless, the trial court's conduct was not so egregious as to deprive Petitioner of a fair trial in front of an impartial jury. Many of the trial court's interruptions were interposed during the cross-examination of D.B. While Ms. Tennen displayed some difficulty in attempting

---

[26] The State was interrupted at least five times throughout the trial. (ECF No. 10-2 at 147, 159, 163, 167; ECF No. 10-3 at 30).

74

to impeach D.B. on cross-examination, which made her questioning seem disorganized, overall, her cross-examination of D.B. was effective.[27] In addition, many of the interruptions by the trial court concerned trial procedure and methods for expediting the trial process, not the substance of the evidence presented. *See Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir. 1997) (recognizing that, in considering judicial bias or misconduct claim, court must "differentiate between expressions of impatience, annoyance or ire, on the one hand, and bias or partiality, on the other hand."). While the trial court's conduct might have disproportionately affected the defense, the trial court did not advocate for either side throughout the trial, e.g. by examining witnesses or remarking as to the substance of witness testimony, and the court did not exhibit any belief that the defense was incredible or that Petitioner was guilty of the crimes charged. In other words, the court's interruptions and comments did not "demonstrate bias against [P]etitioner himself." *Willis v. Lafler*, No. 05-74885, 2007 WL 3121542, at *22 (E.D. Mich. Oct. 24, 2007). Furthermore, the comments were directed at counsel, and not at Petitioner, which also undermines Petitioner's argument. *See id.* (finding that relief on judicial bias claim must generally be supported by comments against petitioner, not petitioner's counsel). Finally, as the WVSCA recognized, the trial court instructed the jury both during initial jury instructions and final jury instructions that it remained impartial and neutral, and that the jury should not glean any indication of the court's opinion as to Petitioner's guilt from the court's comments or rulings. In sum, the undersigned cannot conclude that trial court's "behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States

---

[27] It is possible that Ms. Tennen had difficulty with impeachment given the trial court's somewhat conflicting direction as to how he would prefer Ms. Tennen to question D.B., (ECF No. 10-2 at 174, 200), and the State's interruption of her questions laying the foundation for impeachment before she could finish, (*id.* at 187).

Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995). For that reason, the WVSCA's decision denying Petitioner's impartial jury due process claim was not contrary to, or an unreasonable application of, clearly established federal law.

Turning to Petitioner's Confrontation Clause claim, "the Sixth Amendment's Confrontation Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015) (quoting U.S. Const. amend. VI.). The Sixth Circuit effectively summarized the interplay between the Confrontation Clause and a trial court's discretion in the area of trial management as follows:

> Although the Confrontation Clause generally protects a defendant's right to cross-examine the witnesses against him, the Supreme Court has recognized that trial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. The Court has thus explained that the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*United States v. Hynes*, 467 F.3d 951, 960 (6th Cir. 2006) (citations and markings omitted) (ellipsis in original); *see also Quinn v. Hayne*, 234 F.3d 837, 847 (4th Cir. 2000) (recognizing that the Confrontation Clause does not prevent "a trial court from imposing any limits on the scope of defense counsel's cross-examination and presentation of evidence related to the impeachment of a key prosecution witness's credibility."). "[A]lleged violations of the right to confrontation are subject to harmless error analysis." *Davis v. Painter*, No. 2:00-0278, 2000 WL 34333294, at *4 (S.D.W.Va. Dec. 8, 2000) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

Petitioner argues that the trial court's interruptions during the cross-examination of D.B. denied him his Sixth Amendment right to confront witnesses against him. However, as noted above, many of the trial court's interruptions of Ms. Tennen's cross-examination of D.B. concerned appropriate courtroom procedure. The trial court correctly displayed some apprehension that some of Ms. Tennen's comments during questioning could be construed as her essentially attempting to testify. The trial court also interrupted when it believed that Ms. Tennen's methods of impeachment were running afoul of the West Virginia Rules of Evidence. These interruptions, although numerous, did not serve to limit the scope of Ms. Tennen's cross-examination nor did they preclude Ms. Tennen from competently cross-examining D.B. and impeaching his credibility. Ultimately, defense counsel had ample opportunity to cross-examine D.B. and did so effectively, persevering through the trial court's interruptions. *See Hynes*, 467 F.3d at 960 (denying Confrontation Clause claim where defense counsel had ample opportunity to cross-examine witnesses against him and "exercised that opportunity at length"). Moreover, as defense counsel was able to impeach D.B.'s credibility on cross-examination, any error created by the trial court's interruptions was harmless. *See, e.g.*, *Willis*, 2007 WL 3121542, at *24. For these reasons, the WVSCA's decision denying Petitioner's Confrontation Clause claim was not contrary to, or an unreasonable application of, clearly established federal law.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has failed to establish that the state court's denial of Petitioner's impartial jury and Confrontation Clause claims was an unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on

ground nine of Petitioner's § 2254 petition.

### E. Alibi

In his final claim for relief, Petitioner maintains that he was denied due process under the Fourteenth Amendment when the trial court refused to allow him to assert an alibi defense. (ECF No. 2 at 29). Specifically, Petitioner argues that the trial court denied his right to present an alibi defense by refusing to provide the jury with an alibi instruction. (ECF No. 14 at 23). He contends that an alibi instruction would have caused "the jury to focus on the[] many inconsistencies [in D.B.'s statements] and on the evidence consistent with Petitioner's innocence." (*Id.* at 23). In particular, Petitioner emphasizes D.B.'s statements that the crimes took place after D.B. had been placed in foster care, when Petitioner had no access to him. (*Id.*) Petitioner claims that he had "an absolute right to present a defense based upon due process principles." (*Id.* at 24).

At trial, the court denied defense counsel's request for an alibi instruction on the ground that Petitioner had failed to present any evidence supporting an alibi. (ECF No. 10-3 at 51-52). The trial court also denied Petitioner's request for a new trial based on the same argument post-trial. (ECF No. 10-1 at 11). The court reasoned that the plain language of the jury instruction required Petitioner to present some evidence at trial that "he was some other place" at the time of the crimes, which he did not. (*Id.*) Thus, the court concluded that Petitioner was not entitled to an alibi instruction. In addressing Petitioner's alibi claim, the WVSCA pointed out that Petitioner filed a notice of alibi for a particular week in May of 2008 while he was indicted for acts occurring between January 2007 and September 2007. (ECF No. 10-1 at 178). The WVSCA added that Petitioner had failed to present any evidence of alibi at trial. (*Id.*) Consequently, the

WVSCA concluded that the trial court did not err in denying Petitioner's request for an alibi instruction. (*Id.*)

The Fourth Circuit has recognized that state trial court jury instructions are "matters of state law and procedure not involving federal constitutional issues, and are therefore not reviewable in a federal habeas proceeding." *Nickerson v. Lee*, 971 F.2d 1125, 1137 (4th Cir. 1992) (internal quotations omitted), *abrogated on other grounds by Yeatts v. Angelone*, 166 F.3d 255 (4th Cir. 1999). A "federal court may grant habeas relief only when the challenged instruction 'by itself so infected the entire trial that the resulting conviction violates due process,' it is not enough that the instruction was undesirable, erroneous, or even universally condemned." *Nickerson*, 971 F.2d at 1137 (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). "[A]n omitted instruction is less likely to be prejudicial than a misstatement of the law, which means that a petitioner seeking habeas relief based on a trial court's failure to give a particular instruction has an 'especially heavy' burden of demonstrating that the failure to give the instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment." *Kellum v. Pierce*, 24 F. Supp. 3d 390, 404 (D. Del. 2014) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154-55, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977)).

Preliminarily, the undersigned notes that Petitioner has not demonstrated that he was entitled to an alibi instruction under West Virginia law. As the trial court found, the defense did not offer evidence of alibi at trial. Furthermore, according to the WVSCA, the notice of alibi filed by the defense did not relate to the dates of the indictment. However, even assuming that Petitioner was entitled to an alibi instruction under state law, he has not cited any clearly established federal law supporting his position that the

trial court's refusal to provide an alibi instruction violated his due process rights.[28] On the contrary, other federal courts faced with similar arguments have found that "there is no constitutional requirement [to provide] an alibi instruction." *Echols v. Ricci*, 492 F. App'x 301, 313 (3d Cir. 2012); *see also Duckett*, 67 F.3d at 744 ("We, [the Ninth Circuit], have never held . . . that failure to give a specific alibi instruction is necessarily a constitutional violation. Nor has any other circuit."); *Meyer v. Lanham*, 27 F. Supp. 2d 616, 619 (D. Md. 1998) ("There is . . . no specific federal right recognized by the Supreme Court of the United States to have an alibi instruction."). Furthermore, Petitioner has not demonstrated that "the failure to give an alibi instruction was so prejudicial as to have rendered his trial unfair." *Kellum*, 24 F. Supp. 3d at 404. Stated differently, Petitioner has failed to show that the trial court's omission of an alibi instruction "by itself so infected the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147. Indeed, the trial court instructed the jury a number of times that, in order to convict Petitioner, the State had the burden to prove beyond a reasonable doubt that Petitioner was the person who abused and assaulted D.B. (ECF No. 10-3 at 70-71, 73-74, 76, 78, 80-82); *cf. Echols*, 492 F.App'x at 313 (rejecting similar claim where state trial court instructed jury that state carried burden to prove, beyond a reasonable doubt, petitioner's presence at the crime scene); *Duckett*, 67 F.3d at 745 (same); *Alicea v. Gagnon*, 675 F.2d 913, 926 (7th Cir. 1982) (rejecting petitioner's argument that state trial court erred in failing to provide alibi instruction where jury was

---

[28] Petitioner relies on Supreme Court precedent supporting the proposition that a criminal defendant's right to due process includes "the right to a fair opportunity to defend against the State's accusations." (ECF No. 14 at 24) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). In other words, a criminal defendant has the right to present a defense, including offering the testimony of witnesses, examining witnesses against him, and compelling witness attendance. *Washington v. Texas*, 388 U.S. 14, 18-19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Petitioner has not alleged that he was denied any of these rights.

informed the petitioner's presence at scene of crime was necessary for conviction); *Meyer*, 27 F. Supp. 2d at 619 ("In no significant way did the omission of the [alibi] instruction diminish the state's burden of proving the defendant guilty beyond a reasonable doubt."). Accordingly, the WVSCA's denial of Petitioner's alibi claim was not contrary to, or an unreasonable application of, clearly established federal law.

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner has failed to establish that the state court's denial of his alibi claim was an unreasonable application of, or contrary to, clearly established federal law. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on ground ten of Petitioner's § 2254 petition.

## V.    <u>Proposal and Recommendations</u>

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** as follows**:**

1. Respondent's Motion for Summary Judgment, (ECF No. 10), be **GRANTED**;

2. Petitioner's Petition for a Writ of Habeas Corpus by a Person in State Custody, (ECF No. 2), be **DENIED**; and

3. That this action be **DISMISSED, with prejudice**, and removed from the docket of the court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Petitioner shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the

"Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner, Respondent, and any counsel of record.

**FILED:** April 27, 2015

Cheryl A. Eifert
United States Magistrate Judge