## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

SCOTTY E. BOOTHE,

                    Petitioner,

v.                                       CIVIL ACTION NO.   2:14-cv-25165

DAVID BALLARD,

                    Respondent.


### MEMORANDUM OPINION AND ORDER


Pending before the Court are Petitioner's[1] *pro se* Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "Petition"), (ECF No. 2), Petitioner's Motion for an Evidentiary Hearing, Appointment of Counsel and Memorandum in Support Thereof (the "Motion for Hearing and Appointment of Counsel"), (ECF No. 15), and Respondent's Motion for Summary Judgment, (ECF No. 10). On April 27, 2015, Magistrate Judge Cheryl A. Eifert entered proposed findings of fact and recommendations for disposition (the "PF&R"), in which she denied the Motion for Hearing and Appointment of Counsel and recommended that the Court grant Respondent's Motion for Summary Judgment, deny the Petition, and dismiss this matter. (ECF No. 21.) Petitioner filed timely objections to the PF&R on May 12, 2015 (the "Objections"). (ECF No. 22.)

---

[1] The Court notes that the docket for this case lists the Petitioner as the "Plaintiff" and the Respondent as the "Defendant."

For the reasons provided herein, the Court **OVERRULES** the Objections, (ECF No. 22), **ADOPTS** the PF&R, (ECF No. 21), to the extent it is consistent with this Memorandum Opinion and Order, **GRANTS** Respondent's Motion for Summary Judgment, (ECF No. 10), **DENIES** the Petition, (ECF No. 2), in its entirety, **AFFIRMS** the Magistrate Judge's denial of Petitioner's Motion for Hearing and Appointment of Counsel, (ECF No. 15), and **DISMISSES** this case **WITH PREJUDICE**.

### *I.   Background*

This case involves a collateral attack by a state prisoner on his conviction pursuant to 28 U.S.C. § 2254. The extensive pertinent background for this matter is as follows.

### A.      Initial State Proceedings and Direct Appeal

On September 9, 2008, Petitioner was indicted in Fayette County, West Virginia on four counts: (1) Count One—sexual assault in the first degree by unlawfully and feloniously penetrating the anus of the victim ("D.B.") "with his penis" in violation of West Virginia Code § 61-8B-3; (2) Count Two—sexual assault in the first degree by unlawfully and feloniously penetrating the anus of D.B. "with the handle of a knife" in violation of West Virginia Code § 61-8B-3; (3) Count Three—sexual abuse in the first degree by unlawfully and feloniously "subject[ing]" D.B. "to sexual contact by intentionally touching his penis with his hand . . . for his sexual gratification" in violation of West Virginia Code § 61-8B-7(a)(3); and (4) Count Four—sexual abuse in the first degree by unlawfully and feloniously "subject[ing]" D.B. "to sexual contact by placing [D.B.'s] hand on his penis . . . for his sexual gratification" in violation of West Virginia Code § 61-8B-7(a)(3). (ECF No. 10, Ex. 1 at 2–3.) The indictment alleged that these acts occurred between January 2007 and September 2007, (*id.* at 2), when D.B. was five years old and Petitioner was

thirty-two years old, (*see* ECF No. 10, Ex. 12 at 212 (providing the testimony of Detective Glen Chapman that D.B.'s date of birth is October 17, 2001 and Petitioner's date of birth is December 8, 1974)).

"Petitioner's trial took place on October 20-21, 2009." (*Id.*, Ex. 11 at 173.) Petitioner's trial counsel included "Gina Tennen from the Liberty Law Group in California," (*id.*), and R. Lavoyd Morgan from Lewisburg, West Virginia, (ECF No. 10, Ex. 12 at 2). Following jury selection, the trial court gave initial instructions to the jury wherein he stated, in pertinent part, that "the way or the manner that [the trial judge] rule[s] on any . . . matters must never ever be taken by any of you as any indication at all that [the trial judge] favor[s] one side or the other in this case, because [the trial judge] do[es] not." (*Id.* at 118–19.) The trial court further instructed the jury that, "[a]s presiding [j]udge throughout this entire trial at all times [the trial judge] stand[s] completely neutral, impartial, and indifferent as between the State of West Virginia and [Petitioner]." (*Id.* at 119.)

During Petitioner's opening statement, Mr. Morgan asserted that "there are no medical reports supporting any physical abuse of this child, there are no medical reports substantiating any trauma to this child, . . . psychological or physical . . . . [y]ou're not going to hear any of that." (*Id.* at 138.) Mr. Morgan also argued that "[t]here is no physical evidence, no blood evidence, no semen evidence, no medical evidence [and] no scientific evidence." (*Id.*) Mr. Morgan further asserted that the jury would "hear from a doctor who is a board certified forensic psychiatrist . . . and a board certified neuropsychiatrist" who would testify that Petitioner "does not exhibit any characteristics of a pedophile." (*Id.* at 139.) Finally, Mr. Morgan argued that the State was "going to try to convince [the jury] that [Petitioner] did these horrible things to this little boy based on

3

what the little boy said," (*id.* at 140), and that D.B.'s "stories . . . changed dramatically each time he was interviewed," (*id.* at 138).

The prosecution's first witness was D.B.'s foster parent—Robbie McGee. Mr. McGee testified that he spoke with D.B. after he found D.B. behind another child performing "a humping motion." (*Id.* at 143–44.) According to Mr. McGee, D.B. told him "that when he was at his mama's house a man played with his weenie and had him play with the man's weenie" and the man "had a knife and was playing in the back of him." (*Id.*) Mr. McGee testified that D.B. named Petitioner as the man who performed these acts and that he did not tell his mother or father about the incident because Petitioner was "going to kill them." (*Id.* at 145–46.) Mr. McGee also testified that he and D.B.'s other foster parent then immediately called a 1-800 number they received as foster parents "in case of emergencies" and reported D.B.'s statements. (*Id.* at 146.)

On cross-examination, Mr. McGee testified that D.B. was "confused" when Mr. McGee "stopped" D.B. from performing the humping motion on another child because "he didn't know it was right or it was wrong." (*Id.* at 152.) Mr. McGee also testified that D.B. was "confused why [Mr. McGee] stopped [D.B.]" and "was still confused until [they] talked about it." (*Id.*)

The state next called D.B. who was eight years old at the time of trial. (*Id.* at 155.) D.B. testified that Petitioner entered his grandmother's house while his grandmother and brother were asleep and his mother was at a store. (*Id.* at 160–61.) D.B. testified that Petitioner then "picked [D.B.] up," "ran outside," and "[w]ent down to the clubhouse." (*Id.* at 161.) D.B. testified that Petitioner placed his "weiner" in D.B.'s "butt" and "humped" him. (*Id.* at 162.) D.B. further testified that Petitioner also placed "[t]he handle and the sharp part" of a brown "pocket knife" in his "butt." (*Id.* at 163–64.) D.B. next testified that he saw "white stuff" on Petitioner's "weiner"

after D.B. "touched [Petitioner] with [his] hand" on Petitioner's "weiner." (*Id.* at 164–65.) D.B.

testified that he ran inside his grandmother's house after the incident and did not "tell . . . anybody

about what happened" because Petitioner "said he would kill [D.B.'s] mom and dad." (*Id.* at 166–

67.) Finally, D.B. testified that he told his foster parents—"Yvonne and Robbie McGee"—about

the incident after D.B. "[h]umped" another child. (*Id.* at 168.)

On cross-examination by Ms. Tennen, D.B. testified that he recalled telling an individual

named Toni Householder that Petitioner "did this to [him] 20 times." (*Id.* at 175.) However, D.B.

later testified that he did not recall telling this to "Toni." (*Id.* at 190.) D.B. also testified that he

recalled telling "Angela that this happened one time." (*Id.* at 190.) Additionally, D.B. testified that

he "only saw the person that did this to [him] one time," but he saw Petitioner "more than one time

at . . . [his] grandmother's house." (*Id.* at 181.)

D.B. also testified that the assault occurred "in an attic of the clubhouse." (*Id.* at 177.) D.B.

described the "attic" as having "a concrete floor" and "brick walls." (*Id.* at 197.)

D.B. further testified on cross-examination that he recalled telling Detective Chapman that

he was "only kind of sure" that the person he identified from a photo array "looked like" Petitioner

"because the man who did this to [D.B.] had a mustache." (*Id.* at 179.) D.B. also testified that he

recalled telling Detective Chapman and "Angela" that he was standing "straight up" when the

Petitioner "humped" him and "stuck a knife" in D.B.'s rectum and that Petitioner "hump[ed]" him

and stuck "a knife up [his] butt at the same time." (*Id.* at 183.) D.B. testified that he recalled saying

that "the knife stayed the same color and the same size the entire time" and that he "saw [Petitioner]

put it inside of [D.B.'s] butt." (*Id.* at 185–86.) D.B. also testified that, while the assault "hurt[],"

he did not bleed "all over the . . . floor" or "in [his] underwear," he did not have "problems going

to the bathroom" or "walking afterwards," he did not "go in an ambulance" or "have surgery on [his] butt," and he did not "cry[] hysterically." (*Id.* at 184–85.)

The trial court interrupted Ms. Tennen's cross-examination of D.B. on numerous separate occasions. (*See, e.g.*, *id.* at 177, 181–82, 187–88, 191–95, 198, 200–01.) The West Virginia Supreme Court of Appeals (the "WVSCA") later noted that the trial court "interrupted Ms. Tennen sixty-seven times during her cross-examination of D.B." *Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at *5 (W. Va. June 19, 2014).

The prosecution's third and final witness was Detective Glen A. Chapman, II. Detective Chapman testified that he interviewed D.B. on May 21, 2008. (*Id.* at 206.) According to Detective Chapman, D.B. told him during this interview that Petitioner "picked [D.B.] up out of the living room of his grandma's residence," "took [D.B.] to Uncle Paul's clubhouse," "put his penis in [D.B.'s] rectum as well as the knife," "touched [D.B.'s] penis in a back and forth motion and made [D.B.] do the same to [Petitioner's] penis," and "wet stuff [came] out of" Petitioner's penis. (*Id.* at 206–07.) Detective Chapman then testified that he showed D.B. a "photo array" with "six photographs" and D.B. identified Petitioner as the assailant. (*Id.* at 208–09.) Detective Chapman testified that he searched "the clubhouse" and did not "find any physical evidence." (*Id.* at 209–10.) Detective Chapman further testified that he determine the date range when the assault occurred as between "January to September of 2007" based on D.B.'s statements that the incident occurred before he went to foster care and the weather was "cool" at the time of the incident. (*Id.* at 210–11.)

During the cross-examination of Detective Chapman by Mr. Morgan, Detective Chapman testified that D.B. said in different statements that "it happened in the bedroom of the house," "'in

the attic of the clubhouse," and "in the upstairs of the house." (*Id.* at 223.) Detective Chapman also testified that he received training on "how to collect" and identify semen and blood samples. (*Id.* at 213.) However, Detective Chapman testified that he did not "attempt to obtain any samples from any of the locations that [D.B.] said this happened," (*id.*), and instead "look[ed] in those places," but did not find a knife, blood stains, or semen stains "in any of those places," (*id.* at 223).

Detective Chapman testified that he selected the photographs for the photo array he provided to D.B. "[b]ased upon physical characteristics of the picture" and he did not perform an "investigation to find if there were other people in the neighborhood that [D.B.] might know that looked like [Petitioner]." (*Id.* at 215–16.) Detective Chapman also testified that he did not "do a survey of the registered sex offenders that lived in the area around where this happened," but was not "surprise[d]" that "there were six." (*Id.* at 216.) Detective Chapman further testified that he interviewed D.B.'s sister, H.C., and she "stated during an interview that there is a male subject at her grandmother's residence" who "made comments of a sexual nature to her and who had pinched her butt." (*Id.* at 218–19.) Detective Chapman testified that H.C. "later identif[ied]" this individual as "Doug Mullins." (*Id.* at 219.) Detective Chapman then testified that he "had this information before [he] showed [D.B.] the photo array," but did not "include a photograph of Doug Mullins in the photo array." (*Id.* at 220.)

Detective Chapman stated that he heard D.B. testify that D.B. did not "know for sure if something happened before or after foster care" and that Detective Chapman—not D.B.—"decided when this allegedly happened." (*Id.* at 217.) Detective Chapman also testified that he spoke with D.B.'s grandmother, Lenora Harless, who said "that there was no opportunity that she was aware of" when Petitioner "could have been alone with [D.B.]." (*Id.* at 222.)

7

Detective Chapman next testified that he requested an examination of D.B. "at the Women's and Children's Hospital in Charleston" and the results of this examination were "negative" for "any trauma to the genitalia or anus" and "[t]here was no medical evidence that a knife" or "anything else" had "been stuck up [D.B.'s] butt." (*Id.* at 224–25.) Detective Chapman further testified that "a social worker" named Ms. Culp "interviewed [D.B.]" and found "that [D.B.] didn't exhibit any symptoms of trauma." (*Id.* at 225.)

On redirect, Detective Chapman testified that when "there has been an identification of someone, then there is generally no need to search for anybody else." (*Id.* at 227.) Detective Chapman also testified that the assault could not "have happened" during or after the time when D.B. was in foster care. (*Id.* at 227–28.)

Following the close of the State's case-in-chief—and outside of the presence of the jury—the prosecution inquired regarding some potential defense witnesses. (*See* ECF No. 10, Ex. 13 at 4–12.) The prosecution stated that it had "a problem" with Petitioner calling Sandra Culp, to which defense counsel replied that they would "[p]robably not" call Ms. Culp. (*Id.* at 5–6.) Next, the prosecution noted that it took issue with Petitioner calling Dr. Bobby Miller as "an expert witness" because the State did not "receive[] a report from Dr. Miller" and "there was some mention in Court" that Dr. Miller would offer "improper evidence" regarding whether Petitioner "fit[s] the profile of a pedophile." (*Id.* at 6–7.) Petitioner's trial counsel responded that they could not "say for sure" whether there was a report from Dr. Miller and they were not "sure" whether they would call Dr. Miller, to which the trial court provided the following response: "I'm not sure you're going to get to. There you go." (*Id.* at 11.)

The defense called two witnesses during the trial. The defense's first witness—Nathan Glanden—was "the owner and investigator for Blue Ridge Investigations" and a former "Chief of Police in . . . Gilbert . . . , West Virginia." (*Id.* at 15–16.) Mr. Glanden testified that he went to "the scene of the" alleged incident at the request of the defense and took "measurements and photographs of that property." (*Id.* at 17; *see also id.* at 17–22 (providing that the defense entered as exhibits three photographs and two drawings of the attic and surrounding area created by Mr. Glanden).) Mr. Glanden testified that the tallest part of the "attic" of the "clubhouse" was "58 inches or 4 feet 10 inches tall." (*Id.* at 21.) Mr. Glanden also testified that he "pulled . . . up" information "through the West Virginia State Police Sex Offender registry page"—which then "diverted [him] to Family Watchdog dot com"—that "[t]here [were] three sex offenders within a one mile radius" and "a total of six within a five mile radius of [Mr. Harless'] residence." (*Id.* at 26–27.) On cross-examination, Mr. Glanden testified that he did not "take any pictures" or "measurements" of "the downstairs area of this building." (*Id.* at 29–31.)

The defense's second witness was Dr. Gail Swarm. Dr. Swarm testified that she is "an Associate Professor of Family Medicine and a practicing family physician" at "the West Virginia School of Osteopathic Medicine and Robert C. Byrd Clinic." (*Id.* at 34.) Dr. Swarm testified that she treated Petitioner from "around 2005 to 2008" for the purpose of "continuing his pain management for his Workers' Compensation case." (*Id.* at 35–36.) Dr. Swarm also testified that she treated Petitioner "for chronic low back pain secondary to an injury" sustained "in the coal mines" and Petitioner was diagnosed with a back ailment called "post-laminectomy syndrome." (*Id.* at 37.) Dr. Swarm opined that, "as a result of [Petitioner's] condition," "[h]e is not able to bend, crouch, climb safely, [or] stoop down in small places" and that "any sustained activity can

really aggravate [his] back." (*Id.* at 38.) Dr. Swarm next testified that Petitioner had not worked "[s]ince his injury" and, in her opinion, Petitioner's condition "affect[ed]" Petitioner's "ability to work or continue [to] work in the coal mines" because that type of work requires "stand[ing] for prolonged periods of time in a low position." (*Id.* at 38–39.)

On cross-examination, Dr. Swarm testified that Petitioner could not "bend" or "crouch" for "sustained periods of time without that then causing possibly further injury and . . . pain." (*Id.* at 40.) Dr. Swarm also testified that Petitioner was "status quo" in that he did not demonstrate any "improvement in his condition" during the period of time when she treated Petitioner. (*Id.* at 41.)

"At some point, [P]etitioner filed a notice of alibi for the time period of May 11-17, 2008 . . . ." *Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at *2 (W. Va. June 19, 2014). Following the close of the defense's case, Petitioner's trial counsel requested that the trial court give the jury an alibi instruction for this week in May 2008. (*See* ECF No. 10, Ex. 13 at 51.) The trial court denied this request on the basis that there was not "evidence to support it." (*Id.* at 52.)

The trial court then stated the following as part of the final jury instructions:

Nothing that I have said or done at any time during this trial can be considered by you as evidence of any fact or as indicating my opinion concerning any fact, or as being any comment by me upon any evidence or the credibility of any witness, the weight of any evidence, the guilt or innocence of the defendant, or that I favor one side or the other in this case. As presiding [j]udge I must and I do stand completely neutral and impartial throughout the entire trial.

. . .

Also, you are not to be concerned with the language or tone of voice I used in any of my rulings.

(*Id.* at 64–65.) The trial court also instructed the jury at least five separate times that the State bears the burden of proving that Petitioner was guilty of the alleged offenses beyond a reasonable doubt. (*See id.* at 70–71, 73–74, 76, 78, 80–81.)

The parties presented their closing arguments following the final jury instructions. (*See id.* at 85–112.) During these arguments, both the prosecution and defense repeatedly emphasized that the prosecution's case centered on the testimony of D.B. (*See, e.g.*, *id.* at 85 (providing the prosecution's argument that if the jury believed "[D.B.'s] testimony, then the defendant is guilty of all four counts"); *id.* at 87 (providing the State's assertion that "[i]f [the jury] believe[d]" D.B.'s testimony, "then [Petitioner] is guilty of [c]ount one"); *id.* at 107 (constituting the prosecution's acknowledgment that "while, no, there is no one that can corroborate what happened in that building, [D.B.] did tell the tale"); *id.* at 103 (providing the defense's argument that the "State wants [the jury] to believe, based on the testimony of [D.B.], that [Petitioner] . . . committed these acts" and the prosecution wanted the jury "to convict [Petitioner] of four felony counts based on that"); *id.* at 105 (providing the defense's assertion that "[t]he State is . . . asking [the jury] to convict [Petitioner] of these felony counts based on solely the ever-changing testimony of a small child with no supporting proof").) Both parties also noted that the State did not offer any physical evidence during trial. (*See, e.g.*, *id.* at 89 (providing the prosecution's acknowledgement that "there is no DNA or blood or fingerprints"); *id.* at 96–97 (providing the defense's statement during closing arguments that the prosecution failed to provide any physical or medical evidence in support of its case); *id.* at 103 (providing the defense's argument that "there was no blood, there was no injury, no medical evidence, and . . . the child had no trauma"); *id.* at 104 (providing the

defense's assertion that "[t]here is no medical evidence, no physical evidence, no scientific evidence, there is no other evidence").)

After closing arguments, the jury retired for deliberations. (*See id.* at 114–15.) The jury returned to the court after approximately 80 minutes of deliberations with the following question: "we would like to know . . . how often [Petitioner] was at the residence of Ms. Harless, and was there anything said to that effect?" (*Id.* at 117.) The trial court declined to answer the jury's question "because the law is that [the jury] heard all of the testimony and [the jurors] have to rely on [their] recollection." (*Id.*) Following roughly 24 minutes of additional deliberations, the jury found Petitioner guilty as to Counts One, Three, and Four of the indictment and not guilty as to Count Two. (*See id.* at 119–20.)

Following trial, Petitioner filed a motion to set aside the verdict and a motion for a new trial. (*See* ECF No. 10, Ex. 3 at 10.) In these motions, Petitioner provided the following pertinent arguments: (1) "no reasonable jury could have logically and reasonably concluded guilt on three of four counts of the [i]ndictment because [D.B.'s] uncorroborated testimony was not credible;" and (2) "the [trial court] erred in not presenting an alibi instruction to the jury." (*Id.*) The trial court denied Petitioner's post-trial motions during a hearing on November 19, 2009, (*see* ECF No. 10, Ex. 14 at 15), and entered an order reflecting these rulings on April 20, 2010, (*see id.*, Ex. 3 at 12).

Petitioner's sentencing hearing occurred on December 4, 2009. (*See id.*, Ex. 15 at 29–102.) One of the witnesses who testified on Petitioner's behalf during this hearing was Dr. Bobby Miller. (*See id.* at 37–69.) Dr. Miller "is board-certified by the American Board of Psychiatry and Neurology" and is "Board Certified in General Psychiatry, Forensic Psychiatry, Neuropsychiatry and Behavioral Neurology." (ECF No. 10, Ex. 16 at 187.) Petitioner's trial counsel requested that

12

Dr. Miller "conduct a Forensic Psychiatry Evaluation of [Petitioner] and provide information regarding any psychiatric diagnosis, the examinee's mental status, and forensic psychiatry opinions regarding [Petitioner's] risk of sexual re-offense and issues regarding his potential for treatment." (*Id.* at 179.) Dr. Miller performed this evaluation on October 12, 2009 and created a "Forensic Psychiatry Evaluation" report, which is dated October 15, 2009. (*Id.* at 179–187.)

In his report, Dr. Miller discussed the results of a battery of standardized and non-standardized tests he administered on Petitioner. (*See id.*) This report includes the following pertinent findings from "standardized" tests: (1) "[t]he Vermont Assessment of Sex Offender Risk Scale placed [Petitioner] in the Low risk category for sexual re-offense;" (2) "[t]he Static-99 resulted in a score of 2," with "[s]cores of 6 or greater . . . usually of significant clinical concern;" (3) the "Sexual Entitlement" and "Sexy Children" scales "of the Hanson Sex Attitude Questionnaire" both "placed [Petitioner] in the 'Normal range;" and (4) Petitioner's "general . . . profile" from the "Abel Questionnaire of Sexual Interest for Men" (the "Abel Questionnaire") was "not consistent with that of a pedophile." (*Id.* at 183.) However, the Abel Questionnaire also provided a 26% "Probability Value that [Petitioner] sexually offended a boy outside of the family"—which Dr. Miller indicated "was in the Low probability range"—and Petitioner's "Social Desirability Score" under the Abel Questionnaire "was 80% and indicative of an individual who wishes to be 'seen in a good light.'" (*Id.*) As to data from "[n]on-standardized [t]esting," the report includes the following findings: (1) "[t]he Carich-Ackerson Sex Offenders Risk Assessment Scale placed [Petitioner] in the Low risk category;" and (2) "[t]he Bays and Freeman-Longo Evaluation of Dangerousness for Sexual Offenders placed [Petitioner] in the Low risk category." (*Id.*) Dr. Miller also notes in the report that Petitioner had a "deficit in empathy for the victim," which Dr.

13

Miller opined "is understandable in . . . light of his denial of the offense." (*Id.* at 185.) Ultimately, Dr. Miller found in his report that "there was insufficient psychiatric evidence to render a clinical Paraphilic diagnosis, such as Pedophilia, with reasonable medical probability" and opined that Petitioner "is at low risk for sexual re-offense among the general population." (*Id.* at 179 & 182.)

Dr. Miller again examined Petitioner following his conviction. (*See, e.g.*, ECF No. 10, Ex. 15 at 41 & 57.) However, Dr. Miller did not alter the findings in his October 15, 2009 report based on this second evaluation. (*See, e.g.*, *id.* at 56–57.)

During the December 4, 2009 sentencing hearing, Dr. Miller testified that Petitioner's "evaluation is normal in all aspects" and that the testing indicated that Petitioner "doesn't fit [the] profile" of a "sexual offender[]." (*Id.* at 44.) Dr. Miller also testified that, according to an "actuarial test," there is an "11 percent" chance that Petitioner "will commit an offense" in "the next ten years," which Dr. Miller described as "low." (*Id.* at 46.) Dr. Miller also stated that, "[b]y and large," "denial is . . . a prominent aspect" of disorders associated with sexual offenders. (*Id.* at 47.) Dr. Miller next noted that Petitioner said he was "only at [D.B.'s house] twice." (*Id.* at 59.) When the Court told Dr. Miller that Petitioner previously provided a statement to the probation officer that he only visited D.B.'s house once, Dr. Miller opined that this discrepancy was due to Petitioner's "desire to minimize contact with the child." (*Id.* at 60.) Finally, Dr. Miller testified that sexual offenders have "passed these tests" and "[t]he cognitive sensitivity of this process is probably around 95 percent." (*Id.* at 62; *see also id.* (providing Dr. Miller's testimony indicating that this percentage of "cognitive sensitivity" means, "if it's done properly . . . there is a five percent chance, minimum, that [a sex offender] will get through").) However, Dr. Miller opined

14

that Petitioner "is probably not bright enough to negotiate his way through this testing in a deceptive manner." (*Id.* at 63.)

At the conclusion of the sentencing hearing, the trial court sentenced Petitioner as follows: (1) "not less than 25 years nor more than one hundred years" on Count One of the indictment; (2) "not less than five nor more than 25 years" on Count Three of the indictment; and (3) "not less than five nor more than 25 years" on Count Four of the indictment. (*Id.* at 98–99.) The court also ordered "that these sentences shall be . . . served consecutively." (*Id.* at 99.)

On April 22, 2010, Petitioner filed a petition for appeal of his conviction on these three counts to the WVSCA. (*See* ECF No. 10, Ex. 6 at 55; *see also id.*, Ex. 5 at 22–53 (constituting Petitioner's brief on direct appeal to the WVSCA).) The WVSCA "refuse[d]" this petition in a one-page order dated October 13, 2010. (*Id.*, Ex. 6 at 55.)

**B.      State Habeas Proceedings**

On October 11, 2011, Petitioner—through counsel—filed a petition for writ of habeas pursuant to West Virginia Code § 53-4A-1 in Fayette County, West Virginia. (*See id.*, Ex. 7 at 57–79.) Petitioner raised the following grounds in his state habeas petition: (1) ineffective assistance of counsel ("IAOC") due to the failure of Petitioner's trial counsel "to call several material witnesses to testify for the defense," including Lenora Harless, Sandra Culp, Dr. Bobby Miller, Dr. Joan Phillips, Rachel Burdette, H.C., Reverend Boothe, serologists, a Jane Doe identified as a "retired DHHR agent," and a "[d]octor [who] spoke to [an] investigator," (*see id.* at 60–61); (2) IAOC due to the inability of Petitioner's "[l]ead" trial counsel—Ms. Tennen—to effectively cross-examine D.B., (*see id.* at 61–63); (3) IAOC due to the failure of Petitioner's trial counsel to prepare for the trial, (*see id.* at 63–64); (4) IAOC due to the failure of Petitioner's trial counsel to conduct

certain investigations before trial, (*see id.* at 64–65); (5) Petitioner's conviction was obtained by a violation of his constitutional right to confront witnesses when the trial court "failed to establish D.B. as a competent witness," (*see id.* at 65–67); (6) denial of Petitioner's right to an impartial jury due the trial court's allegedly "derogatory comments towards defense counsel's practice in the courtroom" and a "personal relationship or connection" between some jurors and the trial judge, (*see id.* at 67–68); (7) insufficient evidence to support a guilty verdict, (*see id.* at 68–69); (8) the trial court erred by considering improper evidence at sentencing, (*see id.* at 69); (9) the trial court erred by failing to instruct the jury on Petitioner's proffered alibi defense, (*see id.* at 69–70); (10) the trial court erred by imposing consecutive sentences and the sentence was excessive, (*see id.* at 70); (11) the prosecution suppressed "[h]elpful [e]vidence," (*see id.* at 70–71); and (12) the trial court improperly and "frequently" made "[p]rejudicial [s]tatements" towards "defense counsel regarding . . . her performance in the courtroom," (*see id.* at 71).

Petitioner's trial judge held an omnibus hearing regarding Petitioner's state habeas petition on February 12, 2013. (*See* ECF No. 10, Ex. 16 at 2–148.) Petitioner's state habeas counsel, G. Todd Houck, (*id.* at 2), called six witnesses during this hearing, (*see id.* at 2–125)—five of which are relevant for purposes of the instant Petition.

Dr. Joan Phillips provided testimony during the omnibus hearing that she is licensed to practice medicine, she is "board certified by the American Board of Pediatrics since 1985" and "board certified in child abuse and neglect" since "2009 when the sub-board certification for child abuse and neglect became available," and she is employed as "a child abuse pediatrician in the Child Advocacy Center at Women and Children['s] Hospital." (*See* ECF No. 10, Ex. 16 at 37–39.) Dr. Phillips testified that she "examined [D.B.] on July 8th of 2008," which was "between nine

16

months and a year" after the assault. (*Id.* at 41 & 45.) Based on this examination, Dr. Phillips testified that all of her findings were negative for signs of anal penetration and D.B.'s "laboratory values [were] negative and normal." (*Id.* at 42.) Dr. Phillips also testified that "[t]here often [are] not any physical findings" as a result of "anal rape" and "only in about five percent of children who have had rectal penetration is there any evidence." (*Id.* at 40.) Dr. Phillips provided two reasons for this lack of evidence: (1) "the rectal sphincter is made to stretch . . . for body function, so it can stretch out and go back to normal as [it is] supposed to;" and (2) "it's a mucosal tissue and mucosal tissue has a lot of blood supply, vascular blood supply, and so they heal very quickly." (*Id.* at 41.)

Petitioner next called a serologist—Dr. Julie Heinig. (*See id.* at 64–87.) Dr. Heinig testified that she holds "a Ph.D. in molecular biology" and is "the Assistant Laboratory Director at DNA Diagnostic Center located in Fairfield, Ohio." (*Id.* at 64–65.) Dr. Heinig noted that she "reviewed the reports and [was] very familiar with this case," (*id.* at 79; *see also id.* at 67 (describing the materials Dr. Heinig reviewed prior to testifying at Petitioner's omnibus hearing)), but she did not visit the potential crime scenes or perform any testing at these locations, (*see id.* at 67).

Dr. Heinig testified that it "would [have] be[en] helpful" to perform examinations on the potential crime scenes to look for biological materials. (*Id.* at 70–71.) Dr. Heinig noted that examples of these "helpful" examinations include (1) visual examinations for "seminal stains," "saliva stains," and "blood stains;" (2) "an examination with a light source," such as "a UV light looking for fluorescing stains;" and (3) " a Luminol type of testing for blood" if "the area can be made dark enough." (*Id.* at 71.) Dr. Heinig testified that she would have performed these examinations if she was "employed" to investigate this case. (*See id.* at 71–73.)

17

Dr. Heinig also testified that she understood that a period of time between "at the most . . . 17 months" and "a minimal time period of eight months" passed between the assault and the investigation. (*Id.* at 70.) She testified that, "if not exposed to environmental insults, . . . DNA can last . . . indefinitely," but she would "expect a little bit of degradation to occur over time." (*Id.* at 73–74.) As to the potential DNA evidence in Petitioner's case, Dr. Heinig opined that she did not think "too much time had . . . passed to do a collection" at the potential crime scenes and "[i]t's worthwhile to do an exhaustive search to see . . . if we can obtain DNA." (*Id.* at 76.) The record does not reflect—and Petitioner does not otherwise assert—that Petitioner's state habeas counsel introduced any physical evidence from the potential crime scenes during the state habeas omnibus proceeding. (*See, e.g.*, *id.* at 2–148.)

Petitioner next called one of his trial attorneys—Mr. Morgan. (*See id.* at 87–115.) Mr. Morgan testified that his expectation prior to trial was that he would act "as local counsel only" and "assist [Ms. Tennen] in guiding her through the process . . . in West Virginia," as she was "not familiar to West Virginia procedure." (*Id.* at 91; *cf. id.* at 97–101 (providing Mr. Morgan's testimony that he prepared and argued pre-trial motions and was "probably" the "lead negotiator" for plea discussions).) Mr. Morgan testified that he "ended up doing more of the trial" than he previously anticipated because "Ms. Tennen was becoming frustrated . . . with her inability to function under . . . West Virginia procedural rules" and these "problems[s] . . . . came to a head" during the cross-examination of D.B." (*Id.* at 92.) Mr. Morgan recalled that the trial court directed "many criticisms and corrections" at Ms. Tennen in the presence of the jury during her cross-examination of D.B. (*Id.* at 93.)

On cross-examination, Mr. Morgan testified that the number of witnesses the defense called during trial "changed from what we had intended to present" and "[t]here were a couple of witnesses we decided not to call." (*Id.* at 108.) Mr. Morgan also testified that he thought Petitioner "was involved in many of [the] discussions" regarding "who would be called, or if not, why not." (*Id.*) Mr. Morgan further testified that he had "more than five" conversations with Ms. Tennen regarding "trial strategy, what witness to call, and what witness not to call," but that he "defer[red]" to Ms. Tennen because "she was lead counsel." (*Id.* at 108–09.)

Petitioner also called Lenora Harless—the maternal grandmother of D.B—as a witness during the omnibus hearing. (*See id.* at 116.) Ms. Harless testified that Petitioner had been to her house to "see [her] daughters" on more than ten occasions and that he previously consumed at the residence "to the point of inebriation." (*Id.* at 119–21; *see also id.* at 170 (providing Ms. Harless' statement to Detective Chapman that "[s]ometimes [Petitioner] was drinking and sometimes he wasn't").) Ms. Harless also testified that Petitioner and D.B. did not "get along" and Petitioner had "pushed" D.B. "in [her] kitchen." (*Id.* at 123.) Ms. Harless further testified that Doug Mullins visited her residence "often." (*Id.* at 121–22.)

During this testimony, Petitioner's counsel entered into the record a statement Ms. Harless provided to Detective Chapman on May 28, 2008. (*Id.* at 124–26.) In this statement, Ms. Harless indicated that, "to [her] knowledge," there was never an occasion when Petitioner "was alone or had the opportunity to do anything to [D.B.]." (*Id.* at 170.) Ms. Harless also stated that she "never suspected or thought or known of anything to happen" between Petitioner and D.B. (*Id.* at 171.) Ms. Harless further noted that Petitioner and D.B. "pick[ed] on each other," Petitioner was "rough with [D.B.]," and, on one occasion, Petitioner "pushed" D.B. in the kitchen of Ms. Harless'

residence. (*Id.* at 171–73.) Finally, Ms. Harless said that she had not "heard [of] any problems" with Petitioner "trying to force [himself] on [anyone]." (*Id.* at 174.)

Petitioner's final witness during the state habeas omnibus hearing was Reverend Roger Boothe. (*See id.* at 131–140.) Reverend Boothe testified that he is a Methodist Minister, he is not related to Petitioner, and he resides at a parsonage that is roughly "50 to 70 feet" from the residence of D.B.'s grandmother. (*Id.* at 132–33.) Reverend Boothe stated that he thought he had a "good relationship" with D.B.—"you know, for a young boy"—and he "talked quite a bit" with D.B. (*Id.* at 137.) Reverend Boothe also testified that D.B.'s father previously said to the Reverend that he told D.B. "if anything was ever done to [D.B.] or happened to him" at Ms. Harless' residence, "[D.B.] could come to [Reverend Boothe] and [the Reverend] would take care of [D.B.]." (*Id.* at 137–38.) Finally, Reverend Boothe testified that D.B. "never [came] to [him] and told [him] something was wrong." (*Id.* at 138.)

At the conclusion of the state habeas omnibus hearing, Petitioner's habeas counsel noted that the court had previously "received" statements "made by Lenora Harless, Rachel and Ronnie Burdette and Halie Campbell." (*See id.* at 57.)

Following the state omnibus hearing, Petitioner's habeas counsel took the deposition of Sandra Culp and submitted this testimony to the state circuit habeas court. (*See id.* at 149–64; *see also id.* at 7 (providing that the state circuit habeas court granted permission for Petitioner to supplement the record with Ms. Culp's deposition testimony following the omnibus hearing).) Ms. Culp testified that she is "certified as a trauma specialist" and she conducted an interview of D.B. at the request of "the Fayette County DHHR" to determine "if [D.B.] had any type of traumatization . . . because they felt [D.B.] had been sexually abused." (*Id.* at 150–52.) Ms. Culp

opined that "[i]f [a] child was traumatized, there's always something that raises a red flag," but—in the case of D.B.—there were "no red flags to suggest sexual abuse[,] . . . sexual assault[,] . . . [or] trauma." (*Id.* at 158 & 163; *see also id.* at 177 (providing a report signed by Ms. Culp regarding an August 12, 2008 interview with D.B., in which Ms. Culp states that "[i]t is the opinion of this therapist that [D.B.] has not been traumatized by the event due to lack of trauma symptoms such as bedwetting, nightmares, clinginess, fear, etc.").)

On cross-examination, Ms. Culp acknowledged that she did not "review[] all the evidence in [the] case." (*Id.* at 160.) Additionally, Ms. Culp testified that not "all individuals who have suffered some type of sexual abuse would exhibit some type of trauma" and individuals "would not exhibit signs of trauma" if "it was done in a nonthreatening way in the beginning, because they have to be trained." (*Id.* at 161–62.) Finally, in a March 12, 2009 amendment to her report, Ms. Culp noted that "[a]fter hearing additional (new to me) information from both the [p]rosecutor and the [d]efense [a]ttorney, it is suggested that [D.B.] be seen by someone for counseling regarding the entire case." (*Id.* at 178.)

On June 19, 2013, the state circuit habeas court entered a forty-two page order denying Petitioner's habeas petition, in its entirety. (*See* ECF No. 10, Ex. 8 at 81–123.) In this order, the court noted, in part, that "no written statement of [Rachel] Burdette's was offered for admission into evidence." (*Id.* at 102.)

On July 15, 2013, Petitioner—through his counsel, Mr. Houck—appealed the circuit court's order denying his petition to the WVSCA. (*See* ECF No. 10, Ex. 9 at 125–33.) In his "notice of appeal" filing with the WVSCA, Petitioner alleged that the state circuit habeas court "erred in ruling" that (1) "Petitioner was afforded his constitutional right to effective assistance of counsel;"

(2) "Petitioner was afforded his constitutional right to confront his accuser;" (3) "Petitioner was afforded his constitutional right to an impartial jury/judge;" (4) "Petitioner was afforded his constitutional right to present alibi evidence/jury instructions;" (5) "Petitioner was not given an excessive sentence;" and (6) "the state properly provided [Petitioner] with any/all exculpatory evidence." (*Id.* at 132–33.) In his subsequent appellate brief, Petitioner raised only the following issues: (1) IAOC due to the failure of Petitioner's trial counsel to call certain witnesses at trial, (*see* ECF No. 10, Ex. 10 at 160–64); (2) "[t]he trial court's repeated interruptions and comments during the cross-examination of D.B. violated Petitioner's constitutional right to confront witnesses and to an impartial jury," (*see id.* at 164–66); and (3) "Petitioner's constitutional right to assert an alibi defense was violated," (*see id.* at 167–69). In the facts section of his appellate brief, Petitioner summarized the non-trial testimony of Sandra Culp, Dr. Joan Phillips, Dr. Bobby Miller, Dr. Julie Heinig, and Lenora Harless. (*See id.* at 155–57.) In the argument section of the brief, Petitioner asserted that he was denied effective assistance of counsel by his trial counsel's failure to call only three witnesses: Ms. Culp, Dr. Phillips, and Dr. Miller. (*See id.* at 160–64.) Additionally, Petitioner argued that he "was severely prejudiced by his lead counsel's failure to present to the jury all of the exculpatory evidence available to refute the uncorroborated testimony of D.B." (*Id.* at 163.)

On June 19, 2014, the WVSCA entered a memorandum decision affirming the circuit court's denial of Petitioner's state habeas petition. *See Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127 (W. Va. June 19, 2014). In this decision, the WVSCA noted the following regarding Petitioner's IAOC claims: "Petitioner . . . argues that Ms. Tennen's failure to present the testimony of Pediatrician Joan Phillips, Assistant Laboratory Director Julie Heinig, and Social Worker

Sandra Culp during his case-in-chief proves that Ms. Tennen was ineffective given the exculpatory nature of their testimony at his omnibus hearing." *Id.* at *3. The WVSCA then noted that, in West Virginia, claims of [IAOC] are "governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 . . . (1984)." *Id.* at *4 (citation omitted). In its subsequent analysis of Petitioner's IAOC claims, the WVSCA addressed claims relating to trial counsel's failure to call the following four witnesses: Dr. Phillips, Dr. Heinig, Ms. Culp, and a "forensic psychologist[]" who submitted a report. *See id.* at *5. The WVSCA affirmed the denial of these claims on the grounds that trial counsel's choices not to call "the *three* witnesses of whom [P]etitioner complains" were "strategic decisions on [P]etitioner's behalf that were assistive of his interests" and Petitioner "failed to prove that . . . any errors [Ms. Tennen] may have made affected the outcome of his trial." *Id.* (emphasis added).

The WVSCA stated the following regarding Petitioner's claims "that the circuit court violated his constitutional rights to an impartial jury and to confront witnesses" against him:

We have said that

"[t]he extent of the cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in case of manifest abuse or injustice." Syl. pt. 4, *State v. Carduff*, 142 W.Va. 18, 93 S.E.2d 502 (1956).

*State v. Wood*, 167 W.Va. 700, 280 S.E.2d 309, 310 (1981). The record on appeal in this case shows that the trial judge properly rebuked both sides when it believed they were stepping outside the boundaries of the law. However, the circuit judge also specifically instructed the jury that he was absolutely impartial and nothing he did or said should be taken as partiality. Further, the trial judge did not prevent defense counsel from asking any questions on cross-examination, it merely asked that Ms. Tennen comply with the laws of this State and not unnecessarily tarry when cross-examining a young child. Importantly, the record also shows that the trial court interrupted the prosecutor and placed the same requirements on her as it

did on Ms. Tennen. Further, the fact that the jury acquitted petitioner of one count of sexual assault indicates that the trial court's comments did not adversely affect the jury or prejudice it against Ms. Tennen or petitioner. Based on this record, we cannot say that the circuit court erred in finding that the trial court did not violate petitioner's constitutional rights to an impartial jury or to confront witnesses against him.

*Id.* at *6 (alteration in original).

Finally, the WVSCA stated the following as to Petitioner's claim regarding the trial court's failure to give an alibi instruction:

We have said,

a trial judge may not make an evidentiary ruling which deprives a criminal defendant of certain rights, such as the right to . . . offer testimony in support of his or her defense . . . which [is] essential for a fair trial pursuant to the due process clause found in the Fourteenth Amendment of the *Constitution of the United States* and article III, § 14 of the *West Virginia Constitution.*

Syllabus Point 3, in part, *State v. Jenkins,* 195 W.Va. 620, 621–22, 466 S.E.2d 471, 472–73 (1995); *see also Chambers v. Mississippi,* 410 U.S. 284 (1973). However, we have also required that "[a] trial court's instructions to the jury must be a correct statement of the law and supported by the evidence . . . ." Syl. Pt. 4, in part, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995).

Petitioner was indicted for acts occurring between January and August of 2007. Yet petitioner offered a notice of alibi for a particular week in May of 2008. Further, petitioner entered no evidence at trial or at his omnibus hearing showing that because he did not assault and/or abuse D.B. during May of 2008, he could not have assaulted D.B. between January and August of 2007. Therefore, we concur with the habeas court's finding that the trial court did not err in denying petitioner's alibi instruction because petitioner failed to enter any evidence in support of it.

*Id.* (alterations in original).

## C.    The Petition and Procedural Posture

Petitioner filed the Petition before this Court on August 28, 2014. (ECF No. 2.) Petitioner raises the following ten grounds in the Petition: (1) IAOC due to his trial counsel's failure to call

as witnesses Sandra Culp (Ground I), Dr. Bobby Miller (Ground II), Dr. Joan Phillips (Ground III), Dr. Julie Heinig (Ground IV), Lenora Harless (Ground V), H.C. (Ground VI), Reverend Boothe (Ground VII), and Rachel Burdette (Ground VIII), (*see id.* at 7–25); (2) Ground IX—the trial court's comments to Petitioner's trial counsel "denied [Petitioner's] constitutional right to an impartial jury and his right to confrontation of a witness against him," (*see id.* at 25–28); and (3) Ground X—"Petitioner was denied due process of law under the Fourteenth Amendment . . . when the trial judge refused" to give Petitioner's proffered jury instruction regarding an alibi, (*see id.* at 29–30).

Respondent filed his Answer to the Petition on December 5, 2014. (ECF No. 8.) In his Answer, Respondent asserts, in part, that the "Petition appears to be timely filed" and "Respondent believes that Petitioner has properly exhausted the claims proffered [in] the . . . Petition." (*Id.* at 2.)

On the same date, Respondent filed his Motion for Summary Judgment. (ECF No. 10.) Petitioner filed his opposition to the Motion for Summary Judgment on February 6, 2015.[2] (ECF No. 14.) To date, Respondent has not filed a reply brief in support of this motion.

On February 6, 2015, Petitioner filed the Motion for Hearing and Appointment of Counsel. (ECF No. 15.) Respondent filed his opposition to this motion on February 9, 2015. (ECF No. 17.) Petitioner has not filed a reply brief in support of this motion to date.

By Standing Order entered in this case on September 15, 2014, this action was referred to Magistrate Judge Cheryl A. Eifert for "total pretrial management and submission of proposed

---

[2] On December 5, 2014, Magistrate Judge Eifert entered a "Notice to Petitioner and Order" in which she ordered Petitioner "to file, within seventy-five (75) days after the date of service of the [Motion for Summary Judgment], any response Petitioner deems appropriate." (ECF No. 13.)

findings of fact and recommendations for disposition." (ECF No. 4 at 2.) On April 27, 2015, Magistrate Judge Eifert entered the PF&R, in which she denied Petitioner's Motion for Hearing and Appointment of Counsel, (ECF No. 21 at 2), and recommends that the Court grant Respondent's Motion for Summary Judgment, deny the Petition, and dismiss this case with prejudice, (*id.* at 81). Petitioner timely filed the Objections on May 12, 2015. (ECF No. 22.) As such, the PF&R, the Objections, Respondent's Motion for Summary Judgment, Petitioner's Motion for Hearing and Appointment of Counsel, and the Petition are all fully briefed and ready for disposition.

## II.   *Applicable Legal Standards and Background*

### A.   **Review of the PF&R**

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Court "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3) (emphasis added). The Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendations to which no objections are addressed. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). In addition, this Court need not conduct a *de novo* review when a party "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). However, "[t]he district court cannot artificially limit the scope of its review by resort to ordinary prudential rules, such as waiver, provided that proper objection to the magistrate's proposed finding or conclusion has been made and the appellant's right to *de novo* review by the district court thereby established." *United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992). In

reviewing those portions of the PF&R to which Petitioner objects, this Court will consider the fact that Petitioner is acting *pro se*, and his filings will be accorded liberal construction. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978).

## B.     Summary Judgment Standard

In the PF&R, Magistrate Judge Eifert recommends that the Court grant Respondent's Motion for Summary Judgment. (*See* ECF No. 21 at 2.) Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment and "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). Rule 56(a) provides that a court should grant summary judgment if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Under the summary judgment standard, "[a] genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Liberty Lobby*, 477 U.S. at 248). Additionally, "[f]acts are 'material' when they might affect the outcome of the case." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *cf.* Charles Alan Wright, *Federal Practice and Procedure* § 2725 (3d ed.) ("[I]n ruling on motions for summary judgment federal courts have held that a fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." (footnotes omitted)). When construing such factual issues, the Court must view the

27

evidence "in the light most favorable to" the party opposing summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Liberty Lobby*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).

The moving party may meet its burden of showing that no genuine issue of material fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If a party fails to make a sufficient showing on one element of a claim, the failure of proof "necessarily renders all other facts immaterial." *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

C.     **Background on AEDPA and Overview of Analysis**

"[F]ederal habeas corpus proceedings [are] a method for preventing individuals from being held in custody in violation of federal law." *Trevino v. Thaler*, 133 S. Ct. 1911, 1916 (2013) (citing

*Martinez v. Ryan*, 132 S. Ct. 1309, 1315–16 (2012)). "In general, if a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Id.* at 1917.

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996" ("AEDPA"). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). "[T]he basic structure of federal habeas jurisdiction" under Section 2254 is "designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Id.* at 103; *cf. Fry v. Pliler*, 551 U.S. 112, 119 (2007) (recognizing that "AEDPA limited . . . the availability of habeas relief" (citation omitted)). *See generally Woodford v. Garceau*, 538 U.S. 202, 206 (2003) ("Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and to further the principles of comity, finality, and federalism." (citations omitted)). As such, "28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

Under Section 2254(a), "[a] federal court may grant habeas relief 'only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States.'" *Weeks v. Angelone*, 176 F.3d 249, 262 (4th Cir. 1999) (quoting 28 U.S.C. § 2254(a)); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." (citations omitted)); *cf. Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas

29

corpus relief does not lie for errors of state law." (citations omitted)). "Therefore, when a petitioner's claim rests solely upon an interpretation of state case law and statutes, it is not cognizable on federal habeas review." *Weeks*, 176 F.3d at 262 (citation omitted); *see also Estelle*, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

"Sections 2254(b) and (c) provide that a federal court may not grant such applications unless, with certain exceptions, the applicant has exhausted state remedies." *Cullen*, 563 U.S. at 181. "The exhaustion requirement . . . ensures that the state courts have the opportunity fully to consider federal-law challenges to a state custodial judgment before the lower federal courts may entertain a collateral attack upon that judgment." *Duncan v. Walker*, 533 U.S. 167, 178 (2001).

Additionally, under the "doctrine of procedural default, . . . a federal court [generally] will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez*, 132 S. Ct. at 1316 (citation omitted). This doctrine "ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases," *Coleman v. Thompson*, 501 U.S. 722, 732 (1991), and that Section 2254 petitioners do not evade state procedural rules governing review of criminal convictions, *see Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("A State's procedural rules are of vital importance to the orderly administration of its criminal courts; when a federal court permits them to be readily evaded, it undermines the criminal justice system.").

Finally, if the petitioner exhausted a habeas claim and "the state court denies the claim on the merits, the claim is [nonetheless] barred in federal court unless one of the exceptions to § 2254(d) set out in §§ 2254(d)(1) and (2) applies." *Richter*, 562 U.S. at 103; *cf. Schriro v.*

*Landrigan*, 550 U.S. 465, 474 (2007) ("[T]he deferential standards prescribed by § 2254 control whether to grant habeas relief . . . ."). "However, the state court's decision must qualify as an 'adjudicat[ion] on the merits' to trigger" the deferential standard under Section 2254(d). *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015) (citation omitted).

  "The limited scope of federal review of a state petitioner's habeas claims, as established by AEDPA, is grounded in fundamental notions of state sovereignty." *Richardson v. Branker*, 668 F.3d 128, 138 (4th Cir. 2012) (citation omitted). "When a federal court adjudicates a habeas corpus petition brought by a state prisoner, that adjudication constitutes an intrusion on state sovereignty." *Id.* (citation omitted); *see also Calderon v. Thompson*, 523 U.S. 538, 555–56 (1998) ("Federal habeas review of state convictions frustrates 'both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.'" (quoting *Murray v. Carrier*, 477 U.S. 478, 487 (1986))); *Richter*, 562 U.S. at 103 (stating that federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority" (citation omitted)). "However, AEDPA restricts that intrusion of state sovereignty by limiting the federal courts' power to issue a writ to exceptional circumstances, thereby helping to ensure that 'state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding.'" *Richardson*, 668 F.3d at 138 (quoting *Richter*, 562 U.S. at 103); *see also Bell v. Cone*, 535 U.S. 685, 693 (2002) (noting that AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law" (citing *Williams v. Taylor*, 529 U.S. 362, 403–04 (2000))).

31

### III.  *Petitioner's Exhausted Habeas Claims*

As a preliminary matter, the Court notes that Magistrate Judge Eifert found in the PF&R that the state courts only adjudicated on the merits six of Petitioner's ten claims in the Petition—Grounds I through IV, IX, and X (together, the "Exhausted Claims")—and that Petitioner exhausted his available state remedies as to these six claims. (*See* ECF No. 21 at 43–45.) The Magistrate Judge further found that Petitioner failed to exhaust his available state remedies as to his remaining four claims in the Petition—Grounds V through VIII (together, the "Unexhausted Claims")—and that these claims are now procedurally defaulted under West Virginia state rules relating to habeas proceedings. (*See id.* at 47–49.)

Petitioner does not object to the Magistrate Judge's findings that the state courts adjudicated the Exhausted Claims on the merits or that he properly exhausted his available state remedies as to these claims. (*See* ECF No. 22.) Petitioner also concedes that he did not exhaust his available state remedies as to the Unexhausted Claims. (*See id.* at 4 (providing Petitioner's statement that he "is in agreement with Magistrate Judge Eifert's findings and recommendations" that he "never presented to the WVSCA his claims that counsel was ineffective for failing to call Ms. Harless, H.C., Reverend Boothe, and Ms. Burdette at trial").) However, Petitioner argues, in part, that these claims are not procedurally defaulted because he is actually innocent of the crimes for which he was convicted. (*See id.* at 5–6.)

The Supreme Court has held "that a federal court faced with allegations of actual innocence, whether of the sentence or of the crime charged, must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default."[3]

---

[3] As discussed at length below, the Court finds that Petitioner failed to exhaust his available state remedies as to the Unexhausted Claims. Absent an exception to the exhaustion requirement, the Petition would then be "mixed" insofar

*Dretke v. Haley*, 541 U.S. 386, 393 (2004). *See generally id.* at 395 ("While availability of other remedies alone would be sufficient justification for a general rule of avoidance, the many threshold legal questions often accompanying claims of actual innocence provide additional reason for restraint."). As such, the Court shall first addresses the Exhausted Claims, then analyze the four Unexhausted Claims that implicate the doctrine of procedural default and its actual innocence exception.

As to the Exhausted Claims, the Court shall address, in turn, whether the state courts adjudicated the Exhausted Claims on the merits, the proper standard under AEDPA for these claims, and finally whether these claims are meritorious. For the reasons that follow, the Court finds that Respondent is entitled to summary judgment as to each of the Exhausted Claims.

## A.      Adjudication on the Merits

A prerequisite of analyzing habeas claims under 28 U.S.C. § 2254(d) "is that the claims submitted must have been 'adjudicated on the merits' in state court." *Winston v. Kelly* (*Winston I*), 592 F.3d 535, 553 (4th Cir. 2010); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013) ("The language of 28 U.S.C. § 2254(d) makes it clear that this provision applies only when a federal claim was 'adjudicated *on the merits* in State court.'"). "When a claim has not been adjudicated on the merits by the state court, a federal court reviews the claim *de novo*." *Winston I*, 592 F.3d at 553–54 (emphasis added).

_____

as it would include both exhausted and unexhausted claims. *See, e.g.*, *Rhines v. Weber*, 544 U.S. 269, 273 (2005) (describing "mixed petitions" as "petitions containing both exhausted and unexhausted claims"). *See generally id.* at 276–79 (providing the analysis pertaining to whether a district court should dismiss or stay a mixed petition). However, as noted below, Petitioner has technically exhausted all of his claims in the Petition because the Unexhausted Claims are now procedurally defaulted. The Court therefore finds that the Petition is not "mixed" and, as such, the Court need not address the analysis of whether to dismiss or stay the Petition pending Petitioner's total exhaustion of his habeas claims. *See, e.g.*, *id.* at 273–79.

33

A claim "was adjudicated on the merits" if it "is exhausted in state court and not procedurally defaulted." *Gray v. Zook*, 806 F.3d 783, 798 (4th Cir. 2015) (citation omitted); *cf. Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999) (stating that a claim has been "adjudicated on the merits" if it was "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree"). "The core element of the doctrine of exhaustion involves the requirement that a claim ha[s] been fairly presented to the state courts prior to seeking relief on federal habeas corpus," including "an opportunity for review by the highest court in the state." *Moore v. Kirby*, 879 F. Supp. 592, 593 (S.D. W. Va. 1995) (citations omitted); *see also Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000) ("Although a petitioner need not 'cit[e] book and verse on the federal constitution' in order to satisfy the exhaustion requirement, the federal claim nevertheless must be 'fairly presented' to the state court." (quoting *Picard v. Connor*, 404 U.S. 270, 275 & 278 (1971))). One method for accomplishing exhaustion in West Virginia is by "petitioning for a writ of habeas corpus in the appropriate circuit court followed by an appeal of the judgment to the [WVSCA], if the result is adverse." *Harper v. Ballard*, Civil Action No. 3:13–23467, 2014 WL 4470536, at *6 (S.D. W. Va. Sept. 10, 2014) (citing *Moore*, 879 F. Supp. at 593).

In this case, the record reflects that Petitioner raised his ten habeas claims in the Petition before the state circuit habeas court, (*see* ECF No. 10, Ex. 7 at 60–71), which denied all of these claims, (*see id.*, Ex. 8 at 81–123). Petitioner then appealed this decision to the WVSCA, but only explicitly raised five of his habeas claims on appeal.[4] (*See id.*, Ex. 9 at 132–33; *id.*, Ex. 10 at 135–

---

[4] The Court notes that, in the facts section of his habeas appellate brief, Petitioner summarized the non-trial testimony of five potential witnesses—Sandra Culp, Dr. Joan Phillips, Dr. Bobby Miller, Dr. Julie Heinig, and Lenora Harless. (ECF No. 10, Ex. 9 at 155–57.) However, in the argument section of his appellate brief, Petitioner omitted any reference to the testimony of Dr. Heinig or Ms. Harless and instead only asserted that he was denied effective assistance of counsel by his trial counsel's failure to call Ms. Culp, Dr. Phillips, and Dr. Miller. (*See id.* at 160–64.) In its subsequent analysis of these claims, the WVSCA analyzed Petitioner's IAOC claims relating to Ms. Culp, Dr. Phillips, and Dr. Miller. *See Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at *3–5 (W. Va. June 19, 2014).

69.) The WVSCA then denied habeas relief as to these five claims—Grounds I through III, IX, and X in the Petition—in a substantive memorandum decision, as well as an additional IAOC claim—Ground IV here. *See Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127 (W. Va. June 19, 2014). While Petitioner did not explicitly raise Ground IV in his appeal, (*see* ECF No. 10, Ex. 9 at 132–33; *id.*, Ex. 10 at 135–69), the WVSCA nonetheless squarely addressed this claim in its memorandum decision, *see Boothe*, 2014 WL 2782127, at *3–5.

As such, the record demonstrates that the WVSCA substantively analyzed and affirmed the denial of the claims presented in Grounds I through IV, IX, and X of the Petition.[5] The Court

---

The WVSCA also addressed Petitioner's claim pertaining to Dr. Heinig—even though Petitioner omitted any reference to Dr. Heinig's testimony in the argument section of his brief—but did not address any claims relating to Ms. Harless. *See id.*

In the PF&R, Magistrate Judge Eifert found that Petitioner "failed to raise" the Unexhausted Claims "before the WVSCA"—including his claim relating to Ms. Harless. (ECF No. 21 at 45.) In the Objections, Petitioner expressly agrees that he "never presented to the WVSCA his claims that counsel was ineffective for failing to call Ms. Harless, H.C., Reverend Boothe, and Ms. Burdette at trial." (ECF No. 22 at 4.)

As Petitioner did not address his claim relating to Ms. Harless in the argument section of his appellate brief—and he now expressly takes the position that he did not raise this claim before the WVSCA—the Court concurs with the position of Magistrate Judge Eifert and Petitioner that he failed to exhaust his available state remedies as to his claim relating to Ms. Harless—Ground V in the Petition.

[5] The Court notes that the procedural history of Ground II— requires further elaboration. In his initial state habeas petition, Petitioner raised the claim that his trial counsel was ineffective by failing to call Dr. Miller. (ECF No. 10, Ex. 7 at 60–61.) The state circuit habeas court then denied this claim on the grounds that Petitioner's trial counsel was not ineffective in failing to call this witness because this testimony would have been improper. (*Id.*, Ex. 8 at 100.) In his habeas appellate brief, Petitioner noted that Dr. Miller's testimony "was not heard by the jury, in part, because counsel failed to disclose his report to the State in a timely fashion." (*Id.*, Ex. 10 at 163.) However, Petitioner's argument as to this witness—as well as the other potential witnesses—was that Petitioner "was severely prejudiced by his lead counsel's failure to present to the jury all of the exculpatory evidence available to refute the uncorroborated testimony of D.B." (*Id.*) As such, Petitioner's appellate claim as to Dr. Miller was that his trial counsel was ineffective by failing to call this witness. (*See id.*)

In their memorandum opinion, the WVSCA addressed Petitioner's claim regarding Dr. Miller generally under the discussion of the decision of Petitioner's trial counsel "not to call various witnesses at trial." *Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at *5 (W. Va. June 19, 2014). Within this discussion, the WVSCA described this claim as "[P]etitioner's claim that Ms. Tennen failed to timely notify the State about the forensic psychologist's report" and noted that "the circuit court found that the report would not have been admissible because evidence regarding 'tendencies' was not compelling evidence that [P]etitioner did not assault D.B." *Id.* The WVSCA then provided a standard relating to counsel's failure to call witnesses, then determined that the failure of Petitioner's trial counsel to call witnesses did not constitute ineffective assistance of counsel. *See id.* at *5.

The WVSCA's statement regarding a "fail[ure] to timely notify" certainly misconstrued the nature of Petitioner's claim, which has consistently been what is presented in Ground II of the Petition—IAOC due to Petitioner's trial counsel failing to call Dr. Miller as a witness during trial. Nonetheless, it is clear that Petitioner exhausted this claim by raising it to the WVSCA, and that the WVSCA determined that this claim was without merit

therefore finds that Petitioner properly exhausted his available state remedies as to these claims. *See, e.g.*, *Harper*, 2014 WL 4470536, at *6 (providing the methods for a petitioner to accomplish exhaustion in West Virginia). The Court also finds that the WVSCA adjudicated each of these six Exhausted Claims on the merits in its June 19, 2014 memorandum opinion.[6] *See, e.g.*, *Gray*, 806 F.3d at 798 (citation omitted); *see also Thomas v. Taylor*, 170 F.3d 466, 475 (4th Cir. 1999) ("[T]he phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in

in a substantive analysis generally regarding the decision of Petitioner's trial counsel "not to call various witnesses at trial." *Id.* The Court therefore finds Petitioner exhausted his claim in Ground II and the WVSCA adjudicated this claim on the merits, despite the errant single-sentence description regarding this claim in the WVSCA's memorandum opinion. *See, e.g.*, *Gray v. Zook*, 806 F.3d 783, 798 (4th Cir. 2015) (stating that a claim "was adjudicated on the merits" if it "is exhausted in state court and not procedurally defaulted").

[6] In the Objections, Petitioner does not contest that the state court adjudicated the Exhausted Claims on the merits, that these claims are exhausted, or that AEDPA deference under Section 2254(d)—rather than *de novo* review—is appropriate as to these claims. (*See* ECF No. 22.) However, the Court notes that Petitioner does argue in the Objections that his counsel during the state habeas omnibus proceeding was ineffective and this ineffectiveness resulted in a "patently inadequate" record pertaining specifically to Petitioner's claims of ineffective assistance of trial counsel. (*See id.* at 2–3.)

　　"A claim is not 'adjudicated on the merits' when the state court makes its decision 'on a materially incomplete record.'" *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015) (quoting *Winston I*, 592 F.3d 535, 555 (4th Cir. 2010)); *see also Winston I*, 592 F.3d at 555–56 ("If the record ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d)." (citations omitted)). "A record may be materially incomplete 'when a state court unreasonably refuses to permit further development of the facts of a claim.'" *Gordon*, 780 F.3d at 202 (quoting *Winston v. Pearson*, 683 F.3d 489, 496 (4th Cir. 2012)); *see also Turner v. Young*, No. 1:08CV884, 2013 WL 2403274, at *4 (M.D.N.C. May 31, 2013) ("[A]lthough § 2254 mandates . . . diligence by the petitioner in developing the factual record before the state court, 'when a state court forecloses further development of the factual record, it passes up the opportunity that exhaustion ensures' and *de novo* review of a petitioner's claims by the federal district court may be appropriate." (quoting *Winston I*, 592 F.3d at 552–56)). "In this circumstance, [courts] do not offend the principles of 'comity, finality, and federalism' that animate AEDPA deference because the state court has 'passed on the opportunity to adjudicate [the] claim on a complete record.'" *Gordon*, 780 F.3d at 202 (second alteration in original) (quoting *Winston I*, 592 F.3d at 555 & 557).

　　In this case, the record does not indicate—and Petitioner does not otherwise argue—that the state circuit habeas court refused to permit the factual development of the record, in any way. Furthermore, Petitioner does not point to any new or material evidence indicating that the WVSCA adjudicated Petitioner's exhausted IAOC claims on a materially incomplete record. *Cf. Winston I*, 592 F.3d at 556 ("New, material evidence, introduced for the first time during federal habeas proceedings, may . . . require a *de novo* review of petitioner's claim." (emphasis added)).

　　The Court therefore finds that Petitioner's assertion that his state habeas counsel's purported ineffectiveness hindered the factual development of the record as to these ineffective assistance of trial counsel claims does not disturb this Court's finding that the WVSCA adjudicated Petitioner's exhausted IAOC claims on the merits. As such, the deferential review standard under Section 2254(d) is appropriate as to these claims. *See, e.g., id.* at 553 ("The only limitation on § 2254(d)'s application is that the claims submitted must have been 'adjudicated on the merits' in state court."). Regardless, as discussed and analyzed herein, these claims would not succeed under even a *de novo* standard of review because Petitioner fails to satisfy the *Strickland* ineffectiveness standard as to each of these four exhausted claims.

state court, and not claims that were decided in state court, albeit in a summary fashion." (citations omitted)). The Court next addresses the proper standard to review these Exhausted Claims.

**B.      Standard under Section 2254(d)**

"[I]f a claim is exhausted in state court and not procedurally defaulted, then it was adjudicated on the merits and is subject to review under the deferential standards set forth in AEDPA's § 2254(d)." *Gray*, 806 F.3d at 798 (citation omitted). Section 2254(d) provides the following:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Section 2254(d)(1) describes the standard of review to be applied to claims challenging how the state courts applied federal law, while § 2254(d)(2) describes the standard to be applied to claims challenging how the state courts determined the facts." *Winston I*, 592 F.3d 535, 553 (4th Cir. 2010).

In the PF&R, Magistrate Judge Eifert analyzed Petitioner's Exhausted Claims solely under the "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) and did not address the "unreasonable determination" clause of Section 2254(d)(2). (*See* ECF No. 21 at 49–81.) In his Objections, Petitioner objects to the Magistrate Judge's findings and recommendations regarding the merits of his Exhausted Claims solely on the grounds that the WVSCA's rulings on these

37

claims were "contrary to" or "an unreasonable application of . . . clearly established Federal law." (*See* ECF No. 22 at 6–14.)

The Court agrees with the Magistrate Judge's finding that Petitioner does not allege in the Exhausted Claims that the WVSCA's rulings on these claims were "based on an unreasonable determination of the facts." (*See* ECF No. 2 at 7–17, 25–31.) Instead, Petitioner's Exhausted Claims each relate to whether the WVSCA's rulings were contrary to or an unreasonable application of federal constitutional law. (*See id.*) As such, the Court shall similarly focus exclusively on the "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) and forego an analysis of Petitioner's Exhausted Claims under Section 2254(d)(2).

"[Section] 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning," *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000)), and "[t]he Supreme Court has carefully defined the relevant terms of this provision," *Meyer v. Branker*, 506 F.3d 358, 365 (4th Cir. 2007). Under the first clause of Section 2254(d)(1), a state court's decision is "contrary to . . . clearly established" federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529 U.S. at 405–06; *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) ("To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." (alterations in original) (quoting *Williams*, 529 U.S. at 405–06)). "Avoiding these pitfalls does not require citation of [Supreme Court] cases" by

the state court. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[I]ndeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.*

As to the second clause, "[a] state court's decision involves an 'unreasonable application' of clearly established federal law under § 2254(d)(1) 'if the state court identifies the correct governing legal rule from . . . [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'"[7] *Powell v. Kelly*, 562 F.3d 656, 664 (4th Cir. 2009) (alterations in original) (quoting *Williams*, 529 U.S. at 407). "The state court's application of clearly established federal law must be 'objectively unreasonable,' for a 'federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Id.* (quoting *Williams*, 529 U.S. at 409–11); *see also Hurst v. Joyner*, 757 F.3d 389, 394 (4th Cir. 2014) (noting that, under AEDPA, "[federal courts] are not at liberty to substitute [their] judgment for that of the state court on matters of federal constitutional law, even if [the federal court] believe[s] the state court decision was incorrect"). Indeed, "even a strong case for relief does not

---

[7] The Fourth Circuit previously extended the "unreasonable application" clause to also include cases where the state court "applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable [or] fails to apply the principle of a precedent in a context where such failure is unreasonable." *Jackson v. Johnson*, 523 F.3d 273, 277 (4th Cir. 2008) (alteration in original) (quoting *Robinson v. Polk*, 438 F.3d 350, 355). However, the Supreme Court explicitly rejected this extension of the "unreasonable application" standard and noted that "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [the Supreme] Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (citation omitted); *see also Barnes v. Joyner*, 751 F.3d 229, 254 (4th Cir. 2014) (Agee, J., dissenting) ("Limiting the 'unreasonable application' prong further, the Supreme Court recently rejected the Fourth Circuit's additional characterization that a state court could unreasonably apply Supreme Court precedent by 'unreasonabl[y] refus[ing] to extend a legal principle to a new legal context where it should apply.'" (quoting *White*, 134 S. Ct. at 1706)).

mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citation omitted).

"[E]valuating whether a rule application was unreasonable requires considering the rule's specificity." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "If a legal rule is specific, the range may be narrow." *Id.* However, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* The "objectively unreasonable" standard "creates 'a substantially higher threshold' for obtaining relief than *de novo* review." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

"Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting *Williams*, 529 U.S. at 412); *see also Burtos v. White*, 521 F.3d 321, 325 (4th Cir. 2008) ("[I]t is Supreme Court precedent, and not Fourth Circuit precedent, to which [courts] look in applying the AEDPA standard of review." (citation omitted)). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer*, 538 U.S. at 71–72 (citations omitted).

A court's "review under § 2254(d)(1) focuses on what a state court knew and did." *Cullen*, 563 U.S. at 182. Thus, a court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 181. Additionally, "[i]n deciding whether a petitioner has demonstrated the deficiency of the state court adjudication under § 2254(d), federal courts must presume state court findings of fact to be correct unless the petitioner

rebuts that presumption by clear and convincing evidence." *Buckner v. Polk*, 453 F.3d 195, 198 (4th Cir. 2006) (citing 28 U.S.C. § 2254(e)(1)).

"If [the Section 2254(d)] standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102. Section 2254(d) provides a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (citations omitted); *see also Meyer*, 506 F.3d at 365 ("As is apparent from the Supreme Court's explication of 28 U.S.C. § 2254(d)(1), federal courts are to accord considerable deference in their review of state habeas proceedings." (citing *Williams*, 529 U.S. at 412–13)). "It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 562 U.S. at 102. "It goes no further." *Id.* Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Nonetheless, "§ 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id.* at 102. "Although AEDPA deference is certainly a difficult standard to overcome, '[t]he standard is demanding but not insatiable; . . . [d]eference does not by definition preclude relief.'" *Golphin v. Branker*, 519 F.3d 168, 178 (4th Cir. 2008) (alterations in original) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)). "The petitioner carries the burden of proof" under Section 2254(d). *Cullen*, 563 U.S. at 181 (citation omitted).

## C.    IAOC Claims

In the PF&R, Magistrate Judge Eifert recommends that the Court grant Respondent's Motion for Summary Judgment as to each of Petitioner's exhausted IAOC claims—Grounds I through IV in the Petition. (*See* ECF No. 21 at 51–63.) Each of these claims relate to Petitioner's trial counsel declining to call certain witnesses during trial.[8] (*See, e.g.*, ECF No. 2 at 7–17.)

---

[8] In the Objections, Petitioner argues the following, in part, in his discussion regarding whether he should receive an evidentiary hearing:

> Petitioner's state habeas counsel was wholly ineffective during the omnibus hearing. Habeas counsel utterly failed to question the trial attorney as to why several important witnesses were not called at trial.
>
> . . .
>
> Petitioner's allegations of ineffectiveness cannot be resolved by reviewing the state court record. The record is patently inadequate because habeas counsel failed to question trial counsel about his reasons for calling these witnesses.

(ECF No. 22 at 2–3.) The Court finds that these assertions *could* be liberally construed as alleging a freestanding claim of IAOC relating to the performance of Petitioner's state habeas counsel during the omnibus hearing. *Cf. Thomas v. Cauley*, Civil Action No. 1:11–0449, 2014 WL 3565970, at *1 (S.D. W. Va. July 18, 2014) ("Because petitioner is proceeding *pro se*, . . . his filings are held to a less stringent standard than if they were prepared by a lawyer and are construed liberally." (emphasis added) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972))).

To the extent this is a freestanding claim, the Court denies it for two reasons. First, this new claim warrants dismissal because Petitioner improperly raised it for the first time in Petitioner's Objections. *See, e.g.*, *United States v. Humphreys*, 194 F.3d 1306, at *1 (4th Cir. 1999) (finding the appellant's claim to be "without merit" where the appellant argued "that the district court abused its discretion when it refused to consider an [IAOC] claim [the appellant] raised for the first time in his objections to the magistrate judge's recommendation"); *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) (holding "that a district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge"); *Murr v. United States*, 200 F.3d 895, 902 n.1 ("Courts have held that while the Magistrate Judge Act . . . permits *de novo* review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate."). The Court recognizes that the Fourth Circuit previously stated that, "as part of its obligation to determine *de novo* any issue to which proper objection is made, a district court is required to consider all arguments directed to that issue, regardless of whether they were raised before the magistrate." *United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992). However, the Court finds that this statement by the Fourth Circuit is distinguishable insofar as it pertains to new *arguments*, *see id.*, whereas the above statement in Petitioner's Objections could be liberally construed as a new *claim*, (*see* ECF No. 22 at 2–3). The Court therefore finds that, insofar as Petitioner raises a new IAOC claim relating to his habeas counsel, this claim is properly denied as improperly raised for the first time in his Objections.

Second, even if the Court reached the merits of Petitioner's new claim, this claim is not cognizable in the instant proceeding. In particular, 28 U.S.C. § 2254(i) provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." *See, e.g.*, *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012) ("§ 2254(i) precludes [a petitioner] from relying on the ineffectiveness of his postconviction attorney as a ground for relief . . . ." (citation omitted)). The

42

Petitioner objects to these recommendations and argues that the WVSCA's rulings affirming the denial of these claims were contrary to, or an unreasonably application of, clearly established federal law. (*See* ECF No. 22 at 6–9.)

In affirming the denial of Petitioner's exhausted IAOC claims, the WVSCA applied the Supreme Court's two-pronged test for IAOC claims established in the landmark case of *Strickland v. Washington*. *Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at *4 (W. Va. June 19, 2014) ("In the West Virginia courts, claims of [IAOC] are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984) . . . ." (quoting *State v. Miller*, 459 S.E.2d 114, 117 (W. Va. 1995))). The *Strickland* two-pronged test is, of course, the correct federal legal standard to determine whether counsel was constitutionally ineffective. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (noting that the Supreme Court "established the legal principles that govern claims of [IAOC] in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)"). The Court therefore finds that the WVSCA identified the correct federal legal standard when considering Petitioner's exhausted IAOC claims.

Additionally, it is beyond dispute that the *Strickland* ineffectiveness standard is clearly established federal law. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 391 (2000) ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'"). Accordingly, the "threshold question" of whether the rule of law applied by the WVSCA was clearly established federal law is "easily" satisfied as to Petitioner's exhausted IAOC claims. *Id.* at 390.

---

Court therefore alternatively finds that Petitioner's new IAOC claim relating to his habeas counsel is without merit.

 Accordingly, the Court **DENIES** Petitioner's freestanding claim in the Objections that his state habeas counsel was constitutionally ineffective during the state omnibus hearing.

As the WVSCA identified the correct legal standard for Petitioner's exhausted IAOC claims and that standard is clearly established, the Court must analyze whether the WVSCA unreasonably applied this clearly established federal law. *See, e.g.*, *Powell v. Kelly*, 562 F.3d 656, 664 (4th Cir. 2009) ("A state court's decision involves an 'unreasonable application' of clearly established federal law under § 2254(d)(1) 'if the state court identifies the correct governing legal rule from . . . [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" (alterations in original) (quoting *Williams*, 529 U.S. at 407)). The Court shall first describe the *Strickland* standard generally and in the specific context of a Section 2254 petition, then analyze whether the WVSCA unreasonably applied this standard when affirming the denial of Petitioner's exhausted IAOC claims.

      1.    <u>Standard for IAOC Claims in Section 2254 Petitions</u>

The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. "It is well established that the [S]ixth [A]mendment's guarantee of a right to counsel encompasses a right to the effective assistance of counsel." *Stuck v. United States*, Civil Action No. 2:08–0240, 2010 WL 3259700, at *2 (S.D. W. Va. Aug. 18, 2010) (citations omitted).

In *Strickland*, the Supreme Court stated that "[a]n [IAOC] claim has two components: [1] [a] petitioner must show that counsel's performance was deficient, and [2] that the deficiency prejudiced the defense." *Wiggins*, 539 U.S. at 521 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "A defendant asserting an [IAOC] claim must . . . satisfy both prongs, and a failure of proof on either prong ends the matter." *United States v. Roane*, 378 F.3d 382, 404 (4th Cir.

44

2004) (citing *Williams v. Kelly*, 816 F.2d 939, 946–47 (4th Cir. 1987)); *see also Jones v. Clarke*, 783 F.3d 987, 991–92 (4th Cir. 2015) ("'[T]here is no reason for a court deciding an [IAOC] claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one,' and '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.'" (quoting *Strickland*, 466 U.S. at 697)).

Under the deficient-performance prong, the petitioner's "burden is to show 'that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687). The petitioner satisfies this burden by "demonstrat[ing] that counsel's representation 'fell below an objective standard of reasonableness.'" *Roane*, 378 F.3d at 404 (quoting *Strickland*, 466 U.S. at 687). This analysis "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010)). "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. "[C]ounsel's performance will not be deemed deficient except in those relatively rare situations where, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.'" *Tice v. Johnson*, 647 F.3d 87, 102 (4th Cir. 2011) (quoting *Strickland*, 466 U.S. at 690).

"It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'" *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 689). However, the Court "must resist the temptation to 'second-guess counsel's assistance . . .' and make 'every effort . . .

to eliminate the distorting effects of hindsight.'" *DeCastro v. Branker*, 642 F.3d 442, 451 (4th Cir. 2011) (quoting *Strickland*, 466 U.S. at 689); *see also Strickland*, 466 U.S. at 690 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."). "Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Richter*, 562 U.S. at 105. Additionally, "[a] criminal defense attorney routinely faces thorny tactical decisions that may heavily bear on the defendant's life or liberty." *Tice*, 647 F.3d 87. "Lacking complete, verifiable information, the lawyer must often make those decisions based on educated surmise and conjecture." *Id.* Indeed, "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689 (citation omitted). For these reasons, "a court asked to engage in detached, dispassionate, after-the-fact review 'must indulge a strong presumption' that counsel's decisions were within the broad spectrum of reasonableness." *Tice*, 647 F.3d at 102 (quoting *Strickland*, 466 U.S. at 689); *see, e.g.*, *Richter*, 562 U.S. at 104 ("A court considering a claim of [IAOC] must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." (quoting *Strickland*, 466 U.S. at 689)); *Bell v. Cone*, 535 U.S. 685, 702 (2002) ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." (citation omitted)); *cf. Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential."). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it

46

deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

"Yet deference to the decisions of counsel is not limitless." *Winston v. Pearson* (*Winston II*), 683 F.3d 489, 504 (4th Cir. 2012). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691; *see also Winston II*, 683 F.3d at 504 ("Attorneys have a duty to investigate their client's case so as to enable them to make professional decisions that merit distinction as 'informed legal choices.'" (quoting *Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011))). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

"Once a petitioner has established deficient performance, he must prove prejudice—'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Winston II*, 683 F.3d at 505 (quoting *Richter*, 562 U.S. at 104). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 694). *See generally id.* at 111–12 ("This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" (quoting *Strickland*, 466 U.S. at 693)). "It is not enough 'to

47

show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* at 104 (quoting *Strickland*, 466 U.S. at 693). "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112; *cf. id.* at 104 ("Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" (quoting *Strickland*, 466 U.S. at 687)). "In sum, '[t]aking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.'" *Elmore*, 661 F.3d at 858 (quoting *Strickland*, 466 U.S. at 696).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla*, 559 U.S. at 371. "An [IAOC] claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 689–90).

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* "The AEDPA standard and the *Strickland* standard are dual and overlapping, and [courts] apply the two standards simultaneously rather than sequentially." *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012) (citing *Richter*, 562 U.S. at 105). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (citations omitted); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) ("When a state prisoner asks a federal court to set aside a [conviction] due to [IAOC] . . . , [Supreme Court] cases require that the federal court use a doubly deferential standard of review that gives both the state court and the defense attorney the benefit

of the doubt." (citation omitted)). "The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Richter*, 562 U.S. at 105 (citation omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable." *Id.* Rather, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

2.   Ground I—Sandra Culp

Petitioner argues that the Magistrate Judge erred by finding that the WVSCA did not unreasonably apply the *Strickland* standard when it affirmed the denial of Petitioner's IAOC claim relating to trial counsel's failure to call Sandra Culp as a witness during trial. (ECF No. 22 at 6–7.) The Court disagrees with Petitioner's argument and finds that the WVSCA did not unreasonably apply clearly established federal law when it affirmed the denial of Petitioner's claim in Ground I of the Petition.

On habeas appeal, the WVSCA found that Petitioner's trial counsel made a strategic choice to not call Ms. Culp as a witness. *Boothe v. Ballard*, No 13–0740, 2014 WL 2782127, at *5 (W. Va. June 19, 2014). Additionally, the WVSCA noted that "the circuit court found that the absence of [Ms. Culp's] testimony at trial did not likely change the outcome given that, during her deposition, she testified that not all sexually abused children exhibit signs of trauma." *Id.* The WVSCA thus affirmed the denial of Petitioner's IAOC claim relating to Ms. Culp. *See id.*

In his Objections, Petitioner argues that this ruling was an unreasonable application of clearly established federal law because "the state presented no expert testimony as to any trauma experienced by D.B. evidencing sexual abuse" and his trial counsel had a duty to "present expert testimony that D.B. displayed no signs of sexual abuse." (ECF No. 22 at 6.) The Court disagrees.

49

Ms. Culp could have testified at trial—as she did in her deposition—regarding her opinion that D.B. did not exhibit any "red flags" of trauma. (*See* ECF No. 10, Ex. 16 at 158 & 163.) However, Petitioner's trial counsel was able to elicit this beneficial opinion through the cross-examination of Detective Chapman. (*See* ECF No. 10, Ex. 12 at 225.) Petitioner's trial counsel certainly could have made the strategic choice to forego Ms. Culp's testimony at trial to avoid exposing additional evidence that would only weaken her opinion, such as (1) Ms. Culp's deposition testimony that she did not review the entire record, (*id.* at 160); (2) her additional opinion that not all individuals who suffer trauma would exhibit signs of this trauma, (*id.* at 161–62); and (3) Ms. Culp's recommendation in the March 12, 2009 amendment to her report that D.B. should receive counseling "regarding the entire case," (*id.* at 178). Additionally, Petitioner's trial counsel may have reasonably determined that the probative value of Ms. Culp's testimony at trial did not outweigh the potential harm presented by Ms. Culp adding additional testimony on cross-examination regarding D.B.'s allegations that he was abused by Petitioner. (*See, e.g.*, *id.*, Ex. 16 at 176–77.) Ultimately, it was well-within the realm of reasonable representation for Petitioner's counsel to determine that the probative value of Ms. Culp's testimony at trial would not outweigh the likely detriment of her testimony on cross-examination.

Contrary to Petitioner's assertion, it was also reasonable for trial counsel to make the strategic choice to not present expert testimony regarding whether D.B. exhibited signs of trauma where the state similarly chose to forgo such expert testimony. Courts have found that it is reasonable for trial counsel to determine that it is more advantageous to forego expert testimony where the state similarly does not provide such evidence and where the state may gain damaging concessions from an expert on cross-examination. *See, e.g.*, *Jackson v. Conway*, 763 F.3d 115,

153–54 (2d Cir. 2014) (finding that defense counsel was not ineffective for declining to pursue expert testimony where counsel "and the State would be on the same footing at trial—neither would have access to an expert and both would have to rely only on the bare medical records" and "counsel could have refrained from calling a[n] . . . expert" out of "fear of the concessions the State may have been able to extract from that expert on cross-examination" (citations omitted)); *see also Green v. Ballard*, Civil Action No. 3:02–1348, 2015 WL 1612198, at *3 (S.D. W. Va. Apr. 10, 2015) ("Because there was no specific expert testimony in favor of the prosecution that a second expert could rebut, trial counsel was reasonable in choosing not to call an expert.") In this situation, Petitioner's trial counsel could have reasonably determined that it was more advantageous to Petitioner to provide a total absence of expert testimony to the jury regarding whether D.B. exhibited indicia of trauma long after the assault occurred, rather than provide an opening to the prosecution to gain concessions from Ms. Culp on cross-examination. The Court therefore finds that the WVSCA was not objectively unreasonable in finding that Petitioner's trial counsel was not constitutionally deficient in making the strategic choice to forego Ms. Culp's testimony during trial. *Cf. Moore v. Hardee*, 723 F.3d 488, 497 (4th Cir. 2013) ("Even if, 'in some cases, counsel would be deemed ineffective for failing to consult or rely on experts,' 'state courts . . . have wide latitude' to determine when an expert is necessary." (quoting *Harrington v. Richter*, 562 U.S. 86, 106 (2011))).

The Court also finds that Petitioner failed to establish that he was prejudiced by his counsel's choice not to call Ms. Culp as a witness during trial. As noted above, Petitioner's counsel elicited testimony regarding Ms. Culp's opinion that D.B. did not exhibit indicia of trauma—without Ms. Culp facing cross-examination—through defense counsel's cross-

examination of Detective Chapman. (*See* ECF No. 10, Ex. 12 at 225 (providing the following exchange between defense counsel and Detective Chapman at trial: "Q: . . . And are you aware that Ms. Culp's finding was that D.B. didn't exhibit any symptoms of trauma? A: Yes.").) Petitioner's trial counsel then emphasized Ms. Culp's uncontroverted opinion regarding the lack of indicia of trauma during the defense's closing arguments. (*See id.*, Ex. 13 at 96.) As such, the jury was aware of Ms. Culp's opinion that D.B. did not exhibit any "red flags" of trauma and Petitioner was not prejudiced by his trial counsel's decision to avoid opening the door to mitigating testimony regarding Ms. Culp's opinion during cross-examination. *See, e.g.*, *Winston II*, 683 F.3d 489, 505 (4th Cir. 2012) (stating that the required showing to satisfy the prejudice requirement is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (quoting *Richter*, 562 U.S. at 104)).

Petitioner nonetheless "argues that the mere presence of Ms. Culp sitting on the witness stand testifying to her findings . . . would have been beneficial to Petitioner's defense." (ECF No. 22 at 7.) However, Petitioner offers no evidence that Ms. Culp's testimony during trial would have resulted in a substantial likelihood that the jury would have reached a different verdict. Additionally, the record does not support the likelihood of a different outcome, as Petitioner's counsel was able to enter Ms. Culp's ultimate opinion into the record through the cross-examination of Detective Chapman, (*see* ECF No. 10, Ex. 12 at 225), while avoiding the likely pitfalls associated with providing the prosecution with an opportunity to cross-examine Ms. Culp. As Petitioner has failed to demonstrate that there was a reasonable probability of a different outcome if Ms. Culp testified, the Court finds that Petitioner has failed to establish that he was prejudiced by his trial counsel's decision to forego this testimony. *See, e.g.*, *Elmore v. Ozmint*, 661

F.3d 783, 858 (4th Cir. 2011) ("[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.'" (quoting *Strickland v. Washington*, 466 U.S. 668, 696 (1984))). Further, as fairminded jurists could—at a minimum—disagree as to whether Petitioner was prejudiced by his trial counsel's decision not to call Ms. Culp as a witness, the Court also finds that Petitioner has failed to demonstrate that the WVSCA unreasonably applied clearly established federal law when it found no prejudice as to this claim. *See, e.g.*, *Richter*, 562 U.S. at 103 ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

For the foregoing reasons, the Court finds that Petitioner has failed to satisfy either the deficient-performance or prejudice requirements of his claim in Ground I that his trial counsel was constitutionally ineffective by failing to call Ms. Culp as a witness at trial. The Court further finds that Petitioner has failed to establish that the WVSCA unreasonably applied clearly established federal law when it affirmed the state circuit habeas court's denial of this claim. The Court therefore finds that Petitioner has failed to satisfy the requirements of Section 2254(d) as to Ground I in the Petition and, as such, Respondent is entitled to summary judgment on this claim. Accordingly, the Court **OVERRULES** Petitioner's objections as to Ground I, **ADOPTS** the PF&R to the extent that Magistrate Judge Eifert recommends that the Court grant summary judgment on this claim, and **GRANTS** Respondent's Motion for Summary Judgment insofar as Respondent seeks summary judgment on Ground I of the Petition.

53

    3.    <u>Ground II—Dr. Bobby Miller</u>

Petitioner next argues that the Magistrate Judge erred by finding that the WVSCA did not unreasonably apply the *Strickland* standard when it affirmed the denial of Petitioner's IAOC claim relating to trial counsel's failure to call Dr. Bobby Miller as a witness during trial. (ECF No. 22 at 7–8.) The Court agrees with Magistrate Judge Eifert's finding and recommendation on this claim.

The WVSCA found that Petitioner's trial counsel made a strategic decision "on [P]etitioner's behalf" and in his interests to decline to call Dr. Miller as a witness. *Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at *5 (W. Va. June 19, 2014). The WVSCA also noted that "the circuit court found that [Dr. Miller's] report . . . was not compelling evidence that [P]etitioner did not assault D.B." *Id.* The WVSCA therefore affirmed the circuit court's denial of Petitioner's IAOC claim relating to Dr. Miller. *See id.* at *7.

Petitioner argues that his trial counsel was deficient for failing to call Dr. Miller as witness at trial because Dr. Miller would have testified that it was unlikely Petitioner committed the offenses and Dr. Miller's testimony "would have reflected positively on his character."[9] (ECF No. 22 at 7–8.) The Court disagrees. The record does not reflect—and Petitioner does not otherwise assert—that the prosecution called any witnesses to opine on Petitioner's character or propensity toward pedophilia, if the state was even permitted to provide such evidence. Petitioner's trial counsel may have therefore reasonably decided that calling Dr. Miller would not have benefited Petitioner's case. Indeed, as with Ms. Culp's testimony, Petitioner's trial counsel may have

---

[9] In the PF&R, Magistrate Judge Eifert found that the performance of Petitioner's trial counsel was not constitutionally deficient due to the failure to call Dr. Miller as a witness because, in part, "the admissibility of Dr. Miller's opinions under West Virginia law is unclear." (ECF No. 21 at 54.) In the Objections, Petitioner argues that Dr. Miller's testimony regarding Petitioner's propensity to commit the offenses would be admissible. (*See* ECF No. 22 at 7.)

    As noted herein, the Court finds that Petitioner's trial counsel was not constitutionally deficient by declining to call Dr. Miller as a witness due to the potential negative testimony this witness may have provided. The Court therefore need not address whether Dr. Miller's testimony would have been admissible at trial.

reasonably concluded that Dr. Miller's testimony would ultimately harm Petitioner's defense, as Dr. Miller could have testified on cross-examination that (1) there was a 26% "Probability Value that [Petitioner] sexually offended a boy outside of the family" according to the Abel Questionnaire, (ECF No. 10, Ex. 16 at 187); (2) there was an "11 percent" chance that Petitioner "will commit an offense" in "the next ten years"—which Dr. Miller described as "low"—according to an "actuarial test," (*id.*, Ex. 15 at 46); (3) sexual offenders previously deceived the battery of tests Dr. Miller performed on Petitioner, (*id.* at 62); (4) if the testing is "done properly," there is still a "five percent chance" that a sex offender will pass the tests, (*id.*); (5) Petitioner had a "deficit in empathy for the victim," (*id.*, Ex. 16 at 185); and (6) Petitioner provided conflicting statements to Dr. Miller and the probation officer as to the number of times he visited D.B.'s house, which Dr. Miller opined was due to Petitioner's "desire to minimize contact with the child," (*id.*, Ex. 15 at 60). Given this potentially harmful testimony, it was entirely reasonably for Petitioner's counsel to make the strategic choice to forego Dr. Miller's testimony at trial. *See, e.g.*, *Jackson v. Conway*, 763 F.3d 115, 153–54 (2d Cir. 2014) (finding that defense counsel was not ineffective by choosing to not pursue expert testimony where the state had not offered expert testimony on the issue and counsel may have "fear[ed] . . . the concessions the State may have been able to extract from that expert on cross-examination" (citations omitted)). Based on this record, Petitioner's trial counsel may have made a reasonable strategic choice not to call Dr. Miller as a witness and the WVSCA certainly did not unreasonably apply clearly established federal law by affirming the circuit court's denial this claim.

The Court further finds that Petitioner has failed to satisfy the prejudice prong as to this claim. As noted above, the harm caused by Dr. Miller's testimony may have substantially

outweighed any potential benefit to Petitioner from his trial counsel calling this witness. Further, Petitioner has provided no showing that Dr. Miller's testimony at trial—including the attendant potential for the prosecution eliciting concessions from Dr. Miller during cross-examination—would have created a reasonable probability of a different outcome. *See, e.g.*, *Winston II*, 683 F.3d 489, 505 (4th Cir. 2012) (stating that, to satisfy the prejudice prong, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (quoting *Harrington v. Richter*, 562 U.S. 86, 104 (2011))). As such, the Court finds that Petitioner has not met his burden to demonstrate that his trial counsel's decision to forego this testimony prejudiced Petitioner.

For these reasons, the Court finds that Petitioner has failed to satisfy either the deficient-performance or prejudice requirements for his claim in Ground II that his trial counsel was constitutionally ineffective by failing to call Dr. Miller as a witness during trial. The Court further finds that Petitioner has failed to establish that the WVSCA unreasonably applied clearly established federal law when it affirmed the circuit court's denial of this IAOC claim. The Court therefore finds that Petitioner has failed to satisfy the requirements of Section 2254(d) as to Ground II in the Petition and, as such, Respondent is also entitled to summary judgment on this claim. Accordingly, the Court **OVERRULES** Petitioner's objections as to Ground II, **ADOPTS** the PF&R to the extent that Magistrate Judge Eifert recommends that the Court grant summary judgment on this claim, and **GRANTS** Respondent's Motion for Summary Judgment insofar as Respondent seeks summary judgment on Ground II of the Petition.

4.      Ground III—Dr. Joan Phillips

56

Petitioner next argues that the Magistrate Judge erred by finding that the WVSCA did not unreasonably apply clearly established federal law when it affirmed the circuit court's denial of Petitioner's IAOC claim pertaining to trial counsel's failure to call Dr. Joan Phillips as a trial witness. (ECF No. 22 at 8.) The Court again agrees with Magistrate Judge Eifert's finding as to this claim and disagrees with Petitioner's position.

The WVSCA similarly found that Petitioner's trial counsel made a strategic decision in Petitioner's interest by not calling Dr. Phillips as a witness during trial. *Boothe*, 2014 WL 2782127, at *5. The WVSCA also noted that the circuit court found that "this decision did not change the outcome of [P]etitioner's trial" because "Dr. Phillip's testimony may have harmed [P]etitioner given that she testified at [P]etitioner's omnibus hearing that the vast majority of children who are rectally penetrated do not manifest physical trauma." *Id.* The WVSCA then affirmed the circuit court's denial of this IAOC claim. *See id.* at *7.

In the PF&R, Magistrate Judge Eifert found that Petitioner failed to establish either that counsel was deficient in declining to call Dr. Phillips as a witness, or that this alleged deficiency resulted in prejudice. (*See* ECF No. 21 at 58–60.) In the Objections, however, Petitioner focuses solely on the prejudice prong and does not specifically object to the Magistrate Judge's findings or recommendation regarding the deficient-performance requirement. (*See* ECF No. 22 at 8.) As Petitioner failed to specifically object to the Magistrate Judge's recommendation that Ground III does not satisfy the deficient-performance prong, the Court finds that this prong alone is sufficient to deny his claim regarding Dr. Phillips. *See, e.g.*, *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004) ("A defendant asserting an [IAOC] claim must . . . satisfy both prongs, and a failure of proof on either prong ends the matter." (citing *Williams v. Kelly*, 816 F.2d 939, 946–47 (4th Cir.

1987))). *See generally Humple v. Hilewitz*, Civil Action No. 2:13-cv-14618, 2016 WL 1117600, at *1 (S.D. W. Va. Mar. 22, 2016) ("[T]he Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed." (citing *Thomas v. Arn*, 474 U.S. 140, 150 (1985))). Nonetheless, as Petitioner specifically objects to the Magistrate Judge's findings and recommendation on the prejudice prong, the Court finds it appropriate—for purposes of this Opinion—to similarly address the issue of prejudice as to Ground III.

Petitioner argues that his counsel's decision not to call Dr. Phillips as a witness prejudiced his defense because her testimony that "D.B. did not [exhibit] any physical signs of abuse . . . would . . . have had a substantial . . . effect in the jury determining their verdict." (ECF No. 22 at 8.) The Court is not persuaded by this argument. While—as Petitioner notes—Dr. Phillips testified during the state omnibus hearing that she did not find any signs of anal penetration in her examination of D.B. many months after the injury, she also testified that these findings are normal. (*See* ECF No. 10, Ex. 16 at 40.) Indeed, Dr. Phillips testified that "[t]here often [are] not any physical findings" as a result of "anal rape" and "only in about five percent of children who have had rectal penetration is there any evidence." (*Id.*) Ultimately, Dr. Phillips testimony that D.B. did not exhibit symptoms of anal rape would have had little to no persuasive value for the jury in light of her testimony that very few victims of anal rape exhibit physical symptoms of such an assault.

In addition, Petitioner's trial counsel was able to evade this substantial shortcoming by eliciting Dr. Phillips' finding that D.B. exhibited no physical symptoms of anal rape—without any testimony that such findings are normal—from Detective Chapman on cross-examination. (*See* ECF No. 10, Ex. 12 at 225.) Petitioner's trial counsel also emphasized—without any qualifying

language—that "the medical examination of this child" resulted in "no findings of any trauma to the anus" during closing arguments. (*Id.*, Ex. 13 at 97; *see also id.*, Ex. 12 at 138 (providing defense counsel's statement during opening statement that "there are no medical reports supporting any physical abuse of this child" and "there are no medical reports substantiating any trauma to this child").) Petitioner's trial counsel was thus able to provide the jury with Dr. Phillips' findings that D.B. did not exhibit physical symptoms of anal penetration *without* the substantial caveat that such findings are normal. Nonetheless, the jury still found Petitioner guilty of three counts—but not of Count II, which alleged that Petitioner penetrated D.B.'s rectum with a knife. (*See, e.g.*, ECF No. 21 at 60.)

Despite the foregoing facts, Petitioner contends that his trial counsel eliciting this positive testimony from Detective Chapman "is not the same as having a live witness on the stand where the jury can observe the witness' demeanor." (ECF No. 22 at 8.) However, Petitioner has provided no evidence indicating that his counsel calling Dr. Phillips as a witness would have created a reasonable probability of a different outcome. To the contrary, Dr. Phillips' live testimony at trial would have been significantly less beneficial to Petitioner's defense, as then the prosecution could have elicited testimony on cross-examination that victims of anal penetration typically do not exhibit signs of this assault. (*See* ECF No. 10, Ex. 16 at 40.) As the jury found Petitioner guilty even with Dr. Phillips' unmitigated findings in the record, the Court finds that there was not a reasonable probability of a different outcome if Petitioner's trial counsel elected to have Dr. Phillips testify at trial. Absent such a reasonable probability, Petitioner has failed to establish that he was prejudiced by his trial counsel's purportedly deficient performance in not calling Dr.

Phillips as a witness. *See, e.g.*, *Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011) (citation omitted).

For the foregoing reasons, the Court finds that Petitioner has failed to satisfy the prejudice requirement for his claim in Ground III that his trial counsel was constitutionally ineffective by failing to call Dr. Phillips as a witness during trial. The Court further finds that Petitioner has failed to establish that the state court unreasonably applied clearly established federal law when it affirmed the circuit court's denial of this claim. The Court therefore finds that Petitioner has failed to satisfy the requirements of Section 2254(d) as to Ground III in the Petition and Respondent is entitled to summary judgment on this claim. Accordingly, the Court **OVERRULES** Petitioner's objections as to Ground III, **ADOPTS** the PF&R insofar as Magistrate Judge Eifert recommends that the Court grant summary judgment on this claim, and **GRANTS** Respondent's Motion for Summary Judgment to the extent that Respondent seeks summary judgment on Ground III of the Petition.

5.      Ground IV—Dr. Julie Heinig

Turning to Petitioner's last exhausted IAOC claim, Magistrate Judge Eifert found in the PF&R that Petitioner failed to establish that he was prejudiced by his trial counsel declining to call Dr. Julie Heinig as a witness during trial.[10] (*See* ECF No. 21 at 60–63.) Petitioner objects to this

---

[10] In the PF&R, Magistrate Judge Eifert notes the following:

> As there is no evidence that Dr. Heinig was known to defense counsel at the time of trial, the undersigned interprets Petitioner's claim [in Ground IV] to mean that defense counsel should have generally called a serologist at trial, and recognizes that Petitioner cites Dr. Heinig's testimony at the state habeas evidentiary hearing as illustrative of the testimony that could have been obtained from a serologist at trial.

(ECF No. 21 at 60–61.) In the Objections, Petitioner does not object to this characterization of his claim in Ground IV. (*See* ECF No. 22 at 8–9.)

The Court concurs with the Magistrate Judge's approach as to Ground IV. Accordingly, the Court shall

finding and argues that he has established the requisite prejudice. (*See* ECF No. 22 at 8–9.) The Court again agrees with Magistrate Judge Eifert's finding and disagrees with Petitioner's position.

As noted above, Petitioner did not explicitly raise an IAOC claim relating to his trial counsel's failure to call a serologist as a witness at trial in his state habeas appeal to the WVSCA. (*See, e.g.*, ECF No. 10, Ex. 10 at 160–64.) Nonetheless, the WVSCA addressed this claim and stated that "the circuit court noted that [Dr. Heinig] never visited the crime scene in this case, nor did she perform any tests showing that DNA was present there or, if present, was still capable of testing." *Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at \*5 (W. Va. June 19, 2014). The WVSCA then found that Petitioner's trial counsel made a "strategic decision[]" not to call Ms. Heinig as a witness and that this decision was "assistive of [Petitioner's] interests." *Id.* at \*5. The WVSCA also found that, even if this was an error, Petitioner "failed to prove . . . that any errors [his trial counsel] may have made affected the outcome of the trial." *Id.* The WVSCA subsequently affirmed the circuit court's denial of this IAOC claim. *See id.* at \*7.

Magistrate Judge Eifert and Petitioner both focus exclusively on the prejudice prong in relation to Ground IV. The Court shall therefore similarly address the issue of prejudice and forego an analysis of the deficient-performance prong in its analysis of this claim. *Cf. United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004) ("A defendant asserting an [IAOC] claim must . . . satisfy both prongs, and a failure of proof on either prong ends the matter." (citing *Williams v. Kelly*, 816 F.2d 939, 946–47 (4th Cir. 1987))).

---

similarly interpret Petitioner's claim in Ground IV as asserting that trial counsel was ineffective for failing to call a serologist at trial and consider Dr. Heinig's testimony as representative of what Petitioner asserts the serologist would have testified at trial.

In the Objections, Petitioner argues that he was prejudiced by his trial counsel's failure to call a serologist—such as Dr. Heinig—because this "testimony would have bolstered Petitioner's argument that there would have been physical evidence at the alleged scene" and "the sheer nonexistence of [this evidence] would have been detrimental [sic] in showing Petitioner's innocence." (ECF No. 22 at 9.) Petitioner's argument fails because it is, at most, speculative. There is no indication in the record—and Petitioner does not otherwise assert—that anyone ever submitted to the state courts any evidence of testing for biological materials or DNA evidence at the potential crime scenes. Indeed, there is no indication in the record that Petitioner's state habeas counsel provided such testing results during the omnibus hearing. (*See, e.g.*, ECF No. 10, Ex. 16 at 2–236 (constituting the transcript of the omnibus hearing and the statements submitted by both parties for consideration by the state circuit habeas court).) Absent such evidence, Petitioner only speculates as to what these test results *might* have revealed—namely, that these tests would have demonstrated a "nonexistence" of DNA evidence at the potential crime scenes. (*See id.*) However, such speculative evidence is insufficient to demonstrate prejudice. *See, e.g.*, *Anderson v. Sec'y, Dep't of Corr.*, No. 8:09–cv–2083–T–17EAJ, 2010 WL 4259448, at *8 (M.D. Fla. Oct. 25, 2010) ("In envisioning exonerating DNA test results, [the petitioner] merely engages in speculation, which is insufficient to demonstrate actual prejudice." (citing *Aldrich v. Wainwright*, 777 F.2d 630, 637 (11th Cir. 1985))); *Yaitsky v. United States*, C.A. No. 2:04-cr-1097-PMD, 2008 WL 3845446, at *8 n.1 (D.S.C. Aug. 18, 2008) ("Prejudice based on speculation . . . is insufficient to establish an [IAOC] claim under *Strickland*." (first alteration in original) (quoting *Sierra v. Schiro*, No. 06-350-PHX-ROS, 2008 WL 2065949, at *11 (D. Ariz. May 13, 2008))); *Tench v. Harkleroad*, No. 3:02CV157-1-MU, 2005 WL 2095073, at *3 (W.D.N.C. Aug. 29, 2005) ("Mere

speculation that . . . evidence existed is insufficient to establish prejudice."). *See generally Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (noting that federal courts should not "grant habeas relief on the basis of little more than speculation with slight support").

Furthermore, Petitioner's counsel elicited trial testimony from Detective Chapman on cross-examination that he "didn't attempt to obtain any samples from any of the locations that [D.B.] said" the assault occurred. (ECF No. 10, Ex. 12 at 213.) During closing arguments, Petitioner's trial counsel then emphasized that Detective Chapman "conducted no blood sample testing" or "semen testing" and that he "doesn't have any DNA testing." (*Id.*, Ex. 13 at 96; *see also id.*, Ex. 12 at 138 (providing defense counsel's statement during opening statements that "[t]here is no physical evidence, no blood evidence, no semen evidence").) The jury was thus aware that the investigating officer—Detective Chapman—did not conduct this testing or provide these results. Nonetheless, the jury still convicted Petitioner on three counts despite this lack of evidence. Petitioner has not provided any evidence indicating that Dr. Heinig's testimony as to the *potential* types of evidence investigators *may* have located at the crime scenes would present a reasonable probability of altering this result. *Cf. Tench*, 2005 WL 2095073, at *3 ("Mere speculation that . . . evidence existed is insufficient to establish prejudice. Moreover, even if such evidence existed, it is arguable that such evidence would not overcome the . . . evidence supporting [the petitioner's] guilt in the instant case."). The Court therefore finds that Petitioner has failed to satisfy his burden that he was prejudiced by his trial counsel's decision not to call a serologist—such as Dr. Heinig—as a trial witness. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 394 (2000) ("The petitioner bears the highly demanding and heavy burden in establishing actual prejudice." (citation omitted)).

For the foregoing reasons, the Court finds that Petitioner has failed to satisfy the prejudice requirement for his IAOC claim in Ground IV. The Court further finds that Petitioner has failed to establish that the WVSCA unreasonably applied clearly established federal law when it affirmed the circuit court's denial of this claim. The Court therefore finds that Petitioner has failed to satisfy the requirements of Section 2254(d) as to Ground IV in the Petition and Respondent is entitled to summary judgment on this claim. Accordingly, the Court **OVERRULES** Petitioner's objections as to Ground IV, **ADOPTS** the PF&R insofar as Magistrate Judge Eifert recommends that the Court grant summary judgment on this claim, and **GRANTS** Respondent's Motion for Summary Judgment to the extent that Respondent seeks summary judgment on Ground IV of the Petition.

## D.      Judicial Bias Claim

In his ninth ground for relief, Petitioner argues, in part, that the trial judge was not impartial and this impartiality resulted in a violation of Petitioner's due process rights.[11] (*See* ECF No. 2 at 25–28.) For the reasons that follow, the Court finds that Respondent is entitled to summary judgment on this claim.

Petitioner asserts that "the WVSCA decision denying Petitioner's [judicial bias] due process claim was contrary to, or an unreasonable application of, clearly established federal law."

---

[11] In the Petition, Petitioner describes this claim as a denial of "his constitutional right to an impartial jury." (ECF No. 2 at 28.) In the PF&R, Magistrate Judge Eifert noted that "[w]hile Petitioner raises his due process claim under the guise of an impartial jury argument, his position is better understood as a judicial bias claim." (ECF No. 21 at 74.) Petitioner does not object to this characterization of this due process claim in his Objections. (*See* ECF No. 22 at 12–13.)

The Court agrees with Magistrate Judge Eifert's characterization of this claim. In the Objections, Petitioner does not suggest that his jury was impartial for some reason beyond the purported influence of the trial judge. (*See id.* at 12–13.) Rather, he asserts that the trial judge acted in a partial manner and this partiality impacted the outcome of the trial. (*See id.*) The Court finds that this allegation is properly construed as a claim of judicial bias, *see, e.g.*, *Rowsey v. Lee*, 327 F.3d 335, 342 (4th Cir. 2003) (addressing the petitioner's claim of judicial bias and stating that "in order to argue that he was deprived of a fair trial, [the petitioner] must also show that the trial judge's bias somehow affected the outlook or deliberations of the jurors"), and shall analyze it as such.

(ECF No. 22 at 13.) However, the WVSCA did not identify a particular standard from then-established Supreme Court precedent when addressing Petitioner's judicial bias claim. *See Boothe*, 2014 WL 2782127, at *6. Rather, the WVSCA cited authority from its own precedent when detailing the appropriate standard for this claim. *See id.* (quoting *State v. Wood*, 280 S.E.2d 309, 310 (W. Va. 1981)). The Court therefore finds that the analysis under 28 U.S.C. § 2254(d)(1) pertaining to whether the state court unreasonably applied clearly established federal law is inapplicable as to this claim. *See, e.g.*, *Powell v. Kelly*, 562 F.3d 656, 664 (4th Cir. 2009) ("A state court's decision involves an 'unreasonable application' of clearly established federal law under § 2254(d)(1) 'if the state court identifies the correct governing legal rule from . . . [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" (alterations in original) (quoting *Williams*, 529 U.S. at 407)). Instead, the Court construes Petitioner's position as asserting that the WVSCA's decision regarding this claim is contrary to clearly established federal law and, as such, the Court shall apply that deferential standard to this claim. *See, e.g.*, *Williams*, 529 U.S. at 405–06 (stating that a state court's decision is "contrary to . . . clearly established" federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent").

As always, the first object of the Section 2254(d) analysis is to identify the clearly established federal law—as provided in Supreme Court precedent—that is implicated by Petitioner's claim. *See, e.g.*, *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) ("As a threshold matter . . . , [courts] first decide what constitutes 'clearly established Federal law, as determined by the

Supreme Court of the United States." (citing 28 U.S.C. § 2254(d)(1))). The Due Process Clause of

the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property,

without due process of law." U.S. Const. amend. V. "A fair trial in a fair tribunal is a basic

requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955); *see e.g.*, *Johnson v.*

*Mississippi*, 403 U.S. 212, 216 (1971) ("Trial before an unbiased judge is essential to due process."

(citations omitted)). "A criminal defendant tried by a partial judge is entitled to have his conviction

set aside, no matter how strong the evidence against him." *Edwards v. Balisok*, 520 U.S. 641, 647

(1997) (citations omitted). The requirement of a fair trial before a fair tribunal is the "most basic

tenet of our judicial system" and "helps to ensure both the litigants' and the public's confidence

that each case has been adjudicated fairly by a neutral and detached arbiter." *Hurles v. Ryan*, 752

F.3d 768, 788 (9th Cir. 2014); *cf. Mistretta v. United States*, 488 U.S. 361, 407 (1989) ("The

legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and

nonpartisanship.").

  "Fairness of course requires an absence of actual bias in the trial of cases." *Murchison*, 349

U.S. at 136; *see also Republican Party of Minn. v. White*, 536 U.S. 765, 775–76 (2002) (stating

that the "meaning of 'impartiality' in the judicial context—and of course its root meaning—is the

lack of bias for or against either party to the proceeding" (emphasis omitted)). "But our system of

law has always endeavored to prevent even the probability of unfairness." *Murchison*, 346 U.S. at

136. The inquiry is therefore "not only whether there was actual bias on [the court's] part, but also

whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to

hold the balance between vindicating the interests of the court and the interests of the accused.'"

*Taylor v. Hayes*, 418 U.S. 488, 501 (1974) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964));

*see also Jones v. Luebbers*, 359 F.3d 1005, 1012 (8th Cir. 2004) ("'[C]learly established Federal law, as determined by the Supreme Court of the United States,' recognizes not only actual bias, but also the appearance of bias, as grounds for disqualification . . . ." (quoting 28 U.S.C. § 2254(d)(1))).[12]

However, "it is also clear that judicial disqualification based on a likelihood or an appearance of bias is not always of *constitutional* significance." *Railey v. Webb*, 540 F.3d 393, 400 (6th Cir. 2008). Indeed, "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986)); *see, e.g.*, *FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948) ("[M]ost matters relating to judicial disqualification d[o] not rise to a constitutional level." (citation omitted)). "Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar." *Bracy*, 520 U.S. at 904 (citations omitted). "But the floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Id.* (citations omitted).

"In order to prevail in a deprivation of due process claim, a [petitioner] must show a level of bias that made 'fair judgment impossible.'" *Rowsey v. Lee*, 327 F.3d 335, 341 (4th Cir. 2003) (citation omitted). As pertinent to the instant matter, the Supreme Court provided the following

---

[12] Courts have considered case law regarding judicial disqualification when addressing Section 2254 claims of judicial bias. *See, e.g.*, *Rowsey v. Lee*, 327 F.3d 335, 341–42 (4th Cir. 2003); *Railey v. Webb*, 540 F.3d 393, 399–415 (6th Cir. 2008); *Jones v. Luebbers*, 359 F.3d 1005, 1012–15 (8th Cir. 2004).

lengthy discussion in *Liteky v. United States* regarding this standard in the context of allegedly prejudicial comments by a trial court:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German–American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.,* at 28 (internal quotation marks omitted). *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as . . . judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

510 U.S. 540, 555–56 (1994). *See generally Rowsey*, 327 F.3d at 341–42 (analyzing a Section 2254 petitioner's argument that the trial judge's prejudicial comments deprived him of his right to due process under the *Liteky* standard).[13]

---

[13] The Court notes that at least one court of appeals found that the *Liteky* standard was not clearly established federal law for purposes of Section 2254(d) because it addressed statutory recusal law, rather than constitutional law. *See Buntion v. Quarterman*, 524 F.3d 664, 674 (5th Cir. 2008). In *Rowsey v. Lee*, the Fourth Circuit did not expressly address whether the *Liteky* standard, as provided above, is clearly established federal law for purposes of the Section 2254(d) analysis. *See* 327 F.3d 335, 341–42 (4th Cir. 2003). However, the Fourth Circuit utilized this standard in a case that involved similar allegations as presented here—namely, a Section 2254 petitioner's assertion that the trial court's remarks infringed on his due process rights. *See id.* Additionally, numerous other courts of appeals utilized the *Liteky* standard when addressing judicial bias claims under Section 2254 based on allegations that a state judge made prejudicial comments during proceedings. *See, e.g., Belden v. Wyo. Dep't of Corr.*, 251 F. App'x 512, 518–19 (10th Cir. 2007); *Jones v. Luebbers*, 359 F.3d 1005, 1014–15 (8th Cir. 2004); *Alley v. Bell*, 307 F.3d 380, 386–88 (6th Cir. 2002). The Court shall therefore follow the Fourth Circuit's precedent in *Rowsey*—as well as the numerous opinions from other courts of appeals—and similarly utilize the *Liteky* standard in the instant analysis.

Finally, courts "[o]rdinarily . . . presume that public officials have properly discharged their official duties." *Bracy*, 520 U.S. at 909 (citation omitted). As such, there is "a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

With these standards in mind, the Court first turns to the standard employed by the WVSCA when it addressed Petitioner's judicial bias claim. *See, e.g.*, *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) ("To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000))). The WVSCA purportedly applied the following standard to both Petitioner's judicial bias and confrontation clause claims:

> [T]he extent of the cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in case of manifest abuse or injustice.

*Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at *6 (W. Va. June 19, 2014) (quoting *State v. Wood*, 280 S.E.2d 309, 310 (W. Va. 1981)). However, the Court finds that the WVSCA's analysis indicates that it did not apply this standard to Petitioner's judicial bias claim. The WVSCA's analysis indicates that it considered Petitioner's judicial bias claim in conjunction with his Confrontation Clause claim and only applied this standard to the latter. *See id.* Indeed, the WVSCA analyzed the partiality of the trial judge beyond his conduct "in excluding or permitting questions on cross-examination," as provided in this stated standard. *See id.* The Court therefore construes the WVSCA's analysis as applying this standard solely to Petitioner's Confrontation Clause claim.

As the WVSCA did not explicitly provide the standard it utilized in addressing Petitioner's judicial bias claim, the Court next turns to how the WVSCA's decision confronted the set of facts associated with this claim. *See, e.g.*, *Cullen*, 563 U.S. at 182 ("To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider . . . how the decision 'confronts [the] set of facts' that were before the state court." (alterations in original) (quoting *Williams*, 529 U.S. at 405–06)). The WVSCA provided the following analysis relating to Petitioner's judicial bias claim:

> The record on appeal in this case shows that the trial judge properly rebuked both sides when it believed they were stepping outside the boundaries of the law. However, the circuit judge also specifically instructed the jury that he was absolutely impartial and nothing he did or said should be taken as partiality. Further, the trial judge did not prevent defense counsel from asking any questions on cross-examination, it merely asked that Ms. Tennen comply with the laws of this State and not unnecessarily tarry when cross-examining a young child. Importantly, the record also shows that the trial court interrupted the prosecutor and placed the same requirements on her as it did on Ms. Tennen. Further, the fact that the jury acquitted petitioner of one count of sexual assault indicates that the trial court's comments did not adversely affect the jury or prejudice it against Ms. Tennen or petitioner. Based on this record, we cannot say that the circuit court erred in finding that the trial court did not violate petitioner's constitutional right[] to an impartial [judge] . . . .

*Boothe*, 2014 WL 2782127, at *6.

In the PF&R, Magistrate Judge Eifert noted that the WVSCA's analysis did not address the entirety of the pertinent facts in the record. (*See* ECF No. 21 at 74.) In particular, the Magistrate Judge agreed with Petitioner that "the trial court disproportionately interrupted defense counsel throughout the trial." (*Id.*) Magistrate Judge Eifert also agreed "with Petitioner that the trial court, at times, displayed excessive impatience with defense counsel, and that the trial court felt compelled on a number of occasions to implicitly remind [Petitioner's trial counsel], in front of the jury, that she was not from West Virginia." (*Id.*) Nonetheless, Magistrate Judge Eifert found

that the WVSCA's decision affirming the circuit court's denial of this claim was not contrary to clearly established federal law because "the trial court's conduct was not so egregious as to deprive Petitioner of a fair trial in front of an impartial jury." (*Id.* at 74–76.) Petitioner objects to this finding and argues that the trial court's "interruptions had a 'substantial and injurious effect' on the jury in determining their verdict." (ECF No. 22 at 12–13.)

The Court agrees with Magistrate Judge Eifert and finds that the WVSCA's decision affirming the denial of Petitioner's judicial bias claim was not contrary to clearly established federal law for numerous reasons. First, the record does not indicate—and Petitioner does not otherwise allege—that the trial court ever expressed an opinion on the evidence or provided any comment indicating that he was biased for or against Petitioner.[14] (*See* ECF No. 10, Ex. 12 (providing the transcript for day one of Petitioner's trial); *id.*, Ex. 13 (constituting the transcript for day two of Petitioner's trial).) Rather, the trial judge's comments to defense counsel—in front of the jury—largely related either to (1) the orderly progression of the trial and, particularly, the progression of defense counsel's examination of witnesses, (*see, e.g., id.*, Ex. 12 at 177 (providing the trial court's comment that "[i]t wastes a lot of time unless" Petitioner's trial counsel had references to D.B.'s prior statement "indexed"); *id.* at 181 (providing the trial court's statement in response to Petitioner's counsel requesting that the court reporter read back the last question that "this is not a common practice in the local courts, so you need to write your question down so you will know" and "[w]e don't have that much time here"); *id.* at 198 (providing the following

---

[14] The Court notes that a page of the testimony of Detective Chapman is missing from the record of the trial transcript in this case. (*See, e.g.*, ECF No. 12 at 229–30.) As Petitioner does not allege that the trial court made any substantively biased comments, the Court finds that this omission does not preclude the Court from addressing his judicial bias claim. Nonetheless, if the missing page turns out to contain information that could reasonably change the outcome of any of Petitioner's claims, the Court would be willing to entertain a motion for reconsideration.

exchange between Petitioner's trial counsel and the court: "[Petitioner's counsel]: I apologize, Your Honor, but I'm going between three statements. [The court]: It would be helpful if you tab things like that so that we could move along.")); or (2) improper examination of witnesses by Petitioner's trial counsel, (*see, e.g.*, *id.* at 182 (providing the trial court's statement during the cross-examination of D.B. by Petitioner's trial counsel that she was "getting a lot of [her] own testimony in about who people are and things" and she was, "in effect, testifying"); *id.* at 187–88 (providing the following statement by the trial judge during the cross-examination of D.B. in response to Petitioner's trial counsel reading portions of D.B.'s prior statement without laying foundation: "Well I have never seen anybody try to do this the way you do it, ma'am, but there is a way to do it."); *id.* at 191–92 (providing that the trial court sustained an objection to Petitioner's counsel reading from a third party's statement during the cross-examination of D.B. and noted the following: "Listen. This is the way we do it here, and that's improper impeachment by you just reading an answer that's different than the one the witness may give you. So go ahead with your questions, please."); *id.* at 192–93 (providing the following statement from the trial court in response to a query by Petitioner's trial counsel as to whether she could read from the witness's prior statement during the cross-examination of D.B.: "I don't know how they call it in California, but it is not record, it is a statement that . . . . [it] is a statement that he gave and you may if you do it in the proper way if you want to impeach him."); *id.* at 194–95 (providing that the trial court sustained the state's objection to Petitioner's counsel showing a photograph to D.B. before marking it as an exhibit and stated that Petitioner's counsel must mark the photograph "for identification as Defendant's Exhibit whatever, No. 1, I guess"); *id.* at 200–01 (providing the trial court's statement to Petitioner's counsel during the cross-examination of D.B. that she could not

"just read" a prior "contradictory statement" and that she "ha[d] to ask a question about it")). Such comments, without some further indicia of bias, are within the prerogative of the trial court and do not form the basis for a meritorious claim of judicial bias. *See, e.g.*, *Liteky v. United States*, 510 U.S. 540, 555–56 (1994) ("*Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as . . . judges, sometimes display."); *id.* at 556 ("A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune."); *see also United States v. Castner*, 50 F.3d 1267, 1273 (4th Cir. 1995) (noting the "obligation" of trial courts "to clarify confused factual issues or misunderstandings, to correct inadequacies of examination or cross-examination, and to 'otherwise insure that the trial proceed[s] efficiently and fairly'" (quoting *United States v. Morrow*, 925 F.2d 779, 781 (4th Cir. 1991))). *See generally United States v. Smith*, 452 F.3d 323, 333 (4th Cir. 2006) ("The entire goal, of course, is to ensure that trials reach fair and just results—but while there is only one goal, there are many courtroom styles that can achieve it.").

Second, each of the trial court's numerous interruptions of Petitioner's trial counsel were directed to counsel and *not* Petitioner himself. The record does not reflect—and Petitioner does not otherwise contend—that the trial court ever made a prejudicial comment to or about Petitioner. Rather, the trial court's remarks largely related to the manner in which Petitioner's trial counsel conducted their questioning of witnesses. (*See* ECF No. 10, Ex. 12 at 148–54, 169–203, 212–26, 228–29; *id.*, Ex. 13 at 14–28, 31–39.) Numerous courts found that similar comments or interruptions by a trial court toward a party's counsel do not support a claim of judicial bias. *See,*

*e.g.*, *United States v. Carson*, 455 F.3d 336, 359 (D.C. Cir. 2006) (rejecting the appellant's judicial bias argument where, in part, the court's "utterances were aimed at defense counsel's conduct and not at the defendants themselves or at the merits of the case" (citation omitted)); *United States v. DiTommaso*, 817 F.2d 201, 220 (2d Cir. 1987) ("[R]eversal is not mandated where, as here, rebukes of defense counsel reflected not upon the merits of the case but rather on the way it was being handled." (citation omitted)); *Willis v. Lafler*, No. 05-74885, 2007 WL 3121542, at *22 (E.D. Mich. Oct. 24, 2007) (finding that the state court's denial of the petitioner's judicial bias claim was not contrary to or an unreasonable application of clearly established law where, in part, the judge's comments "were directed solely at counsel" and "did not in any respect disparage either petitioner or his defense"). The Court similarly finds in this matter that the trial court directing comments and interruptions—that were not substantively suggestive of a particular prejudice held by the trial court—to Petitioner's trial counsel is not indicative of judicial bias.

Third, as the WVSCA noted, the trial court repeatedly instructed the jury that he was impartial in Petitioner's trial proceedings. (*See, e.g.*, ECF No. 10, Ex. 12 at 118–19 ("[A]lways understand, always know that the way or the manner that I rule on any of these matters must never ever be taken by any of you as any indication at all that I favor one side or the other in this case, because I do not."); *id.* at 119 ("As presiding Judge throughout this entire trial at all times I stand completely neutral, impartial, and indifferent as between the State of West Virginia and [Petitioner]."); *id.*, Ex. 13 at 64 ("As presiding Judge I must and I do stand completely neutral and impartial throughout the entire trial.").) Additionally, the trial court provided the following statement in the jury instructions regarding how the jury should construe the court's actions and statements during the trial:

74

> Nothing that [the court] ha[s] said or done at any time during this trial can be considered by you as evidence of any fact or as indicating [the court's] opinion concerning any fact, or as being any comment by [the court] upon any evidence or the credibility of any witness, the weight of any evidence, the guilt or the innocence of the [Petitioner], or that I favor one side or the other in this case.

(*Id.*, Ex. 13 at 64; *see also id.* at 65 (providing the instruction that the jury was "not to be concerned with the language or tone of voice [the court] used in any of [his] rulings").)

The Supreme Court has repeatedly stated that it is "the almost invariable assumption of the law that jurors follow their instructions." *United States v. Olano*, 507 U.S. 725, 740 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). As such, courts presume "that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Id.* (quoting *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985)). In this case, the record does not indicate—and Petitioner has not otherwise shown—that the jury disregarded the trial court's clear statements that he remained impartial, (*see* ECF No. 10, Ex. 12 at 118–19; *id.*, Ex. 13 at 64), or the trial court's instructions that the jury should not consider anything that the trial court said or did during trial as indicating a preference for or against a party, (*see id.*, Ex. 13 at 64–65). The Court therefore finds that these statements and instructions by the trial judge to the jury indicates that the trial court's statements to Petitioner's trial counsel did not prejudice Petitioner's defense. *See, e.g.*, *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion*, 345 F.3d 15, 24 (1st Cir. 2003) (rejecting the defendants' judicial bias claim where the court made comments during trial and questioned witnesses, in part, because "the judge specifically instructed the jury that 'if you felt that I became impatient with the attorneys at some point in time or that I scolded them or that I had some sort of colloquy with them, you should not be influenced by

that'"); *United States v. Williams*, 809 F.2d 1072, 1088 (5th Cir. 1987) (rejecting the appellant's judicial misconduct claim and stating that "[m]ost important to our conclusion that the trial judge maintained the neutrality required of him are the clear and repeated instructions by him to the jury that it was not to consider any questioning or comment by him in its deliberations"). *See generally Rowsey v. Lee*, 327 F.3d 335, 342 (4th Cir. 2003) ("[I]n order to argue that he was deprived of a fair trial, [the Section 2254 petitioner] must also show that the trial judge's bias somehow affected the outlook or deliberations of the jurors.").

Finally, the record does not indicate—and Petitioner similarly does not contend—that the court's comments to Petitioner's trial counsel impeded his counsel's ability to examine any witnesses. *See Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at *6 (W. Va. June 19, 2014) ("[T]he trial judge did not prevent defense counsel from asking any questions on cross-examination . . . ."). In particular, despite the trial court's interruptions, Petitioner's trial counsel was still able to ask all of their desired questions to the state's witnesses on cross-examination, (*see* ECF No. 10, Ex. 12 at 148–54 (providing the cross-examination of Robbie McGee by Petitioner's trial counsel); *id.* at 169–203 (constituting the cross-examination of D.B. by Petitioner's trial counsel); *id.* at 212–26, 228–29 (providing the cross-examination of Detective Glen Chapman by Petitioner's trial counsel); *cf. id.* at 191 (providing that the trial court sustained the state's objection to a question that Petitioner's trial counsel previously asked on cross "once or twice already")), as well as on direct examination of Petitioner's witnesses, (*see* ECF No. 10, Ex. 13 at 14–28, 31–32 (constituting the examination of Nathan Glanden by Petitioner's trial counsel); *id.* at 33–39 (providing the examination of Dr. Gail Swarm by Petitioner's trial counsel)). The fact that the trial court's comments did not impede the effective examination of witnesses by

Petitioner's trial counsel indicates that these comments did not interfere with a fair judgment in Petitioner's case. *See, e.g.*, *Williams*, 809 F.2d at 1087–88 (rejecting the appellants' judicial misconduct argument where, in part, the over 900 interruptions by the trial court "avoided repetition and excluded irrelevant testimony" and defense counsel was still able "to cross-examine each witness fully").

Petitioner nonetheless argues that the state court erred in denying this claim because the trial court disproportionately interrupted Petitioner's trial counsel, these interruptions constituted "egregious" conduct on the part of the trial judge, and "[t]here is no room in any jury trial for *any* level of egregious conduct on the part of a trial court." (ECF No. 22 at 12–13.) In denying Petitioner's state habeas appeal, the WVSCA found, in part, that "the record . . . shows that the trial court interrupted the prosecutor and placed the same requirements on her as it did on Ms. Tennen." *Boothe*, 2014 WL 2782127, at *6. While this statement is technically true, (*see, e.g.*, ECF No. 10, Ex. 12 at 162 (providing an example of the trial court interrupting the prosecution during the direct examination of D.B.)), the record also clearly demonstrates that the trial court disproportionately interrupted Petitioner's trial counsel as compared to the prosecution, (*see id.*, Ex. 12; *id.*, Ex. 13). *Compare Boothe*, 2014 WL 2782127, at *1 (providing the WVSCA's statement that "the circuit court interrupted or commented on" the "questions" from Petitioner's trial counsel "sixty-seven times in front of the jury" during the "cross-examination of D.B."), *with* (ECF No. 21 at 74 n.26 (providing Magistrate Judge Eifert's statement in the PF&R that the trial court interrupted the prosecution "at least five times throughout the trial")). The Court therefore

agrees with Petitioner—and Magistrate Judge Eifert—that Petitioner's trial judge disproportionately interrupted Petitioner's trial counsel.[15]

However, the Supreme Court has long held that a "defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials." *Brown v. United States*, 411 U.S. 223, 231–32 (1973) (citation omitted). Thus, the issue here is not whether Petitioner received a perfect trial, but whether the WVSCA's decision affirming the denial of Petitioner's judicial bias claim was contrary to clearly established law "beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This requires Petitioner to demonstrate that his trial judge's comments and interruptions during trial made "fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Rowsey*, 327 F.3d at 341 ("In order to prevail in a deprivation of due process claim, a [petitioner] must show a level of bias that made 'fair judgment impossible.'" (citation omitted)). As discussed at length above, the record does not indicate that the trial court's comments and interruptions of Petitioner's trial counsel had such an impact. The Court therefore finds that Petitioner's judicial bias claim fails.

For these reasons, the Court finds that the WVSCA's decision affirming the circuit court's denial of Petitioner's judicial bias claim in Ground IX of the Petition was not contrary to clearly established federal law. Respondent is therefore entitled to summary judgment on this claim. Accordingly, the Court **OVERRULES** Petitioner's objections regarding his judicial bias claim in

---

[15] In the PF&R, the Magistrate Judge stated found, in part, that "the trial court's conduct was not so egregious as to deprive Petitioner of a fair trial in front of an impartial jury." (ECF No. 21 at 74; *see also* ECF No. 22 at 13 (providing Petitioner's characterization of this statement from the PF&R as follows: "Magistrate Judge Eifert found that the trial court's conduct was somewhat egregious.").) The Court disagrees with this statement to the extent that Magistrate Judge Eifert characterized the trial judge's conduct as "egregious," to any degree. As discussed at length above, the trial court's interruptions of Petitioner's trial counsel mainly related to the orderly progression of the trial and improper examination by counsel. Such comments are not egregious, but rather are well-within the prerogative of a trial judge in managing a trial. *See, e.g.*, *Liteky v. United States*, 510 U.S. 540, 555–56 (1994).

Ground IX, **ADOPTS** the PF&R to the extent that Magistrate Judge Eifert recommends that the Court grant summary judgment on this claim, and **GRANTS** Respondent's Motion for Summary Judgment insofar as Respondent requests summary judgment on Petitioner's judicial bias claim in Ground IX of the Petition.

### E. Confrontation Clause Claim

Petitioner's ninth ground for relief also includes a claim that the trial judge's interruptions of Petitioner's counsel during the trial violated his constitutional right to confront the witnesses against him. (*See* ECF No. 2 at 25–28.) In the PF&R, Magistrate Judge Eifert recommends that the Court grant Respondent's Motion for Summary Judgment as to this claim. (ECF No. 21 at 76–77.) In the Objections, Petitioner argues that the trial court's interruptions impeded his trial counsel's ability to cross-examine D.B., which resulted in a "substantial and injurious effect on the jury in determining their verdict." (ECF No. 22 at 13–14.) The Court disagrees with Petitioner's argument and finds that Respondent is entitled to summary judgment on Petitioner's Confrontation Clause claim.

As required under Section 2254(d), the Court must first identify the clearly established federal law implicated by this claim. *See, e.g.*, *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) ("As a threshold matter . . . , [courts] first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States." (citing 28 U.S.C. § 2254(d)(1))). The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, means more than being allowed to confront the

witness physically." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (citations omitted). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 19–20 (1985) (emphasis omitted) (quoting *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974)); *see, e.g.*, *United States v. Owens*, 484 U.S. 554, 557 (1988) ("The Confrontation Clause of the Sixth Amendment . . . . has long been read as securing an adequate opportunity to cross-examine adverse witnesses." (citations omitted)); *cf. Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987) ("The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." (citation omitted)). "Accordingly, it is clear from Supreme Court precedent that the Sixth Amendment guarantees the right of a criminal defendant to reasonable cross-examination, when otherwise appropriate, for the purpose of impeaching the credibility of key witnesses." *Quinn v. Haynes*, 234 F.3d 837, 847 (4th Cir. 2000) (citing *Olden v. Kentucky*, 488 U.S. 227, 232 (1988) and *Davis*, 415 U.S. at 315–16).

"Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S. at 20 (citation omitted). Indeed, the Supreme Court has stated the following regarding the limitations that trial courts may impose on cross-examinations without running afoul of the Confrontation Clause:

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's [cross-examination] of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Van Arsdall*, 475 U.S. at 679; *see also Quinn*, 234 F.3d at 847 (stating that the Confrontation Clause does not "prevent[] a trial court from imposing . . . limits on the scope of defense counsel's cross-examination and presentation of evidence related to the impeachment of a key prosecution witness's credibility").

The Court now turns to the WVSCA's analysis of Petitioner's Confrontation Clause claim. In analyzing this claim, the WVSCA did not reference any Supreme Court case law. *See Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at *5–6 (W. Va. June 19, 2014). The Court therefore construes Petitioner's Confrontation Clause claim in Ground IX as alleging that the WVSCA's decision affirming the circuit court's denial of this claim was contrary to clearly established federal law. *Cf. Powell v. Kelly*, 562 F.3d 656, 664 (4th Cir. 2009) ("A state court's decision involves an 'unreasonable application' of clearly established federal law under § 2254(d)(1) 'if the state court identifies the correct governing legal rule from . . . [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 407 (2000))). As noted previously, "[t]o determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (citation omitted).

The WVSCA provided the following standard in addressing Petitioner's Confrontation Clause claim:

> [T]he extent of the cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in case of manifest abuse or injustice.

*Boothe*, 2014 WL 2782127, at *6 (quoting *State v. Wood*, 280 S.E.2d 309, 310 (W. Va. 1981)). While this standard references a "manifest abuse or injustice" requirement, the WVSCA's analysis of this claim indicates that it did not utilize this standard when denying Petitioner's claim. *See id.* Indeed, the WVSCA did not again reference either "manifest abuse" or "injustice" when addressing this claim. *See id.* The Court therefore finds that, while the WVSCA referenced this "manifest abuse or injustice" requirement, it did not apply this standard when addressing Petitioner's Confrontation Clause claim.

The Court must therefore analyze whether the WVSCA's decision was contrary to clearly established federal law by "how the decision confront[ed] [the] set of facts." *Cullen*, 563 U.S. at 182 (citation omitted). The WVSCA affirmed the circuit court's denial of this claim because, in pertinent part, "the trial judge did not prevent defense counsel from asking any questions on cross-examination" and "merely asked that [Petitioner's trial counsel] comply with the laws of this State and not unnecessarily tarry when cross-examining a young child." *Boothe*, 2014 WL 2782127, at *6.

The Court finds that the WVSCA's decision was well-within the bounds provided by clearly established federal law. As discussed at length above, the vast majority of the trial counsel's interruptions of Petitioner's counsel—including during the cross-examination of D.B.—related to either (1) trial management and the orderly progression of defense counsel's examination of the witness, (*see, e.g.*, ECF No. 10, Ex. 12 at 177 (providing a comment by the trial court relating to Petitioner's trial counsel wasting time by not being prepared during the cross-examination of D.B.); *id.* at 181 (same); *id.* at 198 (same)); or (2) improper examination of witnesses by Petitioner's trial counsel, (*see, e.g.*, *id.* at 182 (providing a statement by the trial court that

Petitioner's counsel was, in essence, attempting to testify); *id.* at 200–01 (same); *id.* at 187–88 (providing a statement by the trial judge relating to improper impeachment by Petitioner's counsel); *id.* at 191–92 (same); *id.* at 192–93 (same); *id.* at 194–95 (providing the trial court's statement that Petitioner's counsel must mark a photograph as an exhibit before showing it to D.B.)). Such comments and interruptions are easily within the wide latitude afforded to judges in managing trials and did not infringe on Petitioner's rights under the Confrontation Clause. *See, e.g.*, *Van Arsdall*, 475 U.S. at 679.

Furthermore, as the WVSCA noted, the record does not indicate—and Petitioner does not otherwise argue—that the trial court's comments and interruptions interfered with the opportunity of Petitioner's trial counsel to fully cross-examine D.B. To the contrary, the record reflects that Petitioner's trial counsel was afforded a full opportunity to examine D.B. (*See* ECF No. 10, Ex. 12 at 169–202.) Simply put, Petitioner may disagree with the trial court's management of the trial—including the court's interruptions during the cross-examination of D.B.—but there is no indication in the record that the trial court's comments impeded the opportunity of Petitioner's trial counsel to fully examine D.B. As Petitioner had a full opportunity to cross-examine D.B., Petitioner's Confrontation Clause claim is without merit.[16] *See, e.g.*, *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1134 (10th Cir. 2014) ("Because [the defendant's] counsel had a full opportunity to cross-examine [the government's witness], no Confrontation Clause violation occurred.").

---

[16] In the Objections, Petitioner also argues that the Confrontation Clause violation was not harmless error. (*See* ECF No. 22 at 13–14.) As the Court finds that there was no Confrontation Clause violation, it need not reach the subsequent issue of harmless error. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (holding "that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to . . . harmless-error analysis").

For the foregoing reasons, the Court finds that the WVSCA's decision affirming the denial of Petitioner's Confrontation Clause claim was not contrary to clearly established federal law. The Court therefore finds that Respondent is entitled to summary judgment on this claim. Accordingly, the Court **OVERRULES** Petitioner's objections regarding his Confrontation Clause claim in Ground IX, **ADOPTS** the PF&R to the extent that Magistrate Judge Eifert recommends that the Court grant summary judgment on this claim, and **GRANTS** Respondent's Motion for Summary Judgment insofar as Respondent requests summary judgment on Petitioner's Confrontation Clause claim in Ground IX of the Petition.

## F.      Alibi Instruction Claim

In Ground X of the Petition, Petitioner argues that the trial judge violated his due process rights under the Fourteenth Amendment by refusing to include a jury instruction regarding an alibi defense. (ECF No. 2 at 29–30.) In the PF&R, Magistrate Judge Eifert recommends that the Court grant Respondent's Motion for Summary Judgment as to this claim. (ECF No. 21 at 79–81.) In his brief objection related to this claim, Petitioner argues only that "an alibi instruction would have caused the jury to focus on the many inconsistencies [in D.B.'s statements] and on the evidence consistent with Petitioner's innocence." (ECF No. 22 at 14 (citation omitted).) The Court is not persuaded by Petitioner's argument and finds that summary judgment is warranted as to Ground X.

The Court again first identifies the clearly established federal law that pertains to Petitioner's claim in Ground X of the Petition. *See, e.g.*, *Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004) ("begin[ning]" the analysis of a claim under Section 2254(d)(1) "by determining the relevant clearly established law"). The Fourteenth Amendment to the United States Constitution

states, in relevant part, that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984). The Supreme Court has "long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *Id.*; *cf. Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." (citations omitted)). "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (citation omitted). *But see Sanchez v. Sherman*, Case No. CV 14–4730–JAC (JPR), 2015 WL 5921486, at *13–14 (C.D. Cal. Sept. 2, 2015) (stating that it is not clear whether this statement from *Mathews* is clearly established federal law for purposes of the Section 2254(d)(1) analysis).

"[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). "It is well established that the [proposed] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see, e.g.*, *United States v. Frady*, 456 U.S. 152, 169 (1982) ("[T]he degree of prejudice resulting from instruction error [must] be evaluated in the total context of the events at trial."). "While this does not mean that an instruction

85

by itself may never rise to the level of constitutional error, it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge." *Cupp*, 414 U.S. at 147. "Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction." *Id.*

"[T]he question in . . . a collateral proceeding is 'whether the ailing [or omitted] instruction by itself so infected the entire trial that the resulting conviction violates due process . . . .'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp*, 114 U.S. at 146–47). Additionally, a petitioner carries an "especially heavy" burden if no "instruction was given," as "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 154. "The significance of the omission of . . . an instruction may be evaluated by comparison with the instructions that were given." *Id.* at 156.

The Court notes that the WVSCA did not specifically reference pertinent clearly established federal law when it addressed Petitioner's jury instruction claim.[17] *See Boothe v.*

---

[17] The WVSCA provided the following standard when addressing this claim:

We have said,

> a trial judge may not make an evidentiary ruling which deprives a criminal defendant of certain rights, such as the right to . . . offer testimony in support of his or her defense . . . which [is] essential for a fair trial pursuant to the due process clause found in the Fourteenth Amendment of the *Constitution of the United States* and article III, § 14 of the *West Virginia Constitution.*

Syllabus Point 3, in part, *State v. Jenkins,* 195 W.Va. 620, 621–22, 466 S.E.2d 471, 472–73 (1995); *see also Chambers v. Mississippi,* 410 U.S. 284 (1973). However, we have also required that "[a] trial court's instructions to the jury must be a correct statement of the law and supported by the evidence...." Syl. Pt. 4, in part, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995).

*Ballard*, No. 13–0740, 2014 WL 2782127, at *6 (W. Va. June 19, 2014). As the WVSCA did not reference any relevant clearly established federal law when addressing this claim, the Court construes Petitioner's claim in Ground X as alleging that the WVSCA applied a standard that was contrary to clearly established federal law. *Cf. Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that, "[u]nder the unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" (first alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000))).

Petitioner does not allege that the WVSCA employed a standard that itself was contrary to federal law. (*See* ECF No. 22 at 14.) Rather, Petitioner argues, in essence, that the WVSCA's analysis pertaining to his jury instruction claim was contrary to clearly established federal law. (*See id.*) The Court disagrees for two reasons.

First, as the WVSCA noted, Petitioner "failed to enter any evidence in support" of his proffered alibi instruction. Thus, there was no evidence of this alibi itself. Further, the time frame for the proposed instruction was different than the range when the assault allegedly occurred. *Boothe*, 2014 WL 2782127, at *6. The indictment alleged that the assault occurred between January and September of 2007. (ECF No. 10, Ex. 1 at 2.) During trial, Detective Chapman testified at trial that D.B. was not "able to give . . . any specific date" when the assault occurred.

---

*Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at *6 (W. Va. June 19, 2014) (alterations in original). While the WVSCA cites to the Supreme Court's opinion in *Chambers v. Mississippi*, that case did not specifically address a defendant's right to a particular jury instruction. *See* 410 U.S. 284 (1973). As such, the *Chambers* decision does not directly address Petitioner's claim in Ground X relating to the trial court's refusal to give an alibi jury instruction. *See, e.g.*, *Kubsch v. Neal*, 800 F.3d 783, 802–03 (7th Cir. 2015) (noting that the Supreme Court's decision in *Chambers* was a "narrow holding" that was "based on the combination of the restrictions on impeachment and the exclusion of multiple reliable hearsay confessions by a declarant subject to cross-examination" and was "topped off by the 'under the facts and circumstances of this case' qualification" (quoting *Chambers*, 410 U.S. at 303)).

(ECF No. 10, Ex. 12 at 210.) However, Detective Chapman testified that he determined that the assault occurred between "January to September of 2007" based on D.B.'s statement that the assault occurred before he went into foster care in late summer of 2007 and "back to January" to account for D.B.'s statement that the weather at the time of the assault was "cool" with "no snow." (*Id.* at 211. *See generally id.* at 210 (providing Detective Chapman's testimony on cross-examination that D.B. was in foster care from "approximately August of 2007 till May of 2008").)

The WVSCA noted—and Petitioner does not otherwise contest—that the alibi instruction related to "a particular week in May of 2008." *Boothe*, 2014 WL 2782127, at *6. However, the jury could have concluded that the offense occurred between January and late summer of 2007—as alleged in the indictment—based on Detective Chapman's testimony. (*Cf.* ECF No. 10, Ex. 12 at 135 (providing the following assertion by the prosecution during opening statements: "An element in each of these crimes that State must prove is that these crimes occurred between January 2007 and September 2007.").) Petitioner thus sought to provide an alibi for one week in May 2008 when, based on the evidence at trial, the jury may have found that the offense occurred at any point between January and late summer of 2007. (*Cf. id.*, Ex. 13 at 51 (providing a statement by Petitioner's trial counsel when requesting the alibi instruction that "it's kind of a roundabout alibi").)

Petitioner's trial counsel did imply during his cross-examination of D.B. that D.B. previously provided a statement to Toni Householder that the offense occurred during a week in May 2008. (*See id.*, Ex. 12 at 177.) However, D.B. responded that he did not remember making that comment, (*see id.*), and Petitioner did not call Toni Householder to provide evidence regarding this statement. Indeed, the record provides—and Petitioner does not otherwise contest—that

Petitioner provided no evidence whatsoever indicating that the offense occurred during May 2008. Absent such evidence, the trial court did not infringe on Petitioner's due process rights by refusing to give this alibi instruction. *See, e.g.*, *Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense *for which there exists evidence sufficient for a reasonable jury to find in his favor*." (emphasis added) (citation omitted)); *Tatum v. Dormire*, 183 F.3d 875, 878 (8th Cir. 1999) ("[D]ue process is not offended when a state trial court refuses in a noncapital case to submit an instruction not supported by the evidence."); *Blazic v. Henderson*, 900 F.2d 534, 541 (2d Cir. 1990) ("[D]ue process does not require the giving of a jury instruction when such charge is not supported by the evidence." (citing *Hooper v. Evans*, 456 U.S. 605, 611 (1982) and *Hallowell v. Keve*, 555 F.2d 103, 107 (3d Cir. 1977))).

Second, Petitioner has failed to demonstrate how the trial court's failure to give the alibi instruction prejudiced his defense. Petitioner argues that the alibi instruction "would have caused the jury to focus on the many inconsistencies [in D.B.'s statements] and on the evidence consistent with Petitioner's innocence." (ECF No. 22 at 14.) However, Petitioner's trial counsel highlighted numerous apparent inconsistencies in D.B.'s various statements. (*See, e.g.*, ECF No. 10, Ex. 13 at 97 (providing the assertion by Petitioner's counsel during closing arguments that D.B.'s statements regarding the location of the assault are "ever-changing").) Indeed, Petitioner's counsel was able to elicit testimony indicating that the offense may have occurred over a roughly year-and-a-half period of time, including before or after D.B. was in foster care. (*See, e.g.*, *id.*, Ex. 12 at 217 (providing Detective Chapman's testimony on cross-examination that he heard D.B. testify at trial "that he didn't know for sure if something happened before or after foster care").) As such, the

89

jury was well-aware of the numerous and diverse apparent inconsistencies between D.B.'s statements, including as to when the assault occurred. Despite these inconsistencies, the jury still convicted Petitioner on three charges. The jury's verdict of guilt in spite of the well-established inconsistencies between D.B.'s statements indicates that Petitioner's proposed alibi instruction—which he claims would highlight inconsistencies in D.B.'s statements, (*see* ECF No. 22 at 14)—would not have altered the outcome of Petitioner's trial. The Court therefore finds that Petitioner has failed to meet his burden in demonstrating that the trial court's refusal to give the proffered alibi instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (citation omitted); *cf. id.* (stating that a petitioner carries an "especially heavy" burden if no "instruction was given," as "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law").

For the foregoing reasons, the Court finds that the WVSCA's decision affirming the denial of Petitioner's claim relating to an alibi instruction was not contrary to clearly established federal law. The Court therefore also finds that Respondent is entitled to summary judgment on this claim. As such, the Court **OVERRULES** Petitioner's objections regarding his claim in Ground X, **ADOPTS** the PF&R to the extent that Magistrate Judge Eifert recommends that the Court grant summary judgment on this claim, and **GRANTS** Respondent's Motion for Summary Judgment insofar as Respondent seeks summary judgment on Petitioner's due process claim in Ground X of the Petition.

### IV. *Petitioner's Unexhausted and Procedurally Barred Habeas Claims*

The Court now turns to the claims that Magistrate Judge Eifert found are procedurally defaulted—the Unexhausted Claims in Grounds V through VIII of the Petition. *Cf. Dretke v.*

*Haley*, 541 U.S. 386, 393–94 (2004) ("[A] federal court faced with allegations of actual innocence, whether of the sentence or of the crime charged, must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default."). In the PF&R, Magistrate Judge Eifert *sua sponte* found that the Unexhausted Claims are procedurally defaulted and recommends that the Court dismiss these claims on procedural grounds. (*See* ECF No. 21 at 42–49.) In the Objections, Petitioner argues that Magistrate Judge Eifert erred in this analysis because exceptions to the procedural default doctrine are satisfied in this matter. (*See* ECF No. 22 at 4–6.) For the reasons that follow, the Court finds that Petitioner procedurally defaulted on the Unexhausted Claims and the exceptions to this procedural bar are inapplicable as to these claims.

## A.   *Sua Sponte* Determination on Procedural Default

As a preliminary matter, The Court notes that Respondent did not raise the issue of procedural default in his Answer to the Petition, (*see* ECF No. 8), or the briefing related to Respondent's Motion for Summary Judgment, (*see* ECF Nos. 11 & 14). Instead, Magistrate Judge Eifert raised the issue of procedural default *sua sponte* in the PF&R. (*See* ECF No. 21 at 43.)

"[A] federal habeas court may, in its discretion, deny federal habeas relief on the basis of issues that were not preserved or presented properly by a state." *Yeatts v. Angelone*, 166 F.3d 255, 261 (4th Cir. 1999). As such, "a federal habeas court possesses the authority to address, in its discretion, whether there exists an unexcused adequate and independent state-law ground for a denial of relief from a challenged conviction or sentence." *Id. See generally Gray v. Netherland*, 518 U.S. 152, 162 (1996) (stating that procedural default "provides an independent and adequate state-law ground for the conviction and sentence"). The Fourth Circuit provided the following

91

discussion regarding the proper analysis to determine whether a court should exercise its discretion and raise the issue of procedural default *sua sponte*:

> A federal habeas court, in determining whether it should exercise its discretion to notice a petitioner's procedural default, should be guided by the interests of comity and judicial efficiency that support the consideration of this issue despite the failure of the state to preserve or present the issue properly. The exercise of . . . discretion should not be automatic, but must in every case be informed by those factors relevant to balancing the federal interests in comity and judicial economy against the petitioner's substantial interest in justice. Additionally, the court should consider whether justice requires that the habeas petitioner be afforded with notice and a reasonable opportunity to present briefing and argument opposing dismissal. Further, the court should take into consideration whether the failure of the state to raise the matter of procedural default in a timely manner was intentional or inadvertent, and when a state intentionally has declined to pursue the defense for strategic reasons, the court should be circumspect in addressing the issue.

*Yeatts*, 166 F.3d at 262 (alteration in original) (citations omitted).

In this case, Petitioner was provided notice regarding the issue of procedural default in the PF&R and had an opportunity to object to the Magistrate Judge's *sua sponte* findings and recommendations on this topic. The Petitioner took advantage of that opportunity and objected to some of the Magistrate Judge's findings and recommendations regarding procedural default. (*See* ECF No. 22 at 4–6.) However, Petitioner did not object to the Magistrate Judge raising this issue *sua sponte*. (*See id.*); *cf. Norris v. South Carolina*, 18 F. App'x 171, 172 (4th Cir. 2001) ("[T]he district court need not conduct *de novo* review when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations." (emphasis added) (citing *Orpiano v. Johnson*, 687 F.2d 44, 47–48 (4th Cir. 1982))). Additionally, while the Respondent did not raise the issue of procedural default, there is no indication in the record that this omission was intentional, rather than inadvertent. (*See* ECF No. 8 (constituting Respondent's Answer); ECF Nos. 11 & 14 (constituting Respondent's briefing

related to the Motion for Summary Judgment).) Finally, the interests of judicial efficiency weigh in favor of the Court addressing the Magistrate Judge's *sua sponte* recommendations regarding procedural default, as the Petition, Respondent's Motion for Summary Judgment, the PF&R, and the Objections are fully briefed and ready for disposition by the Court. The Court therefore finds that it is proper to address Magistrate Judge Eifert's *sua sponte* findings and recommendations regarding whether Petitioner's Unexhausted Claims are procedurally defaulted. *See, e.g.*, *Royal v. Taylor*, 188 F.3d 239, 247 (4th Cir. 1999) (stating that, when determining whether to *sua sponte* find that a claim is procedurally defaulted, a court should "consider whether a state's waiver was intentional or inadvertent, whether justice requires that the habeas petitioner be afforded with notice and a reasonable opportunity to present briefing and argument opposing dismissal, and whether interests of comity and judicial efficiency support this exercise of discretion" (citation omitted)); *cf. Harper v. Ballard*, Civil Action No. 3:13–23467, 2014 WL 4470536, at *2 (S.D. W. Va. Sept. 10, 2014) (noting that the magistrate judge "raised the issue of procedural default of [the petitioner's] federal habeas claim *sua sponte*" and adopting the magistrate judge's recommendation to dismiss certain unexhausted claims as procedurally defaulted where the petitioner "was given notice and a reasonable time to respond" to this recommendation). Accordingly, the Court shall now address the exhaustion requirement and—if Petitioner failed to exhaust the Unexhausted Claims—whether those claims are now procedurally defaulted.

**B.     Exhaustion**

Under 28 U.S.C. § 2254, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. §

2254(b)(1); *see, e.g.*, *Picard v. Connor*, 404 U.S. 270, 275 (1971) ("[A] state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." (citations omitted)). The purpose of the "exhaustion-of-state-remedies doctrine" is "to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard*, 404 U.S. at 275; *see also Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) ("The exhaustion requirement . . . codified in the federal habeas statute, 28 U.S.C. §§ 2254(b) and (c) . . . serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights." (citations omitted)). "The rule of exhaustion in federal habeas corpus actions is rooted in considerations of federal-state comity," *Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973), "and Congress has made the specific determination in [Section 2254] that requiring the exhaustion of adequate state remedies . . . will best serve the policies of federalism," *id.* at 492 n.10.

"The core element of the doctrine of exhaustion involves the requirement that a claim ha[s] been fairly presented to the state courts prior to seeking relief on federal habeas corpus," including "an opportunity for review by the highest court in the state." *Moore v. Kirby*, 879 F. Supp. 592, 593 (S.D. W. Va. 1995) (citations omitted); *see also Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000) ("Although a petitioner need not 'cit[e] book and verse on the federal constitution' in order to satisfy the exhaustion requirement, the federal claim nevertheless must be 'fairly presented' to the state court." (quoting *Picard*, 404 U.S. at 275 & 278)). "Fair presentation mandates that the federal claim be fairly presented face-up and squarely" and "both the operative facts and the controlling legal principles must be presented to the state court." *Baker*, 220 F.3d at 289 (citation omitted).

94

To satisfy the exhaustion requirement, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "In West Virginia, exhaustion is accomplished . . . by (1) presenting the federal constitutional issues directly to the [WVSCA] through an appeal of the conviction or sentence; (2) petitioning for a writ of habeas corpus under the [WVSCA's] original jurisdiction and receiving a dismissal with prejudice following a determination on the merits; or (3) petitioning for a writ of habeas corpus in the appropriate circuit court followed by an appeal of the judgment to the [WVSCA], if the result is adverse." *Harper*, 2014 WL 4470536, at *6 (citing *Moore*, 879 F. Supp. at 593); *see also Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006) (noting that "the exhaustion requirement for claims not fairly presented to the state's highest court is technically met when exhaustion is unconditionally waived by the state" (citation omitted)). The exhaustion requirement "refers only to remedies still available at the time of the federal petition," *Gray*, 518 U.S. at 161 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)), and "is strictly enforced," *Hedrick*, 443 F.3d at 364 (citation omitted).

In the PF&R, Magistrate Judge Eifert found that Petitioner failed to exhaust four of his IAOC claims. (ECF No. 21 at 45.) In particular, Magistrate Judge Eifert found that "Petitioner never presented to the WVSCA his" Unexhausted Claims in Grounds V through VIII of the Petition and, as such, "the WVSCA never addressed those claims." (*Id.*) In the Objections, Petitioner concedes that he did not present these four claims to the WVSCA. (ECF No. 22.)

In the argument section of Petitioner's habeas appellate brief to the WVSCA, Petitioner only argues that his trial counsel was constitutionally ineffective by failing to call Sandra Culp, Dr. Joan Phillips, and Dr. Bobby Miller. (*See* ECF No. 10, Ex. 10 at 160–164.) Petitioner failed to

argue in this brief that his trial counsel was also constitutionally ineffective by failing to call the potential witnesses that are the subject of the Unexhausted Claims—namely, Lenora Harless (Ground V), H.C. (Ground VI), Reverend Roger Boothe (Ground VII), and Rachel Burdette (Ground VIII). (*See id.*) Petitioner therefore did not present these IAOC claims "face-up and squarely" to the WVSCA, *see Baker*, 220 F.3d at 289, and the WVSCA did not have the opportunity to rule on these claims. Accordingly, the Court agrees with Magistrate Judge Eifert—and Petitioner—that Petitioner failed to exhaust the Unexhausted Claims in Grounds V through VIII of the Petition.

The next issue is whether an exception to the exhaustion requirement applies as to the Unexhausted Claims. [18] 28 U.S.C. § 2254(b)(1)(B) provides exceptions to the exhaustion requirement where "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." *See, e.g.*, *Stephenson v. Clarke*, Civil Action No. 3:14–cv–00457, 2014 WL 5430995, at *2 (E.D. Va. Oct. 24, 2014) (noting that Section 2254(b)(1)(B) provides "exception[s]" to the exhaustion requirement). These statutory exceptions to the exhaustion requirement apply "only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief." *Duckworth*, 454 U.S. at 3 (citation omitted).

---

[18] The Court notes that the exhaustion requirement is "not jurisdictional" and may be "unconditionally waived by the state." *Hedrick v. True*, 443 F.3d 342, 364 (citations omitted). However, "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3).

In his Answer, Respondent stated that he "believes that Petitioner has properly exhausted the claims proffered within the . . . Petition." (ECF No. 8 at 2.) However, he also expressly "reserve[d] the right to assert issues of exhaustion should a determination be made by this Court that one or more claims have not yet been properly exhausted." (*Id.*) Based on this conditional response on the issue of exhaustion, the Court finds that Respondent did not unconditionally waive this requirement.

In the PF&R, Magistrate Judge Eifert focuses solely on the first exception to the exhaustion requirement provided in Section 2254(b)(1)(B)(i). (*See* ECF No. 21 at 46–49.) In the Objections, Petitioner similarly focuses exclusively on this exception and does not assert that the second exception under Section 2254(b)(1)(B)(ii) is applicable in this matter. (*See* ECF No. 22 at 5–6 (focusing on the exceptions to the procedural default doctrine and not addressing whether circumstances exist that render exhaustion ineffective to protect Petitioner's rights).) The Court therefore shall similarly focus solely on the first statutory exception to the exhaustion requirement—namely, whether "there is an absence of available State corrective process." 28 U.S.C. § 2254(b)(1)(B)(i).

Under the first Section 2254(b)(1)(B) exception, "[a] claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." *Baker*, 220 F.3d at 288 (citing *Gray v. Netherland*, 518 U.S. 152, 161 (1996)); *see also Teague v. Lane*, 489 U.S. 288, 297–98 (1989) (noting that, under the applicable state's rules, the petitioner "forfeited review of [a] claim in the [state] courts" by "not rais[ing] the . . . claim at trial or on direct appeal" and, "[a]s a result, [the] petitioner has exhausted his state remedies under 28 U.S.C. § 2254(b) with respect to the . . . claim" (citations omitted)). Stated differently, "[a] habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer available to him." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (citations omitted); *see, e.g.*, *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999) ("When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the

exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'" (quoting 28 U.S.C. § 2254(b))).

In the PF&R, Magistrate Judge Eifert found that Petitioner would be procedurally barred from returning to state court to raise his four Unexhausted Claims under West Virginia Code § 53-4A-1(c). (ECF No. 21 at 47–49.) The Supreme Court of Appeals of West Virginia provided the following description of this State's post-conviction habeas statute:

> In general, the post-conviction habeas corpus statute, W.Va.Code, 53-4A-1 et seq. (1967) contemplates that every person convicted of a crime shall have a fair trial in the circuit court, an opportunity to apply for an appeal to this Court, and one omnibus post-conviction habeas corpus hearing at which he may raise any collateral issues which have not previously been fully and fairly litigated.

*Losh v. McKenzie*, 277 S.E.2d 606, 609 (W. Va. 1981); *see also Markley v. Coleman*, 601 S.E.2d 49, 53 (W. Va. 2004) (stating that West Virginia's "post-conviction habeas corpus statute . . . clearly contemplates that a person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction habeas corpus proceeding." (alteration in original) (quoting *Gibson v. Dale*, 319 S.E.2d 806, 808 (W. Va. 1984))). The Section of West Virginia's habeas statute at issue here—Section § 53-4A-1(c)—addresses when a habeas "contention" is "deemed . . . waived" and states the following, in pertinent part:

> [A] contention or contentions and the grounds in fact or law relied upon in support thereof shall be deemed to have been waived when the petitioner could have advanced, but intelligently and knowingly failed to advance, such contention or contentions and grounds before trial, at trial, or on direct appeal (whether or not said petitioner actually took an appeal), or *in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article*, or in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, unless such contention or contentions and grounds are such that, under the Constitution of the United States or the Constitution of this State, they cannot be waived under the circumstances giving rise to the alleged waiver. When any such contention or contentions and grounds could have been advanced by the petitioner before trial, at trial, or on direct appeal (whether or not said

> petitioner actually took an appeal), or *in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article*, or in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, but were not in fact so advanced, there shall be a rebuttable presumption that the petitioner intelligently and knowingly failed to advance such contention or contentions and grounds.

W. Va. Code § 53-4A-1(c) (emphases added); *see also Gibson*, 319 S.E.2d at 810 ("A petitioner for habeas corpus relief is not entitled to consideration of claims which have been . . . waived in a prior habeas corpus proceeding under [Section 53-4A-1(c)]." (citations omitted)). "The waiver provisions of [West Virginia] Code § 53-4A-1 . . . may be applied to bar consideration of grounds for relief not asserted in a prior habeas proceeding only when the record demonstrates that an omnibus hearing was conducted in the course of such   prior proceeding." *Gibson*, 319 S.E.2d at 809. *See generally id.* (providing the requirements for a hearing to constitute a valid omnibus hearing for purposes of the waiver provisions of West Virginia Code § 53-4A-1 et seq.).

Under Section 53-4A-1(c), "there is a rebuttable presumption that [a] petitioner intelligently and knowingly waived any contention or ground in fact or law relied on in support of his petition for habeas corpus which he could have advanced on . . . appeal but which he failed to so advance." *Losh*, 277 S.E.2d at 610 (quoting *Ford v. Coiner*, 196 S.E.2d 91, 92 (1972)). "[T]he burden of proof rests on [the] petitioner to rebut the presumption that he intelligently and knowingly waived any contention or ground for relief which theretofore he could have advanced on . . . appeal." *Ford*, 196 S.E.2d at 92.

However, this presumption may not be absolute. "[West Virginia] Code § 53-4A-1(c) contemplates a knowing and intelligent waiver, in the vein of a waiver of a constitutional right, which cannot be presumed from a silent record." *Gibson*, 319 S.E.2d at 808. "Before the failure to advance contentions in a habeas corpus proceeding will bar their consideration in subsequent

applications for habeas corpus relief, the record must conclusively demonstrate that the petitioner voluntarily refrained from asserting known grounds for relief in the prior proceeding." *Id.*; *see also Losh*, 277 S.E.2d at 608 ("A waiver of a constitutional right must be knowing and intelligent, that is a voluntary relinquishment of a known right, and if the waiver is conclusively demonstrated on the record at trial or at a subsequent omnibus habeas corpus hearing, the waiver makes any issue concerning the right waived res judicata in succeeding actions in habeas corpus.").

In the present matter, the record indicates that Petitioner would be procedurally barred under Section 53-4A-1(c) from raising the Unexhausted Claims in a subsequent state proceeding. Petitioner raised the Unexhausted Claims in his initial habeas petition before the state circuit habeas court, (*see* ECF No. 10, Ex. 7 at 60–61), but failed to again raise these four claims in his habeas appeal to the WVSCA, *see Boothe v. Ballard*, No. 13–0740, 2014 WL 2782127, at *3–4 (W. Va. June 19, 2014) (noting the claims Petitioner raised in his habeas appeal before the WVSCA regarding the alleged ineffectiveness of his trial counsel); (ECF No. 10, Ex. 10 at 160–64 (constituting Petitioner's arguments regarding his IAOC claims in his habeas appellate brief)). Under Section 53-4A-1(c), Petitioner waived his right to again bring these Unexhausted Claims before West Virginia courts when he failed to previously raise these claims on habeas appeal. *See, e.g.*, W. Va. Code § 53-4A-1(c) ("[A] contention or contentions and the grounds in fact or law relied upon in support thereof shall be deemed to have been waived when the petitioner could have advanced . . . such contention or contentions . . . in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article.").

The Court notes, however, that the record is devoid of any indication that Petitioner intelligently and knowingly waived these claims, such as evidence that his appellate habeas

counsel cautioned Petitioner that he may waive these claims by not raising them on appeal. *Cf. Gibson*, 319 S.E.2d at 808 ("[West Virginia] Code § 53-4A-1(c) contemplates a knowing and intelligent waiver, in the vein of a waiver of a constitutional right, which cannot be presumed from a silent record."). Nonetheless, Magistrate Judge Eifert found in the PF&R that Petitioner would be barred under Section 53-4A-1(c) from again raising the Unexhausted Claims in state court and that the presumption in favor of knowing and intelligent waiver applies as to these claims. (*See* ECF No. 21 at 47.) Petitioner does not object to these findings. (*See* ECF No. 22.) As Petitioner bears the burden both to raise specific objections to the PF&R and to rebut the presumption that he knowingly and intelligently waived the Unexhausted Claims, the Court finds that his failure to object to the Magistrate Judge's findings regarding waiver under Section 53-4A-1(c) is dispositive on this issue for purposes of the present analysis.[19] *See, e.g.*, *Corr v. Bureau of the Pub. Debt*, 987

---

[19] The Court notes that there is an inherent conflict between the statutory presumption in favor of a knowing and intelligent waiver, *see* W. Va. Code § 53-4A-1(c), and the case law requirement that the record conclusively show voluntary waiver, *see Gibson v. Dale*, 319 S.E.2d 806, 808 (W. Va. 1984). Under Section 53-4A-1(c), there is a rebuttable presumption of a knowing and intelligent waiver. This presumption indicates that, absent a sufficient rebuttal from the petitioner, it is immaterial whether the record otherwise demonstrates a voluntary waiver. *See* W. Va. Code § 53-4A-1(c). Conversely, under the *Gibson* standard, the record must conclusively demonstrate a voluntary waiver. *See Gibson*, 319 S.E.2d at 808 ("Before the failure to advance contentions in a habeas corpus proceeding will bar their consideration in subsequent applications for habeas corpus relief, the record must conclusively demonstrate that the petitioner voluntarily refrained from asserting known grounds for relief in the prior proceeding."). If this latter standard is the pertinent requirement, then what is the purpose of the statutory presumption, in the first instance? Either the record conclusively demonstrates a voluntary waiver, or it does not. It is thus unsurprising that West Virginia courts appear to often cite the statutory presumption, *see, e.g.*, *McBride v. Lavigne*, 737 S.E.2d 560, 573 (W. Va. 2012), but only rarely cite (or apply) the requirement of the record conclusively demonstrating voluntary waiver, *see, e.g.*, *Gibson*, 319 S.E.2d 806, 811–12 (1984). Indeed—with certain exceptions inapplicable here, *see, e.g.*, *Losh v. McKenzie*, 277 S.E.2d 606, 611 (W. Va. 1981) (providing the *Losh* checklist)—the few cases that apply this latter requirement and decline to find waiver appear to only do so where, unlike here, the petitioner contested the issue of voluntary waiver. *See, e.g.*, *Tamburo v. Pszczolkoski*, No. 14–0287, 2015 WL 3751825, at *7 (W. Va. June 15, 2015); *Gibson*, 319 S.E.2d at 810–812; *cf. Losh*, 277 S.E.2d at 610 ("[I]t is more reasonable to apply some of the artificial rules concerning the finality of judgments when the petitioner has been represented by competent counsel familiar with artificial rules, than when the petitioner appears *pro se* since he is unfamiliar with those rules." (emphasis added)).

    The Court also notes that the Fourth Circuit has stated that "[i]f any reasonable possibility exists that the state court may apply an exception to its procedural default rule, the federal court should not apply a state procedural bar to find that exhaustion is futile." *Meadows v. Legursky*, 904 F.2d 903, 909 (4th Cir. 1990) (citation omitted), *abrogated on other grounds by Trest v. Cain*, 522 U.S. 87, 89 (1997). As noted above, Petitioner was represented by counsel in his habeas proceedings and does not argue that the waiver of his Unexhausted Claims was not voluntary. As such, assuming that the statutory presumption in favor of a knowing and voluntary waiver is applicable, the Court

F. Supp. 2d 711, 716 (S.D. W. Va. 2013) ("[T]he Court is not required to review, *de novo* or by any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed." (citing *Thomas v. Arn*, 474 U.S. 140, 150 (1985))); *Ford*, 196 S.E.2d at 92 ("[T]he burden of proof rests on [the] petitioner to rebut the presumption that he intelligently and knowingly waived any contention or ground for relief which theretofore he could have advanced on . . . appeal.").

The Court therefore finds that Petitioner intelligently and knowingly waived the Unexhausted Claims when he failed to raise these claims on habeas appeal to the WVSCA. The Court further finds that Petitioner would be procedurally barred under West Virginia Code § 53-4A-1(c) from again raising these Unexhausted Claims at the state level. The Court next addresses the impact of this state procedural bar in the instant analysis.

## C.    Procedural Default Doctrine

The state procedural bar that prevents Petitioner from returning to state court to exhaust his four Unexhausted Claims implicates the procedural default rule. "The [procedural default] doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). In addition, "[i]f claims were not exhausted in state court but would now be procedurally barred if brought in state court, then federal courts can treat the claims as if they were procedurally defaulted in the state courts." *Clagett v. Angelone*, 209 F.3d 370, 378 (4th

---

finds that it is not reasonably possible that the state courts would apply an exception to the waiver rule under Section 53-4A-1(c). However, the Court recognizes that there *may* be a reasonable possibility that the West Virginia courts would not apply waiver if, in fact, a voluntary waiver must be conclusively demonstrated in the record—regardless of whether Petitioner was represented by counsel and fails to argue that the waiver was not voluntary. The Court finds that this discrete issue is debatable and warrants a certificate of appealability, as provided in the conclusion section of this Opinion.

Cir. 2000) (citing *Coleman*, 501 U.S. at 735 n.1). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim." *Gray v. Netherland*, 518 U.S. 152, 162 (1996) (citations omitted). "The procedural default doctrine . . . appl[ies] . . . whether the default in question occurred at trial, on appeal, or on state collateral attack." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citations omitted).

"The procedural default doctrine . . . 'refers to a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions.'" *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (quoting *McCleskey v. Zant*, 499 U.S. 467, 489 (1991)). "A corollary to the habeas statute's exhaustion requirement, the doctrine has its roots in the general principle that federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Id.* (citations omitted). *See generally Woodford v. Ngo*, 548 U.S. 81, 108 n.5 (2006) (Stevens, J., dissenting) (noting that the procedural default rule is a "judge-made doctrine"). "Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 731–32. Absent the procedural default doctrine, "habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court." *Id.* at 732.; *see also Cone v. Bell*, 556 U.S. 449, 465 (2009) ("When a petitioner fails to properly raise his federal claims in state court, he deprives the State of an opportunity to address those claims in the first instance and frustrates the State's ability to honor his constitutional rights." (citation omitted)). "The [procedural default doctrine] ensures that the

States' interest in correcting their own mistakes is respected in all federal habeas cases." *Coleman*, 501 U.S. at 732; *see also id.* at 750 ("All of the State's interests—in channeling the resolution of claims to the most appropriate forum, in finality, and in having an opportunity to correct its own errors—are implicated whether a prisoner defaults one claim or all of them.").

The procedural default doctrine operates to bar a federal habeas claim "only if the rule of procedure . . . is determined to be an adequate and independent state-law ground for decision." *Thomas v. Davis*, 192 F.3d 445, 450 (4th Cir. 1999) (citation omitted); *see, e.g.*, *Trevino v. Thaler*, 133 S. Ct. 1911, 1917 (2013) ("[A] conviction that rests upon a defendant's state-law procedural default . . . normally rests upon an independent and adequate state ground." (citation omitted)); *Maples v. Thomas*, 132 S. Ct. 912, 922 (2012) ("As a rule, a state prisoner's habeas claims may not be entertained by a federal court when (1) a state court has declined to address those claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." (alterations omitted) (citation omitted)).

"To qualify as an 'adequate' procedural ground, a state rule must be firmly established and regularly followed." *Walker v. Martin*, 562 U.S. 307, 316 (2011) (citation omitted); *see also Richmond v. Polk*, 375 F.3d 309, 323 (4th Cir. 2004) ("A state procedural rule is 'adequate' if it is firmly established and regularly or consistently applied by the state court . . . ." (citing *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988))). "As a general matter, whenever a procedural rule is derived from state statutes and supreme court rules . . . the rule is necessarily 'firmly established.'" *O'Dell v. Netherland*, 95 F.3d 1214, 1241 (4th Cir. 1996). On the other hand, "new procedural

104

rules created after the time they had to be obeyed and procedural distinctions regularly ignored by state courts are by definition not [firmly established]." *Id.* at 1241 n.20.

As to whether the procedural rule is regularly followed, "[c]onsistent or regular application of a state rule of procedural default does not mean undeviating adherence to such rule admitting of *no* exception." *Reid v. True*, 349 F.3d 788, 804 (4th Cir. 2003) (citation omitted). "Rather, 'despite some deviations, a general rule[] that ha[s] been applied in the vast majority of cases' must be considered adequate." *Id.* (alterations in original) (quoting *Plath v. Moore*, 130 F.3d 595, 602 (4th Cir. 1997)). "Where a procedural rule is inconsistently applied, [courts] will not allow . . . . that rule to thwart federal habeas review of constitutional issues that the 'adequacy' requirement was designed to prevent." *Bostick v. Stevenson*, 589 F.3d 160, 164 (4th Cir. 2009) (citation omitted).

Additionally, "a discretionary state procedural rule can serve as an adequate ground to bar federal habeas review." *Beard v. Kindler*, 558 U.S. 53, 60 (2009). Indeed, "a discretionary rule can be 'firmly established' and 'regularly followed'—even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* at 60–61 (citation omitted).

Moreover, "the fact that a state procedural rule is adequate in general does not answer the question of whether the rule is adequate as applied in a particular case." *Reid*, 349 F.3d at 805 (citation omitted). "In making this adequacy determination, [courts] ask 'whether the particular procedural bar is applied consistently to cases that are *procedurally* analogous-here, cases in which the particular claim raised could have been raised previously but was not.'" *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010) (quoting *McCarver v. Lee*, 221 F.3d 583, 589 (4th Cir.

105

2000)); *see also Reid*, 349 F.3d at 805 (stating that "[a]nswering [the adequacy] question requires [courts] to determine whether [the procedural rule] is regularly and consistently applied to claims of the type raised by [the petitioner]" and "[t]he relevant inquiry concerns the procedural posture of the defaulted claim" (citation omitted)). "The question of whether a state procedural ruling is adequate is itself a question of federal law." *Beard*, 558 U.S. at 60 (citing *Lee v. Kemna*, 534 U.S. 362, 375 (2002)).

The state procedural rule at issue here—waiver under West Virginia Code § 53-4A-1(c)—is both adequate and independent. Section 53-4A-1(c) is a statutory waiver provision and, as such, this procedural rule is firmly established. *See, e.g.*, *O'Dell*, 95 F.3d at 1241 n.20 (stating that "unambiguous statutes or court rules are always 'firmly established'"). A review of West Virginia case law indicates that the state courts routinely apply this procedural bar where, as here, a petitioner is represented by counsel and fails to appeal certain claims to the WVSCA.[20] *See, e.g.*, *Grimes v. Plumley*, No. 12–1425, 2013 WL 5967042, at *3, 11–13 (W. Va. Nov. 8, 2013) (finding "no clear error or abuse of discretion by the circuit court" where, in part, the circuit court found that the petitioner waived claims "which could have been raised on appeal, but [were] not"); *Pendleton v. Ballard*, No. 12–0653, 2013 WL 2477245, at *2 (W. Va. May 24, 2013) ("adopt[ing]

---

[20] West Virginia courts do decline to apply the waiver rule under Section 53-4A-1(c) to certain claims in limited situations, such as post-habeas proceeding claims that habeas counsel was ineffective, *see, e.g.*, *Losh v. McKenzie*, 277 S.E.2d 606, 608 (W. Va. 1981) (noting that a petitioner "may still petition the court on [certain limited] grounds," including "[IAOC] at the omnibus habeas corpus hearing," even if they failed to raise those grounds at the previous habeas corpus proceedings), or where there was not a valid habeas omnibus hearing, *see Gibson v. Dale*, 319 S.E.2d 806, 809 (W. Va. 1984) ("The waiver provisions of [West Virginia] Code § 53-4A-1 . . . may be applied to bar consideration of grounds for relief not asserted in a prior habeas corpus proceeding only when the record demonstrates that an omnibus hearing was conducted in the course of such prior proceeding."). In the Objections, Petitioner argues for the first time that his habeas counsel was ineffective. (*See* ECF No. 22 at 2–3.) However, the four Unexhausted Claims at issue in the instant procedural default analysis relate to the alleged ineffectiveness of Petitioner's *trial* counsel and *not* his habeas counsel. As the Unexhausted Claims do not allege that Petitioner's habeas counsel was ineffective, the exception to the waiver provision under Section 53-4A-1(c) pertaining to claims that habeas counsel was ineffective is inapplicable as to the Unexhausted Claims.

and incorporat[ing] the circuit court's well-reasoned findings and conclusions" wherein the circuit court found that the petitioner waived numerous claims that he failed to raise on appeal); *Kees v. Nohe*, No. 11–1465, 2013 WL 149614, at *13 (W. Va. Jan. 14, 2013) (finding "no error in the decision of the circuit court" where the circuit court determined, in pertinent part, that the petitioner, "who was represented by counsel on . . . appeal, could have advanced [a] claim on . . . appeal and did not[,] [s]o . . . this claim is deemed waived"); *McBride v. Lavigne*, 737 S.E.2d 560, 573 (W. Va. 2012) ("[A]s neither of these issues were raised on . . . appeal, they are presumed to have been waived . . . ." (citation omitted)); *Ford v. Coiner*, 196 S.E.2d 91, 95 (W. Va. 1972) (finding that the defendant waived a claim that he failed to raise on appeal (citing W. Va. Code § 53-4A-1(c)); *see also Howard v. Ballard*, Civil Action No. 5:08CV112, 2009 WL 1872970, at *14 (N.D. W. Va. June 29, 2009) ("[T]here is no evidence that § 53-4A-1(c) has not been regularly and consistently applied."). *See generally Losh v. McKenzie*, 277 S.E.2d 606, 608 (W. Va. 1981) ("[I]f the waiver is conclusively demonstrated on the record at trial or at a subsequent omnibus habeas corpus hearing, the waiver makes any issue concerning the right waived res judicata in succeeding actions in habeas corpus."). The Court therefore finds that the waiver provisions in Section 53-4A-1(c) are routinely and consistently applied to claims with similar procedural histories as the four Unexhausted Claims at issue here. *Cf. Talbert v. Plumley*, Case No. 3:14-cv-22222, 2015 WL 5726945, at *1 (S.D. W. Va. Sept. 30, 2015) (finding that the petitioner procedurally defaulted on habeas claims that he failed to raise on "state habeas appeal," as well as claims that he did not advance on "his direct appeal").

Regarding the independent state-law ground inquiry, a state procedural rule is "independent of federal law" if it "do[es] not depend on a federal constitutional ruling on the

107

merits." *Stewart v. Smith*, 536 U.S. 856, 860 (2002); *see, e.g.*, *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985) (finding that a state procedural rule was not independent where, "[b]efore applying the waiver doctrine to a constitutional question, the state court must rule, either explicitly or implicitly, on the merits of the constitutional question"); *McNeill v. Polk*, 476 F.3d 206, 211 (4th Cir. 2007) ("A state procedural rule . . . is independent if it does not depend on a federal constitutional ruling." (citing *Ake*, 470 U.S. at 75)). For "example," a state procedural rule is not independent "if 'the State has made application of the procedural bar depend on an antecedent ruling of federal law, that is, on the determination of whether federal constitutional error has been committed.'" *Harris v. Reed*, 489 U.S. 255, 274 (1989) (quoting *Ake*, 470 U.S. at 75)). Additionally, even if a state procedural rule "does not require a federal constitutional ruling on the merits, if the state court's decision rested primarily on a ruling on the merits nevertheless, its decision would not be independent of federal law." *Stewart*, 536 U.S. at 860.

The state waiver provision at issue in this case—Section § 53-4A-1(c)—provides the following, in pertinent part:

> [A] contention or contentions and the grounds in fact or law relied upon in support thereof shall be deemed to have been waived when the petitioner could have advanced, but intelligently and knowingly failed to advance, such contention or contentions . . . in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, *unless such contention or contentions and grounds are such that, under the Constitution of the United States or the Constitution of this State, they cannot be waived under the circumstances giving rise to the alleged waiver.*

West Virginia Code § 53-4A-1(c) (emphasis added). By its terms, this provision limits waiver if the United States Constitution does not permit waiver under "the *circumstances* giving rise to the alleged waiver." *See id.* However, there is no indication in this language that this "circumstances"

108

determination requires reaching the merits of a claim *prior* to addressing waiver. *See id.*; *see also McBride*, 737 S.E.2d at 573 ("[W]here habeas relief is being denied because of the litigant's failure to have raised the issue at an earlier point in time, the decision is one controlled by state law as it derives from legitimate concerns of finality." (citation omitted)). Indeed, courts applying this waiver provision address only the procedural posture of the waived claims without any discussion as to the potential merits of the claims. *See, e.g.*, *McBride*, 737 S.E.2d at 573; *Ford*, 196 S.E.2d at 95; *Kees v. Nohe*, 2013 WL 149614, at *11–13. As the operation of Section 53-4A-1(c) does not require first addressing the merits of a federal constitutional claim, the Court finds that this waiver provision is independent of federal law for purposes of the procedural default analysis. *See, e.g.*, *Howard*, 2009 WL 1872970, at *2 (finding that the petitioner waived certain claims where "the state habeas court did not rely on a federal constitutional ruling, but rather found that [the waived claims] were procedurally barred pursuant to West Virginia Code § 53-4A-1(c)").

Finally, the Court notes that another court in this District recently found that West Virginia Code § 53-4A-1(c) is both an adequate and independent state procedural rule for purposes of the procedural default doctrine. *See Green v. Ballard*, Civil Action No. 3:02–1348, 2015 WL 1612198, at *5 (S.D. W. Va. Apr. 10, 2015) (stating that West Virginia Code § 53-4A-1(c) "is an adequate and independent state ground for denying [the petitioner's] claim" (citations omitted)); *see also Talbert*, 2015 WL 5726945, at *1 (finding that the petitioner procedurally defaulted on the claims that he failed to advance "on either his direct appeal or his state habeas appeal" pursuant to Section 53-4A-1(c)). Based on the above discussion, the Court concurs with this determination and finds the West Virginia Code § 53-4A-1(c) is an adequate and independent state procedural rule as applied to claims with similar procedural histories as the four Unexhausted Claims at issue here.

109

Section 53-4A-1(c) may therefore operate to procedurally bar Petitioner's Unexhausted Claims unless an exception to the procedural default doctrine applies.

**D.     Exceptions to the Procedural Default Doctrine**

In his Objections, Petitioner asserts that the exceptions to the procedural default rule prevent the application of this doctrine as to his four otherwise-barred Unexhausted Claims. (*See* ECF No. 22 at 4–6.) The Court shall therefore now address the applicability of the exceptions to the procedural default doctrine.

"The doctrine barring procedurally defaulted claims from being heard is not without exceptions." *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012) (citation omitted); *cf. Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010) ("Although the doctrine of procedural default limits federal habeas review of state convictions, it does not provide an absolute bar."). "[T]he procedural default doctrine . . . allows for federal habeas review of federal claims defaulted in state court pursuant to an adequate and independent state procedural rule where a petitioner can show (1) cause for the default and prejudice therefrom or (2) that failure to consider the claims will result in a fundamental miscarriage of justice." *Richmond v. Polk*, 375 F.3d 309, 323 (4th Cir. 2004); *see, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (providing these exceptions to the procedural default doctrine).

1.     Cause and Prejudice

With regard to the first exception, "[t]he cause and prejudice requirement" is "an equitable exception" that "shows due regard for States' finality and comity interests while ensuring that 'fundamental fairness [remains] the central concern of the writ of habeas corpus.'" *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quoting *Strickland v. Washington*, 466 U.S. 668, 697 (1984)). "Cause

110

for a procedural default exists where 'something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . impeded [his] efforts to comply with the State's procedural rule.'" *Maples v. Thomas*, 132 S. Ct. 912, 922 (2012) (alterations in original) (quoting *Coleman*, 501 U.S. at 753). The Supreme Court has not further "identified with precision exactly what constitutes 'cause' to excuse a procedural default." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Nonetheless, courts have identified certain objective factors that may constitute cause, such as (1) "interference by officials that makes compliance with the State's procedural rule impracticable," *McCleskey v. Zant*, 499 U.S. 467, 493–94 (1991) (citation omitted); (2) "a showing that the factual or legal basis for a claim was not reasonably available to counsel," *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *cf. Talbert v. Plumley*, Case No. 3:14-cv-22222, 2015 WL 5726945, at *3 (S.D. W. Va. Sept. 30, 2015) ("An absence of reasonable diligence will defeat an assertion of cause." (citing *Hoke v. Netherland*, 92 F.3d 1350, 1354 n.1 (4th Cir. 1996))); (3) "novelty of the claim," *Wright v. Angelone*, 151 F.3d 151, 160 n.5 (4th Cir. 1998) (citing *Reed v. Ross*, 468 U.S. 1, 12–16 (1984)); and (4) in certain limited situations, IAOC, *see, e.g.*, *Martinez*, 132 S. Ct. at 1320 (addressing cause where "there was no counsel or counsel . . . was ineffective" in "an initial-review collateral proceeding"); *id.* at 1317 (stating that IAOC "during an appeal on direct review may provide cause to excuse a procedural default" (citing *Coleman*, 501 U.S. at 754)). "The rules for when a prisoner may establish cause to excuse a procedural default . . . . reflect an equitable judgment that only where a prisoner is impeded or obstructed in complying with the State's established procedures will a federal habeas court excuse the prisoner from the usual sanction of default." *Id.* at 1318 (citations omitted).

If a petitioner establishes cause, they must then also establish actual prejudice. *Richmond*, 375 F.3d at 326. "To establish prejudice, [a petitioner] must show 'not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *McCarver v. Lee*, 221 F.3d 583, 592 (4th Cir. 2000) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Satcher v. Pruett*, 126 F.3d 561, 572 (4th Cir. 1997) ("To show actual prejudice, [a petitioner] must demonstrate that the error worked to his 'actual and substantial disadvantage,' not merely that the error created a 'possibility of prejudice.'" (quoting *Murray*, 477 U.S. at 494)); *cf. Richmond*, 375 F.3d at 327 (discussing the prejudice standard in the context of alleged errors at the sentencing phase). *See generally Murray*, 477 U.S. at 494 ("Such a showing of pervasive actual prejudice can hardly be thought to constitute anything other than a showing that the prisoner was denied 'fundamental fairness' at trial.").

In the PF&R, Magistrate Judge Eifert found that Petitioner could not establish either cause or prejudice for his failure to raise the Unexhausted Claims before the WVSCA. (ECF No. 21 at 48–49.) Petitioner's sole objection to these findings is these claims "would establish cause under the *Martinez* exception" to the doctrine of procedural default. (ECF No. 22 at 5.)

In general, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause." *Maples*, 132 S. Ct. at 922 (citation omitted). "That is so . . . because the attorney is the prisoner's agent, and under 'well-settled principles of agency law,' the principal bears the risk of negligent conduct on the part of his agent." *Id.* (quoting *Coleman*, 501 U.S. at 753–54). Nonetheless, in *Martinez v. Ryan*, the Supreme Court identified the following limited exception where the conduct of a prisoner's post-conviction attorney may constitute sufficient cause:

112

> [A] federal habeas court [may] find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim;" and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (third and fourth alterations in original) (emphasis omitted) (quoting *Martinez*, 132 S. Ct. at 1318–21). However, the *Martinez* Court explicitly stated that this exception "does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Martinez*, 132 S. Ct. at 1320 (citation omitted). Indeed, the *Martinez* exception "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of [IAOC] at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.*

Petitioner here asserts that the *Martinez* exception applies to show cause why he failed to raise the four procedurally barred Unexhausted Claims on direct habeas appeal at the state level. (ECF No. 22 at 5.) In particular, "Petitioner argues that, it goes without saying, if a petitioner has the right (although equitable in nature) to effective assistance of counsel at this habeas proceeding, it would be nonsensical, that it would not apply to the collateral appeal, equally." (*Id.*)

The Court is not persuaded by this argument. The record reflects that Petitioner raised each of the procedurally barred claims at his initial-review state habeas proceeding. (*See, e.g.*, ECF No. 10, Ex. 7 at 60–61.) However, the procedural bar that prevents Petitioner from now raising these claims in this federal habeas case arises out of Petitioner's failure to again raise these claims *on appeal* from his initial state habeas proceeding. The Supreme Court explicitly stated that the

113

*Martinez* exception "does not concern attorney errors in . . . appeals from initial-review collateral proceedings." *Martinez*, 132 S. Ct. at 1320 (citation omitted). As such, claims that a petitioner fails to raise on appeal from initial-review habeas proceedings—like Petitioner's barred Unexhausted Claims—do not fall under the "limited circumstances" giving rise to the *Martinez* exception. *Id.*; *cf. Gray v. Zook*, 806 F.3d 783, 789 (4th Cir. 2015) ("[A] petitioner raising a *Martinez* claim never presented the claim in state court . . . ."). The Court therefore finds that Petitioner has failed to show cause under the *Martinez* exception for his failure to raise his procedurally barred Unexhausted Claims on appeal.

Petitioner does not provide any additional objections to Magistrate Judge Eifert's findings that he failed to establish cause and prejudice for not raising the procedurally barred Unexhausted Claims on appeal from his initial state habeas proceeding. (*See* ECF No. 22 at 4–6.) Accordingly, the Court finds that Petitioner has failed to satisfy the cause and prejudice exception to the procedural default doctrine as to the Unexhausted Claims in Grounds V through VIII of the Petition.

### 2.    Fundamental Miscarriage of Justice

Turning to the second exception to the procedural default doctrine—fundamental miscarriage of justice—the Supreme Court has noted that "[t]he cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice." *Dretke v. Haley*, 541 U.S. 386, 393 (2004). "[I]n appropriate cases the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration." *Murray*, 477 U.S. at 495 (citation omitted). The Supreme Court therefore "recognized a narrow exception" to the procedural default doctrine "where a constitutional

violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke*, 541 U.S. at 393 (citing *Murray*, 477 U.S. at 496); *see, e.g.*, *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) ("In other words, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief."); *Wolfe v. Johnson*, 565 F.3d 140, 160 (4th Cir. 2009) ("A proper showing of 'actual innocence' is sufficient to satisfy the 'miscarriage of justice' requirement." (citing *House v. Bell*, 547 U.S. 518, 536–37 (2006))). *See generally Bousley v. United States*, 523 U.S. 614, 623 (1998) ("It is important to note . . . that 'actual innocence' means factual innocence, not mere legal insufficiency."); *Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, [the Supreme] Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.").

"A showing of actual innocence can serve as a gateway" insofar as it "may be utilized by a § 2254 petitioner to secure the adjudication of his otherwise defaulted claims." *Wolfe*, 565 F.3d at 164 (citation omitted); *cf. Teleguz v. Zook*, 806 F.3d 803, 808 (4th Cir. 2015) ("[A]lthough a petitioner claims actual innocence . . . for purposes of asserting a gateway innocence claim, such an innocence claim 'does not by itself provide a basis for relief.'" (quoting *Coleman v. Hardy*, 628 F.3d 314, 318 (7th Cir. 2010))). "In the usual case the presumed guilt of a prisoner convicted in state court counsels against federal review of defaulted claims." *House*, 547 U.S. at 537. However, "a petition supported by a convincing" showing of actual innocence raises "sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that

the trial was untainted by constitutional error." *Id.* (citation omitted). "[H]ence, a review of the merits of the constitutional claims is justified." *Id.* (citation omitted). "[A] § 2254 petitioner is entitled to have a[n] . . . actual innocence issue addressed and disposed of in the district court." *Wolfe*, 565 F.3d at 164 (citing *Bousley*, 523 U.S. at 623).

"[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536–37 (quoting *Schlup*, 513 U.S. at 327). Stated differently, "[a] petitioner's burden at the gateway stage is to demonstrate . . . that more likely than not any reasonable juror would have reasonable doubt." *Id.* at 538.

The "more likely than not" standard in the actual innocence analysis requires a petitioner "to make a stronger showing than that needed to establish prejudice," but "imposes a lower burden than [a] clear and convincing standard." *Schlup*, 513 U.S. at 327 (citation omitted). This "standard thus ensures that petitioner's case is truly extraordinary, while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Id.* (citation omitted).

Additionally, the word "reasonable" in the required gateway showing for actual innocence "is not without meaning." *Id.* at 329. "It must be presumed that a reasonable juror would consider fairly all of the evidence presented." *Id.* "It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id.*

"To be credible, . . . a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented

116

at trial." *Id.* at 324; *see also Teleguz v. Pearson*, 689 F.3d 322, 328 (4th Cir. 2012) ("When a petitioner raises a . . . gateway actual innocence claim, it must be supported by 'new reliable evidence.'" (quoting *Schlup*, 513 U.S. at 324)). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324. Additionally, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bears on the probable reliability of . . . evidence [of actual innocence]." *McQuiggin*, 133 S. Ct. at 1935 (alterations in original) (quoting *Schlup*, 513 U.S. at 332).

"[A]lthough . . . a gateway" actual innocence claim "requires new reliable evidence . . . , the habeas court's analysis is not limited to such evidence." *House*, 547 U.S. at 537 (citation omitted). As this "standard is intended to focus the inquiry on actual innocence . . . , the district court is not bound by the rules of admissibility that would govern at trial." *Schlup*, 513 U.S. at 327. Instead, the Supreme Court provided the following statement regarding the evidence a district court should consider when addressing a claim of actual innocence:

> [T]he emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. . . . The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.

*Id.* at 327–28 (citation omitted); *see also House*, 547 U.S. at 539 (stating that the actual innocence "inquiry . . . requires a holistic judgment about all the evidence" (citation omitted)). "If new evidence so requires, this [review] may include consideration of the credibility of witnesses presented at trial." *House*, 547 U.S. at 538–39 (citation omitted).

117

"The meaning of actual innocence" under this standard "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Schlup*, 513 U.S. at 329. "It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.*; *see also House*, 547 U.S. at 538 ("The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." (citation omitted)). "Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329.

"[T]he gateway actual-innocence standard is by no means equivalent to the standard . . . govern[ing] claims of insufficient evidence." *House*, 547 U.S. at 538 (citation omitted). When addressing a claim of insufficient evidence, "courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict." *Id.* As an actual innocence "claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *Id.* (citation omitted).

Finally, the Supreme Court has repeatedly emphasized that the gateway actual innocence "standard is demanding and permits review only in the extraordinary case." *House*, 547 U.S. at 538 (citation omitted); *see, e.g.*, *McQuiggin*, 133 S. Ct. at 1936 ("We stress once again that the [actual innocence] standard is demanding."); *cf. Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir.

118

1998) ("Claims of actual innocence . . . presented . . . as gateways to excuse a procedural default . . . should not be granted casually."). Indeed, "claims of actual innocence are rarely satisfied." *Schlup*, 513 U.S. at 324. "At the same time, though, the [actual innocence] standard does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538. "Rather, the petitioner must demonstrate that more likely than not, in light of new and reliable evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Teleguz*, 806 F.3d at 809 (citing *House*, 547 U.S. at 538).

In the Objections, Petitioner argues that the failure of this Court to consider the Unexhausted Claims "would result in a 'fundamental miscarriage of justice' inasmuch, [sic] Petitioner's case is of an extraordinary nature, premised on inconsistent statements, faulty police investigations, and inherently incredible testimony." (ECF No. 22 at 5.) Petitioner further asserts that these alleged issues "spread across the entirety of this record which patently shows that Petitioner is factually innocent and, more importantly – actually innocent." (*Id.* at 5–6 (emphasis omitted).) For the reasons that follow, the Court disagrees with Petitioner's arguments and finds that Petitioner has failed to satisfy his burden in demonstrating that, in light of new and reliable evidence, no reasonable juror would have found him guilty beyond a reasonable doubt.

The Court notes that Petitioner does not specify what new and reliable evidence he relies upon for his assertion of actual innocence. (*Id.*) The Court therefore construes Petitioner's argument as asserting that the pertinent new evidence includes the claims in the Petition that were not raised during trial. Thus, this new evidence includes the testimony of Sandra Culp, Dr. Bobby

119

Miller, Dr. Joan Phillips, Julie Heinig, Lenora Harless, H.C., Reverend Boothe, and Rachel

Burdette, as well as Petitioner's proffered alibi instruction.[21]  (*See* ECF No. 2.)

At the outset of this analysis, the Court notes that the new evidence proffered by Petitioner

is a far cry from the type of new evidence courts have found sufficient to satisfy the actual

innocence standard. Courts found that this gateway standard was met when "the petitioner has

made a credible and compelling showing of his actual innocence," *Rivas v. Fischer*, 687 F.3d 514,

552 (2d Cir. 2012), such as where the petitioner provides (1) new DNA evidence and expert

testimony "call[ing] into question" the "central forensic proof connecting [the petitioner] to the

crime," as well as "substantial evidence pointing to a different suspect," *House v. Bell*, 547 U.S.

518, 540–41 (2006); (2) "sworn statements of several eyewitnesses that [the petitioner inmate] was

---

[21] As Petitioner asserts in Ground VI of the Petition, (*see* ECF No. 2 at 20), D.B.'s sister—H.C.—provided a statement to Detective Chapman that another individual—Doug Mullins—made comments to her and pinched her "on the butt," (ECF No. 10, Ex. 16 at 188–89). Petitioner's trial counsel elicited this statement from Detective Chapman during cross-examination. (*See id.*, Ex. 12 at 218–19.) As such, this statement was before the jury at trial. Petitioner has not asserted or provided any evidence indicating that H.C. would provide additional pertinent information. (*See, e.g.*, ECF No. 22 at 10.) The Court therefore finds that Petitioner's assertions in the Petition regarding H.C.'s statements, (*see* ECF No. 2 at 20), are not new evidence for purposes of this analysis and shall analyze these statements only in the context of the total mix of new and old evidence.

Petitioner also asserts in Ground VIII that D.B.'s mother—Rachel Burdette—would have provided testimony regarding (1) "the presence of other men in [the residence];" (2) "D.B.'s exposure to Doug Mullins . . . who in the past made sexual advances/abuses towards one of D.B.'s siblings in the home;" and (3) "D.B.'s exposure to other potential offenders, including the neighbor of D.B.'s father." (*Id.* at 24.) However, as the state circuit habeas court noted, Petitioner did not call Ms. Burdette as a witness during the omnibus hearing and "no written statement of Ms. Burdette's was offered for admission into evidence." (ECF No. 10, Ex. 8 at 102.) Indeed, Petitioner does not identify any statement from Ms. Burdette in the present record, (*see, e.g.*, ECF No. 22 at 11 (providing Petitioner's discussion regarding Rachel Burdette in the Objections)), and the Court cannot otherwise locate such a statement. Petitioner has thus failed to provide new reliable evidence regarding the potential testimony of Rachel Burdette. The Court therefore shall not consider any hypothetical testimony from Ms. Burdette in this analysis.

Additionally, Petitioner alleges in Ground X that "the trial judge refused" to give his "alibi defense." (ECF No. 2 at 29–30.) However, as noted above, the record does not indicate—and Petitioner does not otherwise argue—that Petitioner has ever presented evidence of this proposed alibi either during trial or in his post-conviction proceedings. Absent such evidence, the Court finds that Petitioner's assertion regarding an alibi for a week in May 2008—when Detective Chapman testified, and the indictment alleged, that the offense occurred sometime between January and September of 2007, (*see* ECF No. 10, Ex. 12 at 211)—does not constitute new evidence for purposes of this analysis.

Finally, as discussed above, Ground IX of the Petition includes judicial bias and Confrontation Clause claims. (*See* ECF No. 2 at 25–28.) These claims do not address evidence that was not raised at trial, (*see id.*), and, as such, the Court shall not consider these claims in the instant actual innocence analysis.

not involved in the crime" and affidavits "that cast doubt on whether [the petitioner inmate] could have participated" in the offense where the prosecution relied mainly on the testimony of two correctional officers who witnessed the crime, *Schlup v. Delo*, 513 U.S. 298, 331 (1995); (3) a third party's consistent and repeated statement that they committed the offense, *Jones v. McKee*, No. 08 CV 4429, 2010 WL 3522947, at *9–10 (N.D. Ill. Sept. 2, 2010); *see, e.g.*, *Carringer v. Stewart*, 132 F.3d 463, 478–79 (9th Cir. 1997) (finding that the petitioner opened the actual innocence gateway where another person testified under oath that he committed the offense and separately boasted to other individuals that he set-up the petitioner); and (4) documentary evidence indicating that the petitioner was in another country on the day of the offense and five affidavits from individuals stating that the petitioner was outside the country at the precise time of the offense, *see Garcia v. Portuondo*, 334 F. Supp. 2d 446, 452–56 (S.D.N.Y. 2004). *See generally Schlup*, 513 U.S. at 324 (providing the Supreme Court's statement that examples of sufficient new reliable evidence for a gateway claim including "exculpatory evidence, trustworthy eyewitness accounts, or critical physical evidence"). By contrast, Petitioner's new evidence here is either speculative or has little to no probative value as to whether (1) Petitioner committed the offense, or (2) the prosecution's central witness—the victim, D.B.—was credible. This deficiency alone indicates that Petitioner's actual innocence gateway argument is without merit. *See, e.g.*, *Schlup*, 513 U.S. at 324 ("To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial."). Nonetheless, the Court shall analyze the pertinent evidence presented at trial, the value of Petitioner's new evidence, and the total mix of evidence.

*Evidence Presented During Trial*

121

The Court begins this analysis with the pertinent evidence adduced during trial. As the prosecution repeatedly indicated during its closing arguments, the State's case centered on the testimony and statements of the victim—D.B. (*See, e.g.*, ECF No. 10, Ex. 13 at 85 ("If you believe [D.B.'s] testimony, then the defendant is guilty of all four counts.").) D.B. provided testimony that Petitioner entered his grandmother's house while his family members were asleep or at the store, took him to a "clubhouse," placed his "weiner" in D.B.'s "butt" and "humped" him, placed "[t]he handle and sharp part" of a "pocket knife" in D.B.'s "butt," had D.B. touch Petitioner's penis, and D.B. saw "white stuff" on Petitioner's penis. (*Id.*, Ex. 12 at 160–65.) D.B. further testified that he did not inform any family members about the assault because Petitioner "said he would kill [D.B.'s] mom and dad," (*Id.* at 166–67), but that he eventually told his foster parents—the McGees—about the assault after D.B. "[h]umped" his brother, (*id.* at 168). The prosecution also called D.B.'s foster parent—Robbie McGee—who testified that D.B. told him a similar story regarding the assault and identified Petitioner as the assailant. (*See id.* at 143–46.) The prosecution's final witness was Detective Chapman who testified that D.B. provided him with a similar statement regarding the assault and identified Petitioner out of a photo array. (*Id.* at 206–09.) Detective Chapman further testified that he determined the date range when the assault occurred as between "January to September of 2007" based on D.B.'s statement that the incident occurred before he went to foster care and that the weather was "cool" at the time of the incident. (*Id.* at 210–11.) The State did not offer any additional evidence, such as medical records or physical evidence, in support of its case.

Petitioner's counsel elicited numerous concessions from the prosecution's witnesses during cross-examination. In particular, during the cross of D.B., Petitioner's counsel elicited the

following beneficial statements and contradictions: (1) D.B. recalled telling Toni Householder that Petitioner "did this to [him] 20 times," (*id.* at 175), but later told "Angela" that "this happened one time," (*id.* at 190); (2) D.B. testified that he "only saw the person that did this to [him] one time," but he saw Petitioner "more than one time at . . . [his] grandmother's house," (*id.* at 181); (3) D.B. testified that he recalled telling Detective Chapman that he was "only kind of sure" that the person he identified from a photo array "looked like" Petitioner "because the man who did this to [him] had a mustache," (*id.* at 179); (4) D.B. testified that Petitioner inserted both his penis and a knife in D.B.'s "butt at the same time," (*id.* at 183); (5) D.B. also testified that, while the alleged assault involved a knife and "hurt[]," he nonetheless did not bleed "all over the . . . floor" or "in [his] underwear," he did not have "problems going to the bathroom" or "walking afterwards," he did not "go in an ambulance" or "have surgery on [his] butt," and he did not "cry[] hysterically," (*id.* at 184–85); and (6) D.B. testified that he recalled previously saying that "the knife stayed the same color and the same size the entire time," but that he also "saw [Petitioner] put it inside of [D.B.'s] butt," (*id.* at 185–86).

Petitioner's counsel was also able to elicit the following potentially beneficial testimony during the cross-examination of Detective Chapman: (1) D.B. said in different statements that the single incident "happened in the bedroom of the house," "in the attic of the clubhouse," and "in the upstairs of the house," (*id.* at 223); (2) Detective Chapman received training on "how to collect" and identify semen and blood samples, (*id.* at 213), but he only "look[ed] in [the] places" where D.B. stated the assault occurred—without finding any blood or semen stains, (*id.* at 223)—and did not "attempt to obtain any samples from any of the locations that [D.B.] said this happened," (*id.* at 213); (3) H.C. told Detective Chapman that Doug Mullins "made comments of a sexual nature

to her and . . . pinched her butt" at D.B.'s grandmother's house, (*id.* at 218–19), but Detective Chapman did not include a photograph of Doug Mullins in the photo array he showed to D.B., (*id.* at 220), perform an "investigation to find if there were other people in the neighborhood that [D.B.] might know that looked like [Petitioner]," (*id.* at 215–16), or "do a survey of the registered sex offenders that lived in the area around where this happened," (*id.* at 216; *cf. id.* at 227 (providing Detective Chapman's testimony on redirect that when "there has been an identification of someone, then there is generally no need to search for anybody else")); (4) Detective Chapman heard D.B. testify that D.B. did not "know for sure if something happened before or after foster care" and that Detective Chapman—not D.B.—"decided when this allegedly happened," (*id.* at 217; *cf. id.* at 227–28 (providing Detective Chapman's testimony on redirect that the assault could not "have happened" during or after the time when D.B. was in foster care)); (5) Detective Chapman spoke with D.B.'s grandmother—Ms. Harless—who said "that there was no opportunity that she was aware of [when Petitioner] could have been alone with [D.B.]," (*id.* at 222); (6) the results of D.B.'s examination "at the Women's and Children's Hospital in Charleston" were "negative" for "any trauma to the genitalia or anus" and "[t]here was no medical evidence that a knife" or "anything else" had "been stuck up [D.B.'s] butt," (*id.* at 224–25); and (7) Sandra Culp "interviewed [D.B.]" and found "that [D.B.] didn't exhibit any symptoms of trauma," (*id.* at 225).

The defense called two witnesses during the presentation of its case—Nathan Glanden and Dr. Gail Swarm. Mr. Glanden testified that he was a private investigator and visited the attic of the "clubhouse" at the defense's request. (ECF No. 10, Ex. 13 at 15–17.) Mr. Glanden further testified that he took photographs and measurements in and around the attic, (*id.* at 17; *see also id.* at 17–22 (providing that the defense entered three photographs and two drawings of this area into

124

evidence)), and found that the tallest part of the attic was "58 inches or 4 feet 10 inches tall," (*id.* at 21). Mr. Glanden also testified that he visited a site through the "West Virginia State Police Sex Offender registry page" that indicated there were three sex offenders within a one mile radius of Ms. Harless' house, as well as six sex offenders within a five mile radius of this residence. (*Id.* at 26–27.)

The defense's second witness—Dr. Gail Swarm—testified that she treated Petitioner from "around 2005 to 2008" for "for chronic low back pain secondary to an injury" sustained "in the coal mines" and Petitioner was diagnosed with a back ailment called "post-laminectomy syndrome." (*Id.* at 35–37.) Dr. Swarm opined that, "as a result of [Petitioner's] condition," "[h]e is not able to bend, crouch, climb safely, [or] stoop down in small places" and that "any sustained activity can really aggravate [his] back." (*Id.* at 38; *see also id.* at 38–39 (providing Dr. Swarm's opinion that Petitioner's condition "affect[ed]" Petitioner's "ability to work or continue [to] work in the coal mines" because that type of work requires "stand[ing] for prolonged periods of time in a low position").)

This is the full extent of the pertinent evidence adduced during Petitioner's trial. The Court now turns to Petitioner's new evidence. As discussed below, this evidence is insufficient to satisfy the actual innocence standard.

*Petitioner's New Evidence*

Petitioner's new evidence falls into roughly three categories.[22] The first category is evidence that would likely only serve to prejudice Petitioner's case in the eyes of a reasonable

---

[22] The Fourth Circuit has stated that "[w]here a state court looks at the same body of relevant evidence and applies essentially the same legal standard to that evidence that the federal court does under [the actual innocence analysis], Section 2254(e)(1) requires that the state court's findings of fact not be casually case aside." *Sharpe v. Bell*, 593 F.3d 372, 379 (4th Cir. 2010). In this case, the state court addressed the new evidence offered by Petitioner. *See Boothe v.*

juror and includes the testimony and statements of Sandra Culp, Dr. Bobby Miller, Dr. Joan Phillips, and Lenora Harless. As previously noted, Ms. Culp submitted a deposition following Petitioner's state omnibus hearing in which she notes that she is "certified as a trauma specialist" and conducted an interview of D.B. at the request of "the Fayette County DHHR." (ECF No. 10, Ex. 16 at 150–52.) Ms. Culp testified that "[i]f [a] child was traumatized, there's always something that raises a red flag," but, in the case of D.B., Ms. Culp opined that there were "no red flags to suggest sexual abuse[,] . . . sexual assault[,] . . . [or] trauma." (*Id.* at 158 & 163.) Petitioner's counsel previously elicited this finding from Detective Chapman during the trial. (ECF No. 10, Ex. 12 at 225 (providing the testimony of Detective Chapman that Ms. Culp "interviewed [D.B.]" and found "that [D.B.] didn't exhibit any symptoms of trauma")).)

On the other hand, the *new* evidence in Ms. Culp's deposition—namely, the testimony that was not presented during trial—would not benefit Petitioner's defense. In particular, Ms. Culp testified that (1) she had not "reviewed all the evidence in [the] case," (*id.*, Ex. 16 at 160); (2) not "all individuals who have suffered some type of sexual abuse would exhibit some type of trauma" and individuals "would not exhibit signs of trauma" if "it was done in a nonthreatening way in the beginning, because they have to be trained," (*id.* at 161–62); and (3) in a March 12, 2009 amendment to her report, Ms. Culp noted that "[a]fter hearing additional (new to me) information from both the [p]rosecutor and the [d]efense [a]ttorney, it is suggested that [D.B.] be seen by someone for counseling regarding the entire case," (*id.* at 178). This new evidence serves only to

*Ballard*, No. 13–0740, 2014 WL 2782127, at *1–7 (W. Va. June 19, 2014) (providing the WVSCA's analysis of Petitioner's Exhausted Claims); (ECF No. 10, Ex. 8 at 81–123 (providing the state circuit court's analysis of Petitioner Exhausted Claims and Unexhausted Claims).) However, the state courts did not analyze this evidence under a standard analogous to the actual innocence gateway standard. *See Boothe*, 2014 WL 2782127, at *1–7; (ECF No. 10, Ex. 8 at 81–123.) The Court therefore shall not give deference to the state court's findings regarding this new evidence. *See Sharpe*, 593 F.3d at 379.

126

diminish the finding presented during trial that D.B. did not exhibit indicia of trauma. As there is no indication in the record that Ms. Culp presented any new evidence that would benefit Petitioner's case, the Court finds that any new evidence related to Ms. Culp's testimony is not more likely than not to sway a hypothetical reasonable juror as to whether Petitioner was guilty beyond a reasonable doubt.

Regarding Dr. Miller's report and testimony, Dr. Miller testified during the omnibus hearing that, following an evaluation of Petitioner, he found that Petitioner's "evaluation [was] normal in all aspects" and that the testing indicated that Petitioner "doesn't fit [the] profile" of a "sexual offender[]." (ECF No. 10, Ex. 15 at 44.) However, Dr. Miller's evaluation also yielded findings that would likely be detrimental to Petitioner's defense in the eyes of the jury, including that (1) there was a 26% "Probability Value that [Petitioner] sexually offended a boy outside of the family" according to the Abel Questionnaire, (*id.*, Ex. 16 at 187); (2) there is an "11 percent" chance that Petitioner "will commit an offense" in "the next ten years"—which Dr. Miller described as "low"—according to an "actuarial test," (*id.*, Ex. 15 at 46); (3) sexual offenders had previously deceived the battery of tests Dr. Miller performed on Petitioner, (*id.* at 62); (4) if the testing is "done properly," there is still a "five percent chance" that a sex offender will pass the tests, (*id.*); (5) Petitioner had a "deficit in empathy for the victim," (ECF No. 10, Ex. 16 at 185); and (6) Petitioner provided conflicting statements to Dr. Miller and the probation officer as to the number of times he visited D.B.'s house, which Dr. Miller opined was due to Petitioner's "desire to minimize contact with the child," (*id.*, Ex. 15 at 60). Thus, while the ultimate finding that Petitioner did not fit the profile of a pedophile may benefit Petitioner's defense, to some extent, this finding was not made in isolation. Indeed, Dr. Miller's report and testimony includes numerous

127

additional findings that would likely harm Petitioner's case from the perspective of a hypothetical reasonable juror. The Court therefore finds that the new evidence regarding Dr. Miller's testimony and report is, on balance, not more likely than not to sway a reasonable juror as to whether Petitioner was guilty beyond a reasonable doubt.

Turning next to Dr. Phillips' testimony, Dr. Phillips testified during the omnibus hearing that she is licensed to practice medicine and "examined [D.B.] on July 8th of 2008"—"between nine months and a year" after the assault. (*See id.*, Ex. 16 at 37–45.) Dr. Phillips testified that the results of this examination were negative for signs of anal penetration and all of D.B.'s "laboratory values [were] negative and normal." (*Id.* at 42.) However, Petitioner's trial counsel was able to elicit this positive finding during the cross-examination of Detective Chapman. (*See* ECF No. 10, Ex. 12 at 225.)

The only *new* evidence relating to Dr. Phillips' testimony is—as with Ms. Culp's testimony—evidence that would harm Petitioner's defense. In particular, the jury did not hear Dr. Phillips' testimony that "[t]here often [are] not any physical findings" as a result of anal rape and "only in about five percent of children who have had rectal penetration is there any evidence." (*Id.*, Ex. 16 at 40.) This additional evidence would mitigate the potential benefit of Dr. Phillips' finding that D.B. did not exhibit signs of anal penetration, which Petitioner's counsel was able to enter into the record without any qualifications during the cross-examination of Detective Chapman. (*See, e.g.*, *id.*, Ex. 12 at 225.) As the only new evidence relating to Dr. Phillips' testimony and evaluation of D.B. would harm Petitioner's defense, the Court finds that this new evidence is not more likely than not to alter a reasonable juror's determination as to Petitioner's guilt.

Finally, Ms. Harless—D.B.'s maternal grandmother—testified during the omnibus hearing that Doug Mullins visited her residence "often." (*Id.*, Ex. 16 at 121–22.) She also provided a statement to Detective Chapman in which she noted that, "to [her] knowledge" there was never "a time that [Petitioner] was alone or had the opportunity to do anything to [D.B.]." (*Id.* at 170.) However, Petitioner's counsel was able to elicit testimony during trial as to both of these points. (*See* ECF No. 10, Ex. 12 at 218–19 (providing Detective Chapman's testimony on cross-examination that H.C. provided a statement that Doug Mullins "made comments of a sexual nature to her and . . . had pinched her butt" at D.B.'s grandmother's house); *id.* at 222 (providing Detective Chapman's testimony on cross that Ms. Harless previously stated "that there was no opportunity that she was aware of [when Petitioner] could have been alone with [D.B.]").)

Again, the *new* evidence that the jury did not hear from Ms. Harless' statement and testimony at the omnibus hearing would be detrimental to Petitioner's defense, including: (1) Petitioner visited Ms. Harless' residence on more than ten occasions and he had consumed alcohol at the residence "to the point of inebriation," (ECF No. 10, Ex. 16 at 119–21); and (2) Petitioner and D.B. did not "get along," they "picked" on each other, and, on one occasion, Petitioner "pushed" D.B. in the kitchen of the residence, (*id.* at 171–74). As the only new evidence from Ms. Harless' statement and testimony harms Petitioner's defense, the Court finds that this evidence would not be likely to alter a reasonable juror's determination as to Petitioner's guilt.

The second category of Petitioner's new evidence constitutes evidence that provides little to no additional probative value and includes the testimony of a serologist—such as Dr. Julie Heinig. Dr. Heinig testified during Petitioner's omnibus hearing that she holds "a Ph.D. in molecular biology" and is "the Assistant Laboratory Director at DNA Diagnostic Center located

129

in Fairfield, Ohio." (*Id.* at 64–65.) Dr. Heinig then testified that it "would [have] be[en] helpful" to perform examinations on the potential crime scenes, such as (1) visual examinations for "seminal stains," "saliva stains," and "blood stains;" (2) "an examination with a light source," such as "a UV light looking for fluorescing stains;" and (3) " a Luminol type of testing for blood" if "the area can be made dark enough." (*Id.* at 71; *see also id.* at 71–73 (providing Dr. Heinig's testimony that she would have performed these examinations if she had "been employed" to investigate this case).) Dr. Heinig recognized that a period of time between "at the most . . . 17 months" and "a minimal time period of eight months" passed between the assault and the investigation and she would "expect a little bit of degradation to occur over time." (*Id.* at 73–74.) However, Dr. Heinig also testified that, "if not exposed to environmental insults, . . . DNA can last . . . indefinitely." (*Id.*) Finally, Dr. Heinig opined that she did not think "too much time had . . . passed to do a collection" at the potential crime scenes and "[i]t's worthwhile to do an exhaustive search to see . . . if we can obtain DNA." (*Id.* at 76.)

The Court finds that this testimony would provide little probative value to a hypothetical reasonable juror. Petitioner's counsel elicited testimony from Detective Chapman during cross-examination that Detective Chapman received training on "how to collect" and identify semen and blood samples, but that he did not "attempt to obtain any samples from any of the locations that [D.B.] said this happened." (ECF No. 10, Ex. 12 at 213.) There was thus evidence in the trial record both that Detective Chapman was trained in performing these evaluations and that he did not perform this type of testing at the alleged crime scenes. (*See id.*)

Additionally, Detective Chapman testified that he "look[ed] in [the] places" where D.B. stated the assault occurred and did not find any blood or semen stains. (*Id.* at 223.) Petitioner's

counsel then emphasized during closing arguments that the State did not offer any physical evidence to support D.B.'s statements and testimony regarding the assault. (*See, e.g.*, ECF No. 10, Ex. 13 at 96 ("There is no medical evidence, no physical evidence, no scientific evidence, there is no other evidence."); *see also id.*, Ex. 12 at 138 (providing defense counsel's statement during opening statements that "[t]here is no physical evidence, no blood evidence, no semen evidence").) The jury was thus well aware that there was no physical evidence in the record supporting D.B.'s testimony regarding the assault.

While Ms. Heinig could provide testimony that certain examinations of the potential crime scenes would be desirable, there is no indication in the record that she could provide testimony as to *what* evidence, if any, would have been found at the alleged crime scenes. Ultimately, Dr. Heinig's testimony regarding the possible evaluations the investigating officer could and should have performed is largely cumulative and provides little insight as to what evidence *would*—or could—have been obtained from the alleged crime scenes. The Court therefore finds that Dr. Heinig's testimony would have little to no influence on a reasonable juror's determination as to whether Petitioner was guilty beyond a reasonable doubt.

The final category is evidence that is purely speculative and consists of the testimony of Reverend Boothe. This witness testified during the omnibus hearing that he lived near the residence of D.B.'s grandmother and he thought he had a "good relationship" with D.B. (*Id.*, Ex. 16 at 132–33.) Reverend Boothe also testified that D.B.'s father told D.B. that he "could come to" Reverend Boothe "if anything was ever done to him or happened to him" at Ms. Harless' residence, but D.B. never told Reverend Boothe that "something was wrong." (*Id.* at 137–38.)

The Court finds that this new evidence is purely speculative and would have absolutely no probative value in the eyes of a reasonable juror. The fact that D.B. did not speak with Reverend Boothe regarding the occurrence—or non-occurrence—of the assault has no bearing, whatsoever, on whether the assault occurred. Indeed, it would be mere speculation to infer that D.B. would speak to Reverend Boothe if an incident occurred. The Court declines to find that such speculative evidence would have any bearing on the determinations of a reasonable juror. *See, e.g.*, *Moore v. Quarterman*, 534 F.3d 454, 465 n.17 (5th Cir. 2008) ("To show 'actual innocence,' as with showing 'actual prejudice,' requires something more than pointing to '[a] mere possibility of prejudice,' because a speculative claim 'will not satisfy the actual prejudice prong of the cause and prejudice test, *much less demonstrate actual innocence*.'" (alterations in original) (quoting *United States v. Shaid*, 937 F.2d 228, 236 (5th Cir. 1991))). The Court therefore finds that the testimony of Reverend Boothe would have little or no influence on a reasonable juror's determination as to whether Petitioner was guilty beyond a reasonable doubt.[23]

*Totality of the Evidence*

The totality of the evidence clearly indicates that Petitioner's new evidence fails to meet the requirement that, more likely than not, no reasonable juror would find him guilty beyond a reasonable doubt. During trial, the prosecution offered no physical, medical, or scientific evidence indicating Petitioner's guilt. (*See, e.g.*, ECF No. 10, Ex. 13 at 104 (providing the defense's assertion during closing arguments that "[t]here is no medical evidence, no physical evidence, no

---

[23] Petitioner also alleges in the Petition that Reverend Boothe would testify that "he had knowledge and tracked license plates of individuals entering D.B.'s home at the request of D.B.'s father." (ECF No. 2 at 22.) The court cannot locate any evidence in the record—and Petitioner has not otherwise identified such evidence—indicating that Reverend Boothe "would" testify as to this conduct. The Court therefore finds that this statement is not new reliable evidence and shall not consider this potential testimony in this actual innocence analysis. The Court further notes that, even if this was new reliable evidence, it would similarly be largely irrelevant to a reasonable juror on the issue of guilt.

scientific evidence, there is no other evidence").) Rather, as both the prosecution and defense repeatedly noted, the case turned on the testimony of D.B. (*See, e.g.*, *id.* at 85, 103, 105, 107.) Petitioner was able to elicit testimony demonstrating numerous inconsistencies between D.B.'s testimony and statements, such as the location of the assault, (*see, e.g.*, ECF No. 10, Ex. 12 at 223), and the time frame when the assault occurred, (*see, e.g.*, *id.* at 217). Nonetheless, the jury convicted defendant of three charges and declined to convict him as to the fourth charge involving the allegations that Petitioner inserted a knife in D.B.'s rectum. (*See* ECF No. 10, Ex. 13 at 119–20.) The jury thus found D.B.'s testimony sufficient to convict Petitioner of these three charges. However, Petitioner's new evidence here has no bearing, whatsoever, on D.B.'s credibility. Instead, Petitioner's new evidence either would prejudice his defense or has little to no probative value as to whether he committed this offense. In short, the new evidence is not likely to have any impact on a reasonable juror's determination of guilt. The Court therefore finds that Petitioner has failed to meet his burden of establishing that, "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536–37 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Thus, the actual innocence gateway cannot open for Petitioner.

In summary, the Court finds that Petitioner has failed to exhaust the Unexhausted Claims—Grounds V through VIII in the Petition. The Court further finds that these Unexhausted Claims are now procedurally barred under West Virginia procedural rules and an exception to the procedural default doctrine does not apply as to these claims. As the Unexhausted Claims are procedurally defaulted, the Court also finds that Respondent is entitled to summary judgment on these claims. Accordingly, the Court **OVERRULES** Petitioner's objection to the Magistrate

133

Judge's finding that the Unexhausted Claims are procedurally defaulted, **ADOPTS** the PF&R to the extent Magistrate Judge Eifert recommends that the Court find that these claims are barred by the doctrine of procedural default, and **GRANTS** Respondent's Motion for Summary Judgment as to Grounds V through VIII of the Petition.

## V.   *Motion for Hearing and Appointment of Counsel*

Petitioner also objects to Magistrate Judge Eifert's ruling in the PF&R denying Petitioner's Motion for Hearing and Appointment of Counsel. (ECF No. 22 at 2–4.) For the reasons that follow, the Court construes Petitioner's objection to the Magistrate Judge's denial of this motion as an appeal and affirms the Magistrate Judge's denial of the Motion for Hearing and Appointment of Counsel.

### A.    Standard of Review

In the PF&R, Magistrate Judge Eifert denied the Motion for Hearing and Appointment of Counsel, rather than recommending that the Court deny this motion. (*See* ECF No. 21 at 42.) "A magistrate judge's power is derived from 28 U.S.C. § 636, which provides two general types of referrals by a district court." *Reddick v. White*, 456 F. App'x 191, 192 (4th Cir. 2011). Section 636(b)(1)(A) provides, in relevant part, that "a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court," with the exception of an enumerated list of dispositive issues. Section 636(b)(1)(B) states, in pertinent part, that "a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge . . . proposed findings of fact and recommendations for . . . disposition." "The Supreme Court has summarized these grants of authority to mean that 'nondispositive' pretrial matters are governed by [§ 636(b)(1)(A)] and 'dispositive' matters are covered by [§ 636(b)(1)(B)]." *Reddick*, 456 F.

App'x at 193 (citing *Gomez v. United States*, 490 U.S. 858, 873–74 (1989)). Motions for evidentiary hearings and motions for appointment of counsel are both non-dispositive matters. *See, e.g.*, *Roman v. Napoli*, No. 08–CV–6561–CJS, 2010 WL 1509355, at *1 (W.D.N.Y. Apr. 14, 2010) (affirming the magistrate judge's denial of the Section 2254 petitioner's request for appointment of counsel and stating that "[a] decision relating to an application for appointment of counsel is clearly non-dispositive" (citations omitted)); *Madsen v. Hudson*, No. 1:06 CV 968, 2007 WL 710210, at *1 (N.D. Ohio Mar. 6, 2007) (stating that a habeas petitioner's "[m]otion for an [e]videntiary [h]earing . . . is squarely within the scope of 'nondispositive' matters governed by 28 U.S.C. § 636(b)"). *See generally Bowers v. Univ. of Va.*, Civil Action No. 3:06cv00041, 2008 WL 2346033, at *3 (W.D. Va. June 6, 2008) ("In general, a matter is nondispositive if it does not resolve the substantive claims for relief alleged in the pleadings." (citation omitted)).

"Federal Rule of Civil Procedure 72(a) gives effect to Section 636(b)(1)(A) and governs a district court's review of a magistrate's order regarding a non-dispositive matter." *HSBC Bank USA, Nat'l Ass'n v. Resh*, Civil Action No. 3:12–cv–00668, 2014 WL 317820, at *6 (S.D. W. Va. Jan. 28, 2014) (citation omitted). Rule 72(a) states the following:

> When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision. A party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

Pursuant to Rule 72(a), "[o]nly if a magistrate judge's decision is 'clearly erroneous or contrary to law' may a district judge modify or set aside any portion of the decision." *White v. Chapman*, No. 1:14cv848(JCC/IDD), 2015 WL 4360329, at *2 (E.D. Va. July 14, 2015) (citing Fed. R. Civ. P.

135

72(a)). *See generally Peretz v. United States*, 502 U.S. 923, 944 (1991) ("The Federal Magistrates Act provides two separate standards of judicial review: 'clearly erroneous or contrary to law' for magistrate resolution of nondispositive matters and '*de novo*' for magistrate resolution of dispositive matters." (citations omitted)).

"The 'clearly erroneous' standard applies to questions of fact." *White*, 2015 WL 4360329, at *2. In applying this standard, courts "will not reverse a lower court's finding of fact simply because we 'would have decided the case differently.'" *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). "Rather, a reviewing court must ask whether, 'on the entire evidence,' it is 'left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). This standard is "deferential." *E.g.*, *Resh*, 2014 WL 317820, at *7.

On the other hand, "[w]hen . . . review of a non-dispositive motion by a district court judge turns on a pure question of law, that review is plenary under the 'contrary to law' branch of the Rule 72(a) standard." *Id.* (second alteration in original) (quoting *Robinson v. Quicken Loans Inc.*, No. 3:12–cv–0981, 2013 WL 1704839, at *3 (S.D. W. Va. Apr. 19, 2013)). "This means that, for questions of law, there is no practical difference between review under Rule 72(a)'s 'contrary to law' standard and [a] de novo standard." *Id.* (alteration in original) (quoting *Robinson*, 2013 WL 1704839, at *3).

As such, "the Court will review the factual portions of the" Magistrate Judge's decision denying the Motion for Hearing and Appointment of Counsel "under the clearly erroneous standard but will review the legal conclusions *de novo*." *White*, 2015 WL 4360329, at *2.

## B.    Evidentiary Hearing

136

In the Objections, Petitioner argues that the Magistrate Judge erred in denying his request for an evidentiary hearing because the record before the state habeas courts was not fully developed. (*See* ECF No. 22 at 2–3.) The Court disagrees with Petitioner's position.

28 U.S.C. § 2254(e)(2) "controls whether [a] petitioner may receive an evidentiary hearing in federal district court on . . . claims that were not developed in the [state] courts." *Williams v. Taylor*, 529 U.S. 420, 429 (2000). Section 2254(e)(2) provides the following:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A) the claim relies on--
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

"The Supreme Court has held that the word 'failed' in the opening line of this section connotes fault." *Winston I*, 592 F.3d 535, 552 (4th Cir. 2010) (citing *Williams*, 529 U.S. at 431–32). Specifically, the Supreme Court stated that, "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432. "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court . . . ." *Id.* at 435. "Diligence will require in the usual case that the prisoner, at

137

a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. "Importantly, the [Supreme] Court further explained that, in determining whether a petitioner has been diligent, '[t]he question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts.'" *Wolfe v. Johnson*, 565 F.3d 140, 167 (4th Cir. 2009) (quoting *Williams*, 529 U.S. at 435). "If the petitioner was diligent in pursuing the claim in state court, he cannot have 'failed to develop' the claim, and § 2254(e)(2) does not bar an evidentiary hearing." *Id.* at 167 (citing *Williams*, 529 U.S. at 430).

Nonetheless, "[f]ederal evidentiary hearings ought to be the exception, not the rule." *Winston I*, 592 F.3d at 552 (citation omitted). Evidentiary hearings "are not 'intended to provide a forum in which to retry state cases,' but rather their 'prototypical purpose [is] to fill a gap in the record or to supplement the record on a specific point.'" *Id.* (alteration in original) (quoting *Pike v. Guarino*, 492 F.3d 61, 70 (1st Cir. 2007)). "[A] § 2254 petitioner bears the burden of demonstrating that he was diligent in pursuing his claims in state court." *Wolfe*, 565 F.3d at 167 (citing *Williams*, 529 U.S. at 440).

Magistrate Judge Eifert found, in part, that "Petitioner . . . fails to demonstrate that the absence of a fully developed factual record in the state court proceedings was the result of something other than his or his counsel's lack of diligence." (ECF No. 21 at 40.) The Magistrate Judge then found that "§ 2254(e)(2) would apply to Petitioner's request for an evidentiary hearing . . . and he would be unable to meet the exacting standard for an evidentiary hearing under that provision." (*Id.*) The Court agrees with these findings.

Petitioner does not assert precisely which facts were not fully developed during his state habeas proceedings and instead offers the conclusory statement that "[t]he record is patently

inadequate." (ECF No. 22 at 3.) However, the record does not support this assertion. Indeed, the record in this case indicates that the facts pertaining to all of Petitioner's claims were fully developed before the state circuit habeas court—with the exception of a statement or testimony from Rachel Burdette. In Ground VIII of the Petition, Petitioner asserts that his trial counsel was constitutionally ineffective by failing to call Ms. Burdette as a witness. (ECF No. 2 at 24.) Petitioner argues that Ms. Burdette would have provided testimony regarding (1) "the presence of other men in [the residence];" (2) "D.B.'s exposure to Doug Mullins . . . who in the past made sexual advances/abuses towards one of D.B.'s siblings in the home;" and (3) "D.B.'s exposure to other potential offenders, including the neighbor of D.B.'s father." (*Id.*) During the state omnibus hearing, Petitioner's habeas counsel indicated that he submitted a statement by Rachel Burdette in lieu of testimony during the hearing. (*See* ECF No. 10, Ex. 16 at 57 & 128.) However, in its opinion denying Petitioner's habeas claims, the state circuit court stated that "no written statement of Ms. Burdette was offered for admission into evidence." (*Id.*, Ex. 8 at 102.)

Magistrate Judge Eifert found that Petitioner's failure to develop the testimony of Ms. Burdette during the state habeas proceedings indicates a lack of diligence. (ECF No. 21 at 39–40.) In the Objections, Petitioner does not contest the Magistrate Judge's finding that he was not diligent in developing the factual record relating to his assertions regarding Ms. Burdette in Ground VIII. (*See* ECF No. 22 at 2–3.) Instead, Petitioner argues—for the first time—that his state habeas counsel was "wholly ineffective during the omnibus hearing." (*Id.* at 2.) However, diligence for purposes of the opening clause of Section 2254(e)(2) pertains both to a petitioner *and* his state habeas counsel. *See, e.g., Williams*, 529 U.S. at 432 ("Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or

139

some greater fault, attributable to the prisoner *or the prisoner's counsel*." (emphasis added)). The record reflects—and Petitioner does not otherwise contest—that he was accorded a full opportunity to develop the pertinent facts relating to all of his claims, including Ground VIII, before the state circuit habeas court. (*See* ECF No. 10, Ex. 16.) The record also reflects that Petitioner's failure to develop the facts relating to Ms. Burdette's statement was not due to any reason beyond the lack of diligence of Petitioner or his habeas counsel, such as the state habeas court preventing the introduction of these materials.[24] (*See id.*); *cf. Williams*, 529 U.S. at 434–35 (providing an example where a petitioner would be diligent under Section 2254(e)(2)—despite an undeveloped record—if he failed to develop the facts relating to a claim due to the prosecution "conceal[ing] the facts"); *Hurst v. Joyner*, 757 F.3d 389, 399–400 (4th Cir. 2014) (finding that the petitioner was diligent in pursuing claims before the state court where he presented affidavits in support of the claims and requested "both discovery and an evidentiary hearing," but "the state . .

---

[24] In the Objections, Petitioner argues, in part, that his state habeas counsel "utterly failed to question the trial attorney as to why several important witnesses were not called at trial." (ECF No. 22 at 2.) However, as noted above, "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner *or the prisoner's counsel*." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). As such, the purported lack of diligence of Petitioner's habeas counsel—including in his examination of Petitioner's trial counsel regarding potential trial witnesses—is attributable to Petitioner for purposes of the diligence inquiry. *See, e.g., id.*; *Taylor v. Horn*, 504 F.3d 416, 437 n.17 (3d Cir. 2007) ("[I]neffectiveness of post-conviction counsel is not an exception to § 2254(e)(2)'s requirements." (citations omitted)); *Halvorsen v. Parker*, Civil Action No. 08–484–DLB, 2012 WL 5866595, at *4 (E.D. Ky. Nov. 19, 2012) (citing *Williams* and rejecting the "[p]etitioner's argument that collateral-review counsel's failure to develop the record should serve as cause to excuse the lack of diligence" in developing the record during state habeas proceedings); *see also Fielder v. Stevenson*, Civil Action No. 2:12–cv– 00412–JMC, 2013 WL 593657, at *4 (D.S.C. Feb. 14, 2013) (stating that, while the Supreme Court's decision in "*Martinez* recognizes the need for a meaningful review of an ineffective-assistance-of-counsel claim that arises at initial review collateral proceedings . . . , *Martinez* does not directly provide the authority for a petitioner to expand the record in order to further develop facts that could have been presented in the state court proceeding"); *Williams v. Mitchell*, No. 1:09 CV 2246, 2012 WL 4505181, at *6 (N.D. Ohio Sept. 28, 2012) (rejecting the petitioner's request to "broaden the holding" of the Supreme Court's decision in *Martinez* "to allow claims of ineffective assistance of post-conviction counsel to establish 'cause' for a 'default' of the factual development of a[] . . . claim in state court"). *But see Zimmerman v. Davis*, 683 F. Supp. 2d 523, 536 (E.D. Mich. 2010) ("[W]here a petitioner's failure to develop the factual basis of a claim is a result of the denial of the right to effective assistance of counsel, . . . . it is the State, and not the petitioner, who has exhibited a lack of diligence or some greater fault in failing [sic] to develop the relevant facts in state court."). *See generally Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings." (citations omitted)).

. court unreasonably denied [the petitioner's] motion for further evidentiary development"). The record thus reflects that the failure of Petitioner's habeas counsel to include an affidavit from Ms. Burdette in the state habeas proceedings is attributable solely to Petitioner and his counsel and not to any other impediment. As Petitioner failed to develop the factual allegations relating to Ms. Burdette's proffered statement, the Court finds that Petitioner has failed to meet his burden in demonstrating that he was diligent in developing the facts relating to Ground VIII before the state habeas court. *See, e.g.*, *Wolfe*, 565 F.3d at 167 ("[A] § 2254 petitioner bears the burden of demonstrating that he was diligent in pursuing his claims in state court." (citing *Williams*, 529 U.S. at 440)).

The Court next determines whether an exception to Section 2254(e)(2)'s bar applies in this case. "If the district court decides that [a petitioner] 'failed to develop' his claims in state court, then it must assess whether he satisfies either of § 2254(e)(2)'s exceptions." *Id.* at 168. "Those exceptions are satisfied if the petitioner shows his claim relies on either 'a new rule of constitutional law,' or 'a factual predicate that could not have been previously discovered through the exercise of due diligence,' and prejudice resulted." *Id.* (citing 28 U.S.C. § 2254(e)(2)(A)–(B)).

Magistrate Judge Eifert found in the PF&R that Petitioner does not meet these exceptions, (ECF No. 21 at 40), and Petitioner does not object to this finding, (*see* ECF No. 22 at 2–3). The Court similarly finds that Petitioner has failed to show that an exception to the Section 2254(e)(2) bar applies in this case. In particular, Petitioner does not direct the Court to any "new rule of constitutional law" relating to his undeveloped claim in Ground VIII—or, indeed, to any of his claims in the Petition. (*See id.*) Additionally, Petitioner has not shown that his claim in Ground VIII—or any of his claims, for that matter—relies on a "factual predicate that could not have been

previously discovered through the exercise of due diligence." (*See id.*) To the contrary, the record indicates that Petitioner's counsel discovered Ms. Burdette's alleged statement prior to the state omnibus hearing, (*see* ECF No. 10, Ex. 16 at 57 & 128), but failed to include this evidence in the state habeas record, (*see id.*, Ex. 8 at 102). The Court therefore finds that Petitioner has failed to show that an exception to the Section 2254(e)(2) bar applies as to his sole undeveloped claim in Ground VIII.

In summary, the Court finds that Section 2254(e)(2) bars an evidentiary hearing in this case because there is a fully developed state record for all of Petitioner's claims outside of Ground VIII, Petitioner was not diligent in developing the factual record pertaining to Ground VIII, and Petitioner has failed to show that an exception under Section 2254(e)(2) applies as to this claim. Accordingly, the Court finds that Magistrate Judge Eifert's denial of Petitioner's request for an evidentiary hearing was not clearly erroneous or contrary to law. The Court therefore **AFFIRMS** Magistrate Judge Eifert's denial of Petitioner's request for an evidentiary hearing in the Motion for Hearing and Appointment of Counsel.

## C.     Appointment of Counsel

In the PF&R, Magistrate Judge Eifert also denied Petitioner's request for appointment of counsel. (ECF No. 21 at 41–42.) Petitioner argues that Magistrate Judge Eifert erred by denying this request and "abused her discretion." (*See* ECF No. 22 at 3–4.) The Court disagrees with Petitioner's position and affirms the Magistrate Judge's denial of Petitioner's request for appointment of counsel.

The Sixth Amendment to the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for

his defense." U.S. Const. amend. VI. "A criminal defendant's Sixth Amendment right to counsel attaches after judicial proceedings have been initiated against him and that right applies at all critical stages." *United States v. Williamson*, 706 F.3d 405, 416 (4th Cir. 2013) (citations omitted). However, Supreme Court "cases establish that the right to appointed counsel extends to the first appeal of right, and no further." *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). "As a corollary, a petitioner has no Sixth Amendment right to counsel in order to mount a collateral challenge to his conviction." *Williamson*, 706 F.3d at 416 (citation omitted); *see also Kitchen v. United States*, 227 F.3d 1014, 1019 (7th Cir. 2000) ("[I]t is well established that there is no constitutional right to counsel in collateral proceedings." (citing *Finley*, 481 U.S. at 557)); *cf. Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012) (noting that the Supreme Court's decision in *Coleman v. Thompson* "left open" the question of "whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of [IAOC] at trial," but declining to "resolve" this question (citing 501 U.S. 722 (1991))).

Nonetheless, "a court may provide counsel for an indigent inmate pursuing a petition for habeas corpus" pursuant to 18 U.S.C. § 3006A(a)(2). *Johnson v. Johnson*, No. 1:09cv1297, 2011 WL 124601, at *4 (E.D. Va. Jan. 12, 2011) (citation omitted). Section 3006A(a)(2) provides, in relevant part, that "[w]henever the United States magistrate judge or the court determines that the interests of justice so require, representation may be provided for any financially eligible person who . . . is seeking relief under section . . . 2254 . . . of title 28." *See also Rios v. Johnson*, No. 1:09cv919 (LO/TRJ), 2010 WL 3671243, at *7 (E.D. Va. Sept. 13, 2010) (noting that "Rule 6(a) of the Rules Governing § 2254 Cases provides that a court may appoint counsel if it is 'necessary for effective utilization of discovery procedures,' and Rule 8(c) mandates that counsel be

143

appointed only '[i]f an evidentiary hearing is required'"). "Moreover, the Fourth Circuit has limited the appointment of counsel to cases where 'exceptional circumstances' exist, such as when a case is particularly complex or a litigant is unable to represent himself adequately." *Hicks v. Ray*, No. 1:09cv569, 2010 WL 3257847, at *7 (E.D. Va. Aug. 12, 2010) (citing *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), *abrogated on other grounds by Mallard v. U.S. Dist. Court for S. Dist. of Iowa*, 490 U.S. 296 (1989)); *see also Hoggard v. Purkett*, 29 F.3d 469, 471 (8th Cir. 1994) ("In exercising its discretion, the district court should consider the legal complexity of the case, the factual complexity of the case, and the petitioner's ability to investigate and present his claims, along with any other relevant factors." (citation omitted)); *Stutts v. Stevenson*, C/A No. 8:11–191–TMC, 2012 WL 4479126, at *5 (D.S.C. Sept. 28, 2012) (noting that "exceptional circumstances" that warrant the appointment of counsel "include situations where a petitioner has a colorable claim but lacks the capacity to present it" (citing *Gordon v. Leeke*, 574 F.2d 1147, 1153 (4th Cir. 1978))). Ultimately, "[a]ppointing counsel for *pro se* petitioners in habeas corpus cases is a power commended to the discretion of the district court in all but the most extraordinary circumstances." *Winsett v. Washington*, 130 F.3d 269, 281 (7th Cir. 1997) (emphasis added) (citing 18 U.S.C. § 3006A(a)(2)(B)).

In the PF&R, Magistrate Judge Eifert denied Petitioner's request for the appointment of counsel because "the issues raised by Petitioner . . . are adequately presented by the record before this Court," Petitioner's claims "do not merit an evidentiary hearing," and Petitioner does not raise colorable claims. (ECF No. 21 at 42.) Petitioner objects to this ruling on the grounds that he "does have a likelihood of success on the merits" and his claims "cannot be adjudicated in a full and fair

way without appointment of counsel." (ECF No. 22 at 4.) The Court is not persuaded by Petitioner's arguments.

As Magistrate Judge Eifert noted, Petitioner—through counsel—filed a direct appeal of his conviction, (*see, e.g.*, ECF No. 10, Ex. 5), a state collateral attack on his conviction, (*see, e.g.*, *id.*, Ex. 7), and an appeal of the state circuit habeas court's denial of Petitioner's claims, (*see, e.g.*, *id.*, Ex. 10). The legal basis for each of Petitioner's claims was fully developed through these extensive proceedings. Additionally, as discussed at length above, the record is more than sufficient for the Court to determine that each of Petitioner's claims either lacks merit or is barred by the doctrine of procedural default. Finally, the Court previously found that an evidentiary hearing is not required in this case. Based on these considerations, the Court finds that this case does not present exceptional circumstances warranting the appointment of counsel and the interests of justice do not require such an appointment. *See, e.g.*, *Wilson v. U.S. Parole Comm'n*, No. 1:11cv1328(JCC/TRJ), 2012 WL 1571316, at *1–2 (E.D. Va. May 3, 2012) (denying the petitioner's request for the appointment of counsel where the petitioner's claim was "without merit" and an evidentiary hearing was not necessary); *Rios*, 2010 WL 3671243, at *7 (denying the petitioner's motion for appointment of counsel where the petitioner's claims were either without merit or procedurally barred and "no court proceedings [were] required to adjudicate petitioner's claims").

For the foregoing reasons, the Court finds that Magistrate Judge Eifert's decision denying Petitioner's request for the appointment of counsel was not clearly erroneous or contrary to law. The Court therefore **AFFIRMS** Magistrate Judge Eifert's denial of Petitioner's request for appointment of counsel in the Motion for Hearing and Appointment of Counsel.

### VI.  *Conclusion*

For the reasons provided herein, the Court **OVERRULES** the Objections, (ECF No. 22),

**ADOPTS** the PF&R, (ECF No. 21), to the extent it is consistent with this Memorandum Opinion

and Order, **GRANTS** Respondent's Motion for Summary Judgment, (ECF No. 10), **DENIES** the

Petition, (ECF No. 2), in its entirety, **AFFIRMS** the Magistrate Judge's denial of the Motion for

Hearing and Appointment of Counsel, (ECF No. 15), and **DISMISSES** this case **WITH**

**PREJUDICE**.

The Court has also considered whether to grant a certificate of appealability. *See* 28 U.S.C.

§ 2253(c). A certificate will be granted only if there is "a substantial showing of the denial of a

constitutional right." *Id.* § 2253(c)(2). The standard is satisfied only upon a showing that

reasonable jurists would find that any assessment of the constitutional claims by this Court is

debatable or wrong and that any dispositive procedural ruling is likewise debatable. *See Miller–El*

*v. Cockrell*, 537 U.S. 322, 336–38 (2003); *Slack v. McDaniel*, 529 U.S. 437, 484 (2000); *Rose v.*

*Lee*, 252 F.3d 676, 683–83 (4th Cir. 2001). The Court finds that this standard is satisfied as to only

one issue presented in this Opinion. In particular, the Court **GRANTS** a certificate of appealability

as to the following question: "Under West Virginia Code § 53-4A-1(c), may a court apply the

statutory rebuttable presumption in favor of a knowing and intelligent waiver of certain claims if

the petitioner was represented by counsel during the applicable proceedings and fails to argue that

the waiver was not voluntary, or must the record nonetheless conclusively demonstrate that the

waiver was not voluntary before a court may find that the petitioner waived certain claims?" *See*

*generally supra* 101–02 n.19. The Court further **DENIES** a certificate of appealability as to the

remaining findings and rulings in this Opinion. Pursuant to Rule 11(a) of the Rules Governing

146

Proceedings Under 28 U.S.C. § 2254, Petitioner may not appeal the Court's denial of a certificate

of appealability, but he may seek a certificate from the court of appeals under Federal Rule of

Appellate Procedure 22.

The Court **DIRECTS** the Clerk to remove this action from the Court's docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any

unrepresented party.

ENTER:        March 31, 2016

_____

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE